JUDGE SULLIVAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LENNARD HAMMERSCHLAG, Individually, and On Behalf of All Others Similarly Situated,<br><br>Plaintiff<br><br>v.<br><br>CITIGROUP INC., CHARLES PRINCE, SALLIE KRAWCHECK, and GARY CRITTENDEN,<br><br>Defendants. | No. '07 CIV 10258<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |




Plaintiff Lennard Hammerschlag ("Plaintiff"), individually and on behalf of all other persons and entities who purchased or otherwise acquired securities issued by Citigroup Inc. ("Citigroup" or the "Company") from January 1, 2004 through November 5, 2007, inclusive (the "Class Period"), by his undersigned attorneys, for his Complaint, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on his investigation (made by and through his attorneys), which investigation included, among other things, a review and analysis of: (1) public documents pertaining to Citigroup and the Defendants; (2) Citigroup filings with the Securities and Exchange Commission ("SEC"); (3) press releases published by Citigroup; (4) analyst reports concerning the Company; (5) newspaper and magazine articles (and other media coverage) regarding Citigroup, its business or any Defendant. Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control. Plaintiff believes that further substantial

evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action brought on behalf of all purchasers of Citigroup publicly traded securities during the Class Period, which securities were artificially inflated as a result of Defendants' dissemination of false and misleading statements and deceptive acts concerning: (1) Citigroup's actual exposure to the risk of loss due to its enormous warehoused portfolio of mortgage-backed securities; (2) the overvaluing of mortgage-backed securities held as assets on Citigroup's balance sheet based on intentionally misleading and overly optimistic valuation models; and (3) Citigroup's improper accounting for and lack of disclosure of its implicit guarantees of the debt of certain highly-leveraged special investment vehicles ("SIVs") that were heavily invested in mortgage-backed securities. In each of Citigroup's financial statements since January 1, 2004, Citigroup has failed to consolidate the financial results and liabilities of certain SIVs as required by Generally Accepted Accounting Principles ("GAAP"), and Citigroup has failed to disclose the risks attendant to its SIVs.

2. Citigroup has orchestrated a massive scheme designed to conceal an enormously risky and unsound subprime mortgage portfolio, much of which was used as the underlying collateral for debt instruments sold or held for sale by Citigroup. Despite the impending defaults in these subprime mortgages resulting from shoddy and reckless underwriting, Citigroup continued to highly rate and thereby inflate the value of the debt securities it created which were collateralized by these mortgages. These debt securities were packaged into commercial instruments that were either held on Citigroup's balance sheet awaiting sale or were sold to investors.

3. As the truth about the actual risks and true value of Citigroup's various mortgage backed securities were revealed to the market, Citigroup has been forced to incur massive write downs of the value of its mortgage backed assets held on its balance sheet.

4. Moreover, as the market has absorbed the truth about the value of Citigroup's debt securities, Citigroup has been forced to provide guarantees to off-balance sheet SIVs which had acquired Citigroup's debt securities. Unknown to Citigroup's investors, Citigroup has implicit guarantees to back up these SIVs in the case of default. As the mortgage-backed securities owned by these SIVs (and which were sold to them by Citigroup) have tumbled in value, these SIVs have looked to Citigroup to rescue them to the tune of billions of dollars in additional liability. The crisis has, therefore, revealed the clear fact that Citigroup should have kept these entities and their potential debt on its balance sheet and its failure to do so was in violation of GAAP.

5. Beginning on October 15, 2007, Citigroup finally began to reveal the extent of its overvaluing of its mortgage backed debt instruments and has been forced to write down over $11 billion dollars of mortgage backed debt instruments held on its balance sheet. In addition, Citigroup has been forced to enter into agreements with other Wall Street institutions to shore up its SIVs by creating a $100 billion dollar credit facility. As the market has absorbed the truth about Citigroup's true financial condition, Citigroup's share price has fallen by over 26% and the Company has lost over $60 billion in market value.

## JURISDICTION AND VENUE

6. This action arises under Sections 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

7. This Court has subject-matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

8. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391. Many of the acts and practices complained of herein, including the misrepresentations and schemes alleged herein, occurred in substantial part in this District, and Citigroup's principle executive offices are located in this District.

9. In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States' mail, interstate telephone communications and the facilities of a national securities exchange and market.

## THE PARTIES

10. Plaintiff Lennard Hammerschlag purchased Citigroup common stock on the open market during the Class Period at a price inflated by the fraud alleged herein and in reliance on the false and misleading statements and omissions made by Defendants. Plaintiff's purchases of Citigroup common stock are set forth in the attached certification. When the truth about Citigroup's true financial condition was disclosed, Plaintiff suffered damages when Citigroup's stock price lost more than a quarter of its value.

11. Defendant Citigroup, together with its subsidiaries, is a diversified global financial services holding company providing a broad range of financial services to consumer and corporate customers. The Company has more than 200 million customer accounts and conducts business in more than 100 countries. Citigroup was incorporated in 1988 under the laws of the State of Delaware. The principal executive offices of Citigroup are located at 399 Park Avenue, New York, New York. Citigroup's common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "C."

12. Defendant Charles Prince ("Prince") was, at all times relevant hereto, Chairman of the Board and Chief Executive Officer of Citigroup, until being forced to resign on November 4, 2007. Prince became CEO of Citigroup in October 2003 and assumed the role of Chairman in April 2006. Most of Prince's compensation package is tied to his performance at the Company. For example, during the year ended December 31, 2006, Prince received a bonus of $13.2 million and stock awards amounting to $10.6 million, in addition to his base salary of $1 million. During the Class Period, Prince signed false and misleading SEC filings and knowingly issued false statements about Citigroup's financial health.

13. Defendant Sallie Krawcheck ("Krawcheck") was, from November 2004 until March 2007, Chief Financial Officer and Head of Strategy for Citigroup. In that position, she oversaw Citigroup's financial reporting, treasury, tax, investor relations, mergers and acquisitions and strategic planning for the firm. She is now the Chairman and Chief Executive Officer for Citigroup Global Wealth Management and is responsible for the Citigroup Private Bank, Citigroup Smith Barney, and Citigroup

Investment Research. During the Class Period, Krawcheck signed false and misleading SEC filings and knowingly issued false statements about Citigroup's financial health.

14. Defendant Gary Crittenden, formerly American Express's CFO, became CFO of Citigroup on March 12, 2007, replacing Defendant Krawcheck. During the Class Period, Crittenden signed false and misleading SEC filings and knowingly issued false statements about Citigroup's financial health.

15. Prince, Krawcheck and Crittenden are collectively referred to herein as the "Individual Defendants." The Individual Defendants and Citigroup are collectively referred to herein as the "Defendants."

## CONTROL PERSON ALLEGATIONS/GROUP PLEADING

16. By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Citigroup, its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through Citigroup's internal corporate documents, conversations and connections with other corporate officers, analysts, marketing executives, and conversations and connections with the Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Citigroup's officers and directors.

17. It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged herein was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their

high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

18. The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of securities laws.

19. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20. The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the

content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

21. Each of the Defendants is liable as a participant in a scheme, plan and course of conduct that operated as a fraud and deceit on Class Period purchasers of the Company's securities. Throughout the Class Period, Defendants disseminated materially false and misleading statements and suppressed material adverse facts about Citigroup.

## CITIGROUP'S FRAUDULENT CONDUCT

22. Over the past five years, Citigroup has been the industry leader in extending subprime mortgages and refinancings. Subprime loans are loans made to borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-valuations.

23. The current crisis in subprime mortgages is rooted in the massive volume of mortgage loans given to high credit risk consumers in recent years without sufficient assessments of the risks that these consumers would be able to afford these loans. These risky loans have then been bundled into various security and debt obligations and then sold into the commercial paper markets. Generally, after a homeowner gets a mortgage, the lending institution sells the loan to a Wall Street firm, known as an underwriter, where it is repackaged with other loans, securitized and offered to investors as a

mortgage backed security. These mortgage backed securities are sold in the form of various commercial instruments, but principally as bonds and collateralized debt obligations ("CDOs").

24. CDOs are a type of asset-backed security and structured credit product. CDOs gain exposure to the credit of a portfolio of fixed income assets and divide the credit risk among different tranches: senior tranches (rated AAA), mezzanine tranches (AA to BB), and equity tranches (unrated). Losses are applied in reverse order of seniority and so junior tranches offer higher coupons (interest rates) to compensate for the added risk.

25. Rating agencies, like Moody's or Fitch, rate these securities to let investors know the chances of default.

26. The aggressive, and oftentimes predatory, loan policies by U.S. lenders has resulted in large numbers of U.S. borrowers being particularly sensitive to interest rate changes in their ability to pay their mortgages as they come due – particularly where mortgages were qualified based on low introductory rates in adjustable rate mortgages.

27. With the cooling of the housing market, and increase in interest rates, borrowers who over-extended themselves by relying on the low mortgage payments that came with adjustable rate mortgages have been forced to default on their payments as these interest rates and corresponding monthly payments have been jolted upwards.

28. The defaults in mortgages have led to a number of cascading effects in the market for mortgage backed commercial instruments. As defaults have increased, credit rating agencies, which substantially overrated these instruments in concert with

the banks that issued them, downgraded their ratings of the bonds and CDOs. These downgrades diminished the marketability of these instruments and accordingly, those financial institutions holding these bonds and CDOs face massive write-down of these assets.

29. In September 2007, Congress convened a hearing to examine whether the credit agencies had "compromised their impartiality" when they simultaneously rated various mortgage-backed securities and provided advice to Wall Street investment firms about how to package them so as to gain higher credit ratings. Their impartiality was particularly questioned because they receive fees from the investment firms whose securities they rate. This investigation is ongoing.

30. Citigroup has played a central role in orchestrating the subprime crisis. Over the last several years, Citigroup's consumer finance division, CitiFinancial, has been the industry leader in extending sub-prime mortgages. According to an article in *Southern Exposure* in Summer 2003, Citigroup established itself as one of the most powerful sub-prime loan originators by acquiring competitors and marketing its brand-name. Through its flagship sub-prime unit, CitiFinancial, Citigroup claimed 4.3 million customers and 1,600-plus branches in 48 states. (CitiFinancial currently has more than 2,000 branches across the United States.) Many of these sub-prime mortgages were provided to households that either could not afford the high interest rates, or to households that actually qualified for lower-interest mortgages.

31. As has become clear over the last few months, Citigroup's subprime loans were extended based on shoddy underwriting and, often abusive and predatory

terms, thereby ensuring that a significant number of the borrowers would ultimately default.

32. Citigroup securitized its portfolios of subprime mortgages, selling the bulk of these securities to the market and also warehousing a portion of the more risky, less marketable securities for later sale.

33. Simultaneously, Citigroup has also been creating the secondary market for its subprime mortgage-backed securities by being one of the largest purchasers of mortgage backed securities through its "Special Investment Vehicles" ("SIVs").

34. SIVs are off-balance sheet entities that are managed by Citigroup in exchange for lucrative fees. SIVs acquire their assets by issuing short-term, relatively low interest rate notes and then collect higher interest rates from high risk mortgage-backed securities in which they invest.

35. Citigroup has been able to keep these SIVs of its balance sheet by failing to disclose that it is, effectively, the ultimate guarantor of the notes issued by its SIVs.

36. Citigroup has significantly misled investors regarding the health of its subprime business and its exposure to risk from the SIVs it has established. It has, for many years, wholly failed to disclose the risks created by its subprime lending activities and its use of SIVs to purchase and hold securities that result from its lending.

37. Until very recently, even in the face of the widespread problems with subprime loans, Citigroup has continued its practice of denying any problems. For example, on Sept. 12, 2007, Steven Freiberg, chief executive of Citigroup's North American consumer operations, claimed that Citigroup's subprime mortgage business

"actually looks pretty good." According to Freiberg, "Where you think there would be a fire – in our subprime portfolio – it actually looks pretty good."

38. Citigroup's house of cards has now come crashing down. Citigroup's assurances that it was unaffected by the subprime mortgage crisis have proven to be blatantly incorrect. Citigroup's SIVs have suffered significant losses and now face the prospect of even greater losses as a result of having to sell their assets at fire sale prices in order to pay back the money they borrowed.

39. On October 15, 2007, Citigroup and two other major banks, Bank of America and JPMorgan Chase, announced their intention to establish a fund of up to $100 billion that would be used to purchase the assets from the SIVs and thereby alleviate the risk that the SIVs would be forced to dump their assets at fire sale prices.

40. Importantly, in connection with this new fund, Citigroup will be required to take any losses on the assets acquired from the SIVs. In short, by setting up a fund to bail out the SIVs, a fund in which Citigroup will now be explicitly exposed to losses, Citigroup has essentially admitted that it was exposed to the liabilities of the SIVs all along.

41. Most recently, before the market opened on November 5, 2007, Citigroup announced the replacement of its top management team and admitted that it would have to take a write-off in excess of $10 billion in connection with its subprime business. As a result of Citigroup's admission of its subprime problems and its exposure to the liabilities of the SIVs, Citigroup's stock, since October 11, 2007, has fallen from $48.32 to $35.90 (on November 5, 2007), for a total decline of nearly 26%.

42. Thus, in a little more than three weeks, Citigroup has lost nearly $62 billion in market capitalization, making it one of the most significant and rapid market declines in U.S. history.

**THE TRUTH BEGINS TO COME OUT**

43. On September 5, 2007, despite Citigroup's denials, investors began to learn of Citigroup's substantial exposure to its affiliated SIVs. On that day, *The Wall Street Journal* published an article titled "Conduit Risks Are Hovering Over Citigroup" and sub-titled "If the Vehicles Go Sour, Rescues Could Be Costly; 'Bank Has No Concerns.'" The article stated that although few investors realize it, banks such as Citigroup could find themselves burdened by affiliated investment vehicles that issue tens of billions of dollars in short-term commercial paper. The article further stated:

> Citigroup, for example, owns about 25% of the market for SIVs, representing nearly $100 billion of assets under management. The largest Citigroup SIV is Centauri Corp., which had $21 billion in outstanding debt as of February 2007, according to a Citigroup research report. There is no mention of Centauri in its 2006 annual filing with the Securities and Exchange Commission.
>
> Yet some investors worry that if vehicles such as Centauri stumble, either failing to sell commercial paper or suffering severe losses in the assets it holds, Citibank could wind up having to help by lending funds to keep the vehicle operating or even taking on some losses.
>
> Citigroup has told investors in its SIVs (which stands for Structured Investment Vehicles) that they are sound and pose no problems.
>
> "Quite simply, portfolio quality is extremely high and we have no credit concerns about any of the constituent assets," said a recent letter from Paul Stephens and Richard Burrows, directors in Citigroup's London-based group that oversees the bank's SIVs. "Citigroup's SIVs remain robust and their asset portfolios are performing well."
>
> A Citigroup spokesman declined to comment on the bank's SIV disclosures or potential exposure that it might face from them.

44. Reaction to this news was immediate. Citigroup's stock price dropped $1.21 per share from $47.21 per share on September 4, 2007 to $46.00 per share on September 5, 2007 – a decline of 2.56 percent on heavy trading volume of over 35 million shares traded. Citigroup's stock price continued to decline the following day, down another 34 cents to $45.66 on September 6, 2007, for a two-day drop of $1.55 per share or 3.28% (a loss of market capitalization of approximately $7.7 billion). Based upon its assurances that it could weather any problems, Citigroup's stock price recovered by mid-October to the levels at which it was trading prior to the September article.

45. Citigroup's fraudulent denials and omissions were further revealed in mid-October 2007. Over the weekend of October 13 and 14, 2007, press reports circulated that several major banks, including Citigroup, Bank of America and JPMorgan Chase, had been meeting for at least three weeks to create a rescue fund of up to $100 billion to bail out the SIVs. According to *The Wall Street Journal*, in an article entitled "Big Banks Push $100 Billion Plan to Avert Crunch", October 13, 2007:

> The new fund is designed to stave off what Citigroup and others see as a threat to the financial markets world-wide: the danger that dozens of huge bank-affiliated funds will be forced to unload billions of dollars in mortgage-backed securities and other assets, driving down their prices in a fire sale. That could force big write-offs by banks, brokerages and hedge funds that own similar investments and would have to mark them down to the new, lower market prices.
>
> The ultimate fear: If banks need to write down more assets or are forced to take assets onto their books, that could set off a broader credit crunch and hurt the economy. It could make it tough for homeowners and businesses to get loans. Efforts so far by central banks to alleviate the credit crunch that has been roiling markets since the summer haven't fully calmed investors, leading to the extraordinary move to bring together the banks.
>
> In recent weeks, investors have grown concerned about the size of bank-affiliated funds that have invested huge sums in securities tied to shaky U.S. subprime mortgages and other assets. Citigroup, the world's biggest

> bank by market value, has drawn special scrutiny because it is the largest player in this market.

46. In essence, the fund would be used to purchase the assets held by SIVs, including Citigroup's seven SIVs, and allow those SIVs to be unwound. According to *The Wall Street Journal* report:

> The plan is encountering resistance from some big banks. They argue that Citigroup is asking others to help bail out its affiliates and an industry-wide bailout isn't needed. ...
>
> The new fund represents a way for Citigroup and other banks to 'outlast the current market conditions that are so dry right now,' says Jaime Peters, an analyst at Morningstar Inc.

47. On Monday, October 15, 2007, the details of the plan were announced before the market opened. Under the details of the proposed plan, the rescue fund would buy highly rated assets from the SIVs and sell short term debt such as commercial paper to help finance the purchases. However, the sponsoring banks would be the first to take losses if the new fund suffered losses on its assets. *See* "Banks set up fund to bail out investment vehicles," *Reuters*, October 15, 2007.

48. In short, by sponsoring an up to $100 billion rescue plan to buy the assets from the SIVs and then wind down the SIVs, Citigroup effectively admitted that it was liable for the losses of the SIVs all along. By agreeing to take first line losses on the assets purchased by the rescue fund, Citigroup made explicit its commitment to back-stop the SIVs. Unlike JPMorgan Chase and Bank of America, who had little or no exposure to SIVs and sponsored the fund in order to earn fees, Citigroup sponsored the fund purely to protect its exposure to its seven affiliated SIVs. As reported by *The Wall Street Journal* on October 18, 2007, "How London Created a Snarl in Global Markets": "[u]nder the superconduit rescue plan, the fund's sponsors will have to pay a fee to take

part, *accept a discounted price for their assets* and *help insure investors against losses*" (emphasis added).

49. At the Company's 2007 Q3 earnings conference call later on October 15, 2007, Citigroup confirmed its financial commitment to its affiliated SIVs. During the conference call, Citigroup revealed that it had been buying commercial paper from some of its SIVs and that this was one of the reasons that Citigroup's balance sheet had deteriorated, including a decline in Citigroup's Tier 1 capital ratio from 7.9 percent to 7.4 percent during the course of the third quarter, falling below Citigroup's target of 7.5 percent. As Citigroup CFO Crittenden, stated:

> Both the Tier 1 capital ratio and the [Total Common Equity] to risk weighted managed assets ratio reflect the impact of acquisitions and additional assets such as certain leveraged loans and commercial paper which came onto our balance sheet during the quarter. (Bloomberg Transcript, 10/15/07.)

50. The Q3 earnings call also revealed the shocking news that despite Citigroup's assurances just a month earlier that its subprime mortgage portfolio looked "pretty good" its reported net income for July through September quarter declined 57 percent from a year earlier because of, in part, a write-down of subprime mortgage losses totaling $1.56 billion (pre-tax and net of hedges) that Citigroup had "warehoused for future collateralized debt obligation ... securitizations." *See* David Wighton, *Citigroup still failing to stop the SIV skeptics*, FT.com, October 22, 2007.

51. On the Company's subsequent earnings call, Citigroup disclosed that "[o]ur subprime exposure [from securities warehoused for securitization as well as Citigroup's direct holdings of CDO positions] was $24 billion at the beginning of the year, $13 billion at the end of the second quarter, and declined slightly during the third quarter." In reaction to all of these news events, Citigroup's stock price plummeted

$3.09 per share or 6.45% over the immediately following two trading days, from $47.87 on Friday October 12, 2007 to $44.79 on Tuesday October 16, 2007, for a loss of market capitalization of over $15 billion.

52. Then, on October 19, 2007, *The New York Times* published an article titled "No Way to Make a Loan," which revealed why Citigroup's non-performing "corporate loan" total had doubled to $1.2 billion in just three months, the bulk of which was a loan to shore-up a SIV. Citigroup had provided a back-up line of credit to a SIV that would be called if the SIV could not borrow and a German bank could not meet its promise to make the loan. Yet, the very facts that triggered Citigroup's obligation to extend the loan had occurred at the time the agreement was made and the so-called "corporate loan" was simply Citigroup disguising its commitments to shore-up the SIV's it managed in the event of a potential default.

53. On October 19, 2007, Citigroup's stock price declined a further $1.47 to close at $42.36, for an additional loss of market capitalization of approximately $7.3 billion.

54. Thereafter, on October 31, 2007 and November 1, 2007, Citigroup announced it was convening an emergency weekend board meeting to discuss its problems, amid speculation of significant management turn-overs, including replacement of Citigroup's CEO. As a result, Citigroup's share price declined 10.4 percent from the close of $42.11 on October 30, 2007 to $37.73 on November 2, 2007, representing a loss in market capitalization of nearly $22 billion in two trading days.

55. On November 4, 2007, Citigroup issued a press release announcing that its Chairman and CEO, Charles Prince was resigning and that the Company would have to

take a further write down of $8 billion to $11 billion. Citigroup claimed that the declines in value of the bank's subprime exposure "followed a series of rating agency downgrades of subprime U.S. mortgage related assets and other market developments which occurred after the end of the third quarter." According to *The Wall Street Journal*, Citigroup's revelation that its exposure to subprime mortgages were multiples more than originally projected may still be substantially underestimated.

56. On the news of Prince's resignation and the increased writedowns, Citigroup's stock fell 4.85% to $35.90 at the close on November 5th. After close of market on November 5, Citigroup said it provided $10 billion of financing to its SIVs in recent weeks to shore up those funds and the SIVs had drawn $7.6 billion of credit as of October 31. In short, since October 11, 2007, as investors began learning of Citigroup's true exposure to esoteric SIVs and the falsity of its earlier reassurances, and its true exposure to the subprime mortgage crisis, Citigroup's stock has fallen from $48.32 to $35.90, for a total decline of nearly 26% -- representing a loss of nearly $62 billion in market capitalization.

## FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS DURING THE CLASS PERIOD

### Misrepresentations and Omissions Regarding Exposure To Subprime Losses

57. Citigroup failed to disclose to investors known risks in the default of its subprime portfolios and products and concealed the fact that, as the subprime crisis unfolded, it stood to lose billions of dollars. Citigroup's financial statements assured investors that it had sound risk management policies to ensure that the risks of delinquency of its lending portfolios were offset through various means.

58. For example, the 2006 10-K stated that:

> The Company provides a wide range of mortgage and other loan products to its customers. In addition to providing a source of liquidity and less expensive funding, securitizing these assets also reduces the Company's credit exposure to the borrowers. The Company's mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust.

59. Citigroup also states in the 2006 10-K that it mitigates risk in its mortgage portfolio by selling most of the loans its originates:

> As with all other lending activity, this exposes Citigroup to several risks, including credit, liquidity and interest rate risks. To manage credit and liquidity risk, Citigroup sells most of the mortgage loans it originates, but retains the servicing.

60. What Citigroup failed to disclose, however, was that it actually retained a significant volume of these securitized assets on its balance sheet. Moreover, Citigroup also failed to disclose, as more fully set forth below, that despite Citigroup's mortgage loan securitizations being non-recourse, it nevertheless retained a significant risk exposure on these securitizations by implicitly guaranteeing loans issued to SIVs, which were collateralized by Citigroup issued mortgage backed securities.

61. Citigroup also failed to disclose that the credit ratings and value assigned to its mortgage backed securities were based on unreliable financial models. According to the Citigroup's 2006 10-K, in describing the strategy for valuing the assets on its balance sheet:

> Substantially all of these assets and liabilities are reflected at fair value on the Company's balance sheet. Fair values are considered verified if they meet one of the following criteria:
>
> • Externally substantiated via comparison to quoted market prices or third party broker quotations;
>
> • By using models that are validated by qualified personnel independent of the area that created the model and inputs that are verified

by comparison to third-party broker quotations or other third-party sources where available; or

- By using alternative procedures such as comparison to comparable securities and/or subsequent liquidation prices

62. What Citigroup did not disclose was that its financial models used to determine the value of its CDOs and mortgage backed securities were highly inaccurate and entirely subjective. Moreover, rather than these models being "verified" by "third party broker quotations or other third party sources," Citigroup worked with rating agencies to manipulate the debt ratings of its assets and these ratings were then used by Citigroup (and the investing community) to value these assets.

63. As the subprime mortgage crisis intensified in the first quarter of 2007, Citigroup continued to falsely portray to investors that its financial results were sound and that the subprime crisis would not affect its performance. On January 19, 2007, Citigroup published its financial results for the year ended December 31, 2006, and for the fourth quarter ended December 31, 2006. The Company reported net income for the 2006 fourth quarter of $513 billion, record quarterly revenues of $23.8 billion, record full year 2006 revenues of $89.6 Billion, and record full year 2006 income from continuing operations of $21.2 billion.

64. In a press release issued by the Company, announcing its results, Defendant Prince stated "Our results were highlighted by double-digit revenue growth in our corporate and investment banking, wealth management and alternative-investment businesses. In U.S. consumer, we continued to see positive trends from our strategic actions."

65. During a January 19, 2007 conference call with investors discussing the Company's fourth quarter 2006 results, a UBS analyst questioned why loan loss reserves

had not changed when there had been a pick up in Citigroup's consumer loans. Defendant Krawcheck, stated that: " . . . we believe that we have adequate reserves, we believe we have the right level of reserve for what we are seeing in terms of the growth in the portfolio, what we see in terms of the embedded loss in the portfolio. And as the environment changes the complexion, the portfolio changes, etc., we review that. We have I guess to go along with the guys that have the pocket protectors or the Ph.D. guys who look at the reserves and we feel very good, very good about the level of them."

66. On February 23, 2007, Citigroup filed its Form 10-K for the year ended December 31, 2006, with the SEC. The Company reported that it earned $21.2 billion from continuing operations on revenues of $89.6 billion; income was up 7% from 2005, while diluted EPS from continuing operations increased 11 %, with the increment in the growth rate reflecting the benefit from our share repurchase program; and net income, which includes discontinued- operations, was $21.5 billion, down 12% from the prior year, reflecting the absence of significant gains on sales of businesses recorded in 2005.

67. Commenting on its outlook for 2007, the Company stated in part:

> We enter 2007 with good business momentum, as we expect to see our investment initiatives generate increasing revenues, and are well-positioned to gain from our balanced approach to growth and competitive advantages.
>
> We expect to continue to achieve growth in loans, deposits and other customer activity resulting from our increased distribution points, expanded product offerings, and the impact from recent targeted acquisitions.
>
> In 2006, our international businesses contributed 43% of our income from continuing operations. We expect to continue to re-weight our revenue mix towards International Consumer, CIB and Global Wealth Management.

> Disciplined capital allocation will remain fundamental to our strategic process and we will have a sharp focus on expense management.
>
> Although there may be volatility in our results in any given year, over the long term our revenues are targeted to grow organically at a mid to high-single-digit rate, with strong expense and credit management driving earnings and earnings per share growth at a faster level. We will seek to augment this growth rate over time through targeted acquisitions.
>
> Credit is broadly stable as 2007 begins; however, we are budgeting for a moderate deterioration of credit in 2007. In addition, the tax benefits we realized in 2006 will not be repeated in 2007, and we anticipate the effective tax rate to return to a more normalized rate of 30% to 31 %, not the 27.3% recorded in 2006.

68. In commenting on its U.S. Consumer Lending divisions, Citigroup stated in its Form 10-K that "Provisions for loan losses and for benefits and claims increased primarily on higher credit losses in the Real Estate Lending and Auto businesses, partially offset by higher loan loss reserve releases of $63 million in the Real Estate business. Credit losses increased due to volume growth and seasoning in Real Estate, as well as volume growth in Autos."

69. Citigroup concealed the mounting risks of default and devaluing of its subprime loan portfolio in its Form 10-K. Rather, Defendants led investors to believe that the Company's subprime loss exposure was minimal by stating that from 2004 to 2005 "Non-prime [subprime] mortgage originations declined 20%, reflecting the Company's decision to avoid offering teaser rate and interest-only mortgages to lower FICO score customers."

70. On February 25, 2007, Citigroup announced that Crittenden was replacing Krawcheck as CFO of the Company.

71. On April 16, 2007, Citigroup reported net income for the 2007 first quarter of $5.01 billion, or $1.01 per share. In a press release announcing the results, Citigroup

stated "U.S. consumer revenue growth continued to trend positively, up 6%." Prince was quoted as stating:

> We achieved these results while completing our structural expense review, which will help us become a leaner, more efficient organization and lower our rate of expense growth. As we look ahead, our priorities are clear: we will invest to grow and integrate our businesses, take actions to improve efficiency and lower costs, and continue to build momentum across our franchises.

72. Citigroup held a conference call with investors on April 16, 2007, to discuss the Company's financial results for the first quarter of 2007. When questioned by an analyst as to whether $9 billion worth of loans held by Citigroup were no documentation or low documentation subprime loans, Citigroup's CFO would not answer the question and implied that said loans were profitable:

> GLENN SCHORR, ANALYST, UBS: Thanks, it is UBS. On slide 6, the U.S consumer mortgage trend, in the footnote, you noted that it excludes $5 billion of first mortgages and almost $4 billion of second mortgages where you didn't have FICO and LTV data. Just curious on what type of loans that might be, why you don't have the data and how your gut is that that might change the results that you showed on the slide?
>
> GARY CRITTENDEN: We actually just finished preparing this data over the course of the last week or so and we don't have a comprehensive view that includes all of the -- the full scope of the portfolio. The underlying delinquency performance of the things that were excluded from the table have very good delinquency performance associated with them. So there was no -- if you look at the underlying performance of those mortgages that were excluded from the table with those that are included, there was just no underlying difference in the delinquency performance between the two.
>
> GLENN SCHORR: Got you. I would guess it is probably stuff that falls into that all [pay] no [doe]/low doe type of --.
>
> GARY CRITTENDEN: You know, we don't use that nomenclature here and don't think about the business in that way.
>
> GLENN SCHORR: Okay. But you don't have FICO and LTV scores on the loans? Okay. I'm good. I don't need a follow-up. Thanks.

GARY CRITTENDEN: Great. Thanks.

73. In the April 16, 2007, conference call, Prince told analysts that he was pleased the bank had achieved "positive operating leverage" in the first quarter, with revenue up 12% more than the 10% rise in expenses, in an attempt to please investors who had been pressing for expense control. "It feels good to me to see that progress," Prince said. "We are delivering on our plan."

74. Excluding an $871 million after-tax charge relating to the Company's restructuring plan, the Company's profit was $1.18 per share for the first quarter of 2007, which beat analyst estimates of $1.10. Citigroup stock reached a high of $53.59 on the news, a 3.9% increase from is closing price of $51.60 on April 13, 2007.

75. Citigroup's comments about its operations led investors to believe that Citigroup's subprime loan loss exposure was minimal. Paul Nolte, director of investments at Hinsdale Associates, a money management firm was quoted as stating "One of the question marks coming into earnings season has been the mortgage issue, and Citigroup making positive comments about its business has lent some strength to the overall market." Rob Kelley and Grace Wong, "Stocks soar on earnings, deals," *CNNMoney.com*, April 16, 2007.

76. On May 4, 2007, Citigroup filed its Form 10-Q for the first quarter ended March 31, 2007, in which the Company reported income from continuing operations of $5.01 billion in the first quarter of 2007. The Company also reported in part:

> Customer volume growth was strong, with average loans up 14%, average deposits up 19%, average interest-earning assets up 25%, and client assets under fee-based management up 12% from year-ago levels. U.S. debt, equity and equity-related underwriting increased 21 % from year-ago levels. Branch activity included the opening of 99 branches during the quarter (48 internationally and 51 in the U.S.). U.S. Cards accounts were up 14% and purchase sales were up 6%. . . .

> Credit costs increased $1.3 billion from a year ago, primarily driven by an increase in net credit losses of $509 million and a net charge of $597 million to build loan loss reserves. The $597 million net build compares to a net reserve release of $154 million in the prior-year period. The build was primarily due to increased reserves to reflect: a change in estimate of loan losses inherent in the initial tenor portion of the Consumer Loan Portfolio; portfolio growth, and increased delinquencies in second mortgages, in the U.S. Consumer Lending mortgage portfolio; and portfolio growth in Markets & Banking, which includes higher commitments to leveraged transactions and an .increase in average loan tenor. The Global Consumer loss rate was 1.69%, a 23 basis-point increase from the first quarter of 2006.

77. On June 12, 2007, the media reported that a large hedge fund controlled by The Bear Stearns Companies, Inc. ("Bear Stearns") had fallen 23% from the start of the year through late April. "The fund, called the High-Grade Structured Credit Strategies Enhanced Leverage Fund, [was] widely exposed to subprime mortgages, or home loans to borrowers with weak credit histories."

78. Citigroup continued to lie about its exposure to subprime credit risks even after the rating agencies began to downgrade the mortgage backed securities that Citigroup held in its portfolios. Indeed, when specifically asked whether Citigroup had significant exposure to defaults in subprime loans, Citigroup painted a rosy picture for investors. On Sept. 12, 2007, Steven Freiberg, chief executive of Citigroup's North American consumer operations, claimed that Citigroup's subprime mortgage business "actually looks pretty good." According to Freiberg, "Where you think there would be a fire -- in our subprime portfolio -- it actually looks pretty good."

**<u>Misrepresentations and Omissions Regarding SIVs</u>**

79. Under applicable accounting rules, because of Citigroup's financial and other commitments to its affiliated SIVs, Citigroup was required to disclose the nature, purpose, size, and activities of the SIVs and disclose the carrying amount and

classification of the consolidated assets that were collateral for the SIVs' obligations. Citigroup fraudulently failed to comply with any of these accounting rules.

80. In each of Citigroup's financial statements since January 1, 2004, Citigroup has failed to consolidate the financial results and liabilities of its seven affiliated SIVs as required by GAAP. Moreover, Citigroup has failed to disclose in the management discussion and analysis section of its financial statements the risks attendant to Citigroup in the liabilities of its affiliated SIVs.

81. Citigroup's most recent Form 10-K illustrates Citigroup's omissions. In Citigroup's 2006 Annual report filed on Form 10-K (filed February 23, 2007), Citigroup set forth a table in the notes to the financial statements that purported to summarize all of the Company's involvement in special purpose entities. That table disclosed that Citigroup was involved with SIVs that collectively held approximately $81 billion in assets. However, apart from the reference in that one table, the notes to the financial statements did not discuss these SIVs in any further detail. Although the notes referred to the Company's exposure to *conduits*, the notes never discussed Citigroup's exposure to the SIVs:

> In addition to the VIEs that are consolidated in accordance with FIN 46-R, the Company has significant variable interests in certain other VIEs that are not consolidated because the Company is not the primary beneficiary. These include multi-seller finance companies, collateralized debt obligations (CDOs), structured finance transactions, and numerous investment funds. ...
>
> The Company administers several third-party-owned, special purpose, multi-seller finance companies that purchase pools of trade receivables, credit cards, and other financial assets from third-party clients of the Company. As administrator, the Company provides accounting, funding, and operations services to these conduits. Generally, the Company has no ownership interest in the conduits. The sellers continue to service the transferred assets. The conduits' asset purchases are funded by issuing commercial paper and medium-term notes. The sellers absorb the first

> losses of the conduits by providing collateral in the form of excess assets. The Company, along with other financial institutions, provides liquidity facilities, such as commercial paper backstop lines of credit to the conduits. The Company also provides loss enhancement in the form of letters of credit and other guarantees. All fees are charged on a market basis.
>
> During 2003, to comply with FIN 46-R, many of the conduits issued "first loss" subordinated notes such that one third-party investor in each conduit would be deemed the primary beneficiary and would consolidate the conduit. At December 31, 2006 and 2005, total assets in unconsolidated conduits were $66.3 billion and $55.3 billion, respectively.

82. There was no mention of the seven affiliated SIVs, the assets and liabilities held by them, or Citigroup's exposure to them given the rapidly deteriorating credit environment.

83. All of Citigroup's other previous financial filings are similarly devoid of any disclosure of the risks that Citigroup faced with respect to the liabilities of its affiliated SIVs. *See, e.g.*, Citigroup's 2007 first quarter 10Q (filed May 4, 2007), Note 13 to the financial statements, "Securitizations and Variable Interest Entities", which failed to discuss the SIVs; Citigroup's 2007 second quarter 10Q (filed August 3, 2007), Note 13 to the financial statements, "Securitizations and Variable Interest Entities" (same).

**INAPPLICABILITY OF SAFE HARBOR**

84. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Citigroup were materially false and misleading or omitted material facts; knew that such statements or documents would be issued or disseminated to the investing public; knew that members of the investing public were likely to reasonably rely on those misrepresentations and omissions; and knowingly and substantially participated or were

involved in the issuance or dissemination of such statements or documents as primary violations of the federal securities law.

85. Defendants participated in and knew of the fraudulent scheme alleged herein, by virtue of their receipt of information reflecting the true facts regarding Citigroup; their control over, and/or receipt of Citigroup's allegedly materially misleading misstatements; and/or their association with Citigroup, all of which made them privy to confidential proprietary information concerning Citigroup.

86. With respect to non-forward-looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

87. Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor. The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made. No statutory safe harbor applies to any of Defendants materially false or misleading statements.

88. Alternatively, to the extent that any statutory safe harbor is intended to apply to any forward-looking statement pleaded herein, Defendants are liable for the false forward-looking statement pleaded because, at the time each forward-looking statement was made, the defendant making the statement knew or had actual knowledge that the forward-looking statement was materially false or misleading, and the forward-looking statement was authorized and/or approved by a director and/or executive officer of Citigroup who knew that the forward-looking statement was false or misleading. None of the historic or present tense statements made by Defendants was an assumption

underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made. Nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## ADDITIONAL SCIENTER ALLEGATIONS

89. The Individual Defendants were active, culpable, and primary participants in the fraud by virtue of: (1) their knowledge of (a) the increasing risks to which Citigroup was exposed due to defaults in its subprime mortgage portfolio; (b) the inflation in the ratings and value accorded debt instruments linked to Citigroup's subprime mortgages; and (c) Citigroup's exposure to liabilities of SIVs which required that these SIVs be consolidated onto Citigroup's balance sheet; (2) their supervision over Citigroup's employees and actual direction of policies that encouraged the fraud detailed herein; and (3) their association with the Company which made them privy to confidential information concerning the Company.

90. The Individual Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the investing public. The Individual Defendants also knew or recklessly disregarded that the failure to disclose the Company's exposure to subprime mortgages, the overvaluing of mortgage backed debt securities, and the failure to recognize on Citigroup's balance sheet implicit guarantees to back up affiliated SIVs, would cause Citigroup's financial statements to be materially false and misleading, would adversely affect the integrity of the market for the Company's common stock and would cause the price of the Company's common stock to be artificially inflated. The Individual Defendants acted

knowingly or in such a reckless manner as to constitute fraud and deceit upon Plaintiff and the Class.

91. The Individual Defendants directed, knew about or recklessly disregarded the fraudulent practices implemented under their watch. As officers of the Company, the Officer Defendants each knew, through direct knowledge or knowledge learned through the supervisory nature of their positions or recklessly disregarded and failed to disclose, material adverse information; were involved in the decisions concerning the use of finite reinsurance contracts made at the Company and its subsidiaries and the deficient controls; and, made false and misleading statements of material fact.

92. Citigroup knew for many years that, despite maintaining its affiliated SIVs as off-balance sheet entities, Citigroup was required to back-stop them because of Citigroup's significant financial interest in the SIVs and for reputational reasons.

93. At all material times, Citigroup knew that, due to the mismatch in the duration of assets and liabilities held by the SIVs, the SIVs were exposed to heightened liquidity risk in that a severe contraction in the credit market could result in the SIVs struggling to re-borrow when their short-term commercial paper borrowings matured.

94. By early 2007, Citigroup could see that, due to credit quality issues with sub-prime mortgages and the consequent tightening of the credit markets, this liquidity risk was being realized and that Citigroup would be exposed to the losses of the SIVs.

95. Because SIVs fund their operations by raising short-term debt and then use these funds to purchase long-term assets, there is classic mismatching of the duration of assets and liabilities, with the result that SIVs are subject to an enormous "liquidity" risk. In other words, because SIVs constantly re-borrow in the short-term commercial

paper market, the SIVs always face the risk that they will not be able to re-borrow if demand for commercial paper disappears. In that event, the SIVs would no longer be able to hold their long-term assets and would be required to sell them. If there was no demand for those assets either, the SIVs could potentially be forced to sell those assets at depressed prices.

96. At all relevant times, Citigroup and the SIVs knew about this liquidity risk. The ratings agencies, which rated the commercial paper issued by SIVs, explicitly analyzed liquidity risk in determining their ratings. On March 13, 2002, Standard & Poor's published "Structured Investment Criteria", which outlined all the criteria considered by Standard & Poor's in rating a SIV. Among the criteria, Standard & Poor's cited the SIVs liquidity risk, which was described as follows:

> Liquidity risk in a SIV arises in two scenarios. While most SIVs issue a mixture of CP [commercial paper] and MTNs [medium term notes], their weighted-average liability maturity is usually about four to six months, whereas the assets in the vehicle will have considerably longer average maturities. Secondly, some of the SIV's assets will require due diligence by potential purchasers, thereby increasing the sale period for such assets.

97. Both of the above aspects of liquidity risk-- inability to re-borrow in the short-term market and an inability to sell assets-- came to pass. In August 2007, based on fears of sub-prime mortgages and securities backed by such mortgages, credit markets experienced an extreme tightening.

98. As a result of this tightening, SIVs globally were confronted with a one-two punch scenario whereby the short-term commercial paper market dried up, restricting the ability of the SIVs to re-borrow to finance their operations, and the SIVs were unable to divest their assets, because of fears as to the quality of these assets given the problems with sub-prime mortgages.

99. According to an October 15, 2007 *Reuters* article, entitled "Banks set up fund to bail out investment vehicles", since hitting an all-time high of $1.183 trillion in early August, the U.S. asset-backed commercial paper market shrank by nearly 25 percent during an unprecedented nine consecutive weeks of contraction. As of October 10, 2007, the Federal Reserve reported $899.3 billion in asset-backed commercial paper outstanding. Combined with steep drops in its asset portfolio, Citigroup's seven affiliated SIVs were faced with the prospect of having to liquidate their asset portfolios at steep losses.

100. Citigroup also purposely disregarded GAAP accounting for its SIVs while disclosing in its financial statements that its accounting fully complied with GAAP. Under applicable GAAP accounting rules, because of Citigroup's commitments to the SIVs, whether explicit or implicit, Citigroup was required to consolidate the SIVs or, even if not required to consolidate, at least to provide complete disclosures concerning its involvement with the SIVs. Citigroup failed to comply with these requirements. In its 10-K and 10-Q filings in 2007, apart from one table that listed SIVs, Citigroup omitted any mention of the SIVs, and only discussed its exposure to "conduits."

101. Beginning on September 5, 2007, Citigroup's exposure to the SIVs began to leak out. Finally, on October 15, 2007, Citigroup was forced to admit that it was indeed liable for the losses sustained by the SIVs when it announced that it would be participating in a rescue fund that would be used specifically to buy the assets held by SIVs, including the seven SIVs affiliated with Citigroup. By failing to disclose its exposure to the SIVs, Citigroup violated Section 10(b) and Rule 10b-5.

102. Citigroup has maintained a business model relying on issuing subprime loans and securitizing these mortgages for the commercial paper market. Citigroup failed to disclose the risks of default in these mortgages to its investors and, moreover, failed to disclose the risks of default in the portfolios of mortgage backed securities it sold to the market. Rather, it worked with rating agencies to assign the highest credit ratings to investment vehicles based on risky mortgages it had failed to properly underwrite.

**LOSS CAUSATION**

103. Throughout the Class Period, the price of Citigroup's securities was massively inflated as a result of Defendants' false and misleading statements and omissions concerning Citigroup's financial health. But for Defendants' misrepresentations and omissions, which had the effect of overstating shareholders' equity, assets and investment income, while understating liabilities, Plaintiff would not have purchased Citigroup's securities at the artificially inflated prices at which they were offered.

104. As a direct result of Defendants' scheme, misrepresentations and omissions of material facts the price of Citigroup's common stock was artificially inflated throughout the Class Period. When the truth of Citigroup's financial condition was revealed beginning in October 2007, Citigroup's stock price collapsed dramatically. On the first two trading days after Citigroup announced the rescue plan for its SIVs, Citigroup's stock declined by $3.09 per share or 6.45% from $47.87 at the close on Friday, October 12, 2007 to $44.79 at the close on Tuesday October 16, 2007. Over the next two days, Citigroup's stock dropped nearly another dollar to close at $43.83 on Thursday, October 18, 2007. Most recently, before the market opened on November 5, 2007, Citigroup announced the replacement of its top management team and admitted

that it would have to take a write-off in excess of $10 billion in connection with its subprime business. As a result of Citigroup's admission of its subprime problems and its exposure to the liabilities of the SIVs, Citi's stock, since October 11, 2007, has fallen from $48.32 to $35.90 (on November 5, 2007), for a total decline of nearly 26%. Thus, in a little more than three (3) weeks, Citigroup has lost nearly $62 billion in market capitalization.

## CLASS ACTION ALLEGATIONS

105. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased Citigroup securities during the Class Period and who suffered damages as a result of their purchases (the "Class"). Excluded from the Class are (1) the Company and the Individual Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) the subsidiaries or affiliates of the Company or any of Defendants; (4) any person or entity who is, or was during the Class Period, a partner, officer, director, employee or controlling person of the Company or any of Defendants; (5) any entity in which any of Defendants has a controlling interest; and (6) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

106. The members of the Class are so numerous that joinder of all members is impracticable. As of the date of this Complaint, there were approximately 5.06 billion shares of Citigroup common stock outstanding. While Plaintiff does not know the exact number of Class members, Plaintiff believes that there are, at minimum, thousands of members of the Class who purchased Citigroup securities during the Class Period.

107. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

108. Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the SEC filings, and other public statements published and disseminated to the investing public and purchasers of the common stock during the Class Period omitted and/or misrepresented material facts about the risks of Citigroup's mortgage backed securities;

(c) Whether Defendants omitted to state and/or misrepresented material facts about the financial condition, profitability and present and future prospects of the Company;

(d) With respect to Plaintiff's claims under the Exchange Act, whether Defendants acted willfully or recklessly in omitting to state and/or misrepresenting material facts about the financial condition, profitability and present and future prospects of the Company;

(e) Whether the market price of Citigroup common stock during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

(f) Whether the members of the Class have sustained damages, and, if so, what is the proper measure thereof.

109. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that are adverse or antagonistic to the Class.

110. A class action is superior to other available methods for fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress Defendants' wrongful conduct. Furthermore, Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**THE FRAUD-ON-THE-MARKET DOCTRINE**

111. The market for Citigroup's securities was open and efficient at all relevant times for the following reasons (among others):

(a) The Company's securities met the requirements for listing, and were listed and actively traded on the NYSE;

(b) As a regulated issuer, Citigroup filed periodic public reports with the SEC;

(c) Citigroup regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) The market reacted to public information disseminated by Citigroup;

(e) Citigroup was followed by numerous material securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public market place;

(f) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Citigroup securities; and

(g) Without knowledge of the misrepresented or omitted material facts, Plaintiff and the other members of the Class purchased or otherwise acquired Citigroup securities between the time Defendants made the material misrepresentations and omissions and the time the fraudulent scheme was being disclosed, during which time the price of Citigroup securities was inflated by Defendants' misrepresentations and omissions.

112. As a result of the forgoing, the market for Citigroup securities promptly digested current information regarding Citigroup from all publicly available sources and reflected such information in Citigroup's securities prices. Under these circumstances, all purchasers and acquirers of Citigroup's securities during the Class Period suffered similar injury through their purchase or acquisition of Citigroup's securities at artificially inflated prices and a presumption of reliance applies.

**COUNT I**

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS)**

113. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114. This Count is asserted by Plaintiff on behalf of himself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

115. During the Class Period, Defendants, who owed a fiduciary duty to Plaintiff and the Class, carried out a plan, scheme and course of conduct which was intended to and, throughout the class period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (2) artificially inflate and maintain the market price of Citigroup's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of them, took the actions set forth herein.

116. The Defendants (1) employed devices, schemes and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading by use means or instrumentalities of interstate commerce; and (3) engaged in acts, practices, and course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially high market prices for Citigroup securities in violation of Section 10(b) and Rule 10b-5.

117. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a

duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. §29.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information. Defendant's material misrepresentations and omissions as set forth herein violated that duty.

118. Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

119. As a result of Defendants' fraudulent activity, the market price of Citigroup's securities was artificially inflated during the Class Period.

120. In ignorance of the truth concerning Citigroup's true financial condition and exposure to subprime mortgage related liabilities, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Citigroup containing the misleading information, purchased or otherwise acquired Citigroup securities at artificially inflated prices during the Class Period.

121. Citigroup knew that its potential exposure to subprime mortgage losses was greater than that disclosed in its public statements and that it carried significantly more risk of loss due to its exposure to subprime mortgages. Accordingly, the decline in the Company's market capitalization that occurred between October 11, 2007 and

November 7, 2007 was directly attributable to Defendant's fraudulent conduct as alleged herein.

122. Plaintiff's (and the Class's) losses were proximately caused by Defendants' active and primary participation in Citigroup's fraud the investing public. Plaintiff (and members of the Class) purchased Citigroup securities in reliance on the integrity of the market price of those securities, and Defendants manipulated the price of Citigroup securities through their misconduct as described herein. Furthermore, Defendants' misconduct proximately caused Plaintiff's (and the Class') losses. Plaintiff's (and the Class's) losses were a direct and foreseeable consequence of Defendants' failure to disclose and the concealment of, *inter alia*, the true state of the business operations and financial condition of Citigroup.

123. Throughout the Class Period, Defendants were aware of material non-public information concerning Citigroup's fraudulent conduct (including false and misleading statements identified herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information regarding Citigroup's exposure to liabilities due to subprime mortgages, and Plaintiff's (and the Class's) losses were the foreseeable consequence of Defendants' concealment of this information.

124. As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Citigroup securities during the class period.

## COUNT II

## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST THE INDIVIDUAL DEFENDANTS)

125. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

126. As alleged herein, the Individual Defendants acted as controlling persons of Citigroup within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). By virtue of their executive positions, and/or Board membership, as alleged above, these individuals had the power to influence and control and did influence and control, directly of indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends is false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

127. In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

128. As set forth above, the Individual Defendants and Citigroup committed a primary violation of Section 10(b) and Rule 10b-5 by the acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of Citigroup, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other member of the Class suffered damages in connection with their purchases or acquisition of Citigroup securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(A) Declaring this action to be a proper Class action pursuant to Fed. R. Civ. P. 23;

(B) Awarding compensatory damages against all of the Defendants, jointly and severally, in favor of Plaintiff and the Class for all losses and damages suffered as a result of the Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

(C) Awarding Plaintiff his reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts; and

(D) Awarding the Plaintiff and the Class such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: November 9, 2007

**GARDY & NOTIS, LLP**

By: ______________________
James S. Notis (JN 4189)
Dustin P. Mansoor (DM 4039)
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

*Counsel for Plaintiff*

**CERTIFICATION OF PROPOSED LEAD PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, Lennard Hammond certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action (Citigroup, Inc. (NYSE: C)) at the direction of plaintiff's counsel, or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

**Purchases:**

| Date | Shares Bought | Price Per Share |
|---|---|---|
| 8/29/07 | 200 | 46.44 |
| 10/18/07 | 800 | 44.06 |

**Sales (if any):**

| Date | Shares Sold | Price Per Share |
|---|---|---|

5. I have not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Signed: ________________