**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO, TENNESSEE CONSOLIDATED RETIREMENT SYSTEM, SJUNDE AP-FONDEN, FJÄRDE AP-FONDEN, and PENSIONSKASSERNES ADMINISTRATION A/S, Individually and On Behalf of All Others Similarly Situated, | No. |
| Plaintiffs, | |
| v. | |
| CITIGROUP INC., CHARLES O. PRINCE, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN, TODD S. THOMSON, ROBERT DRUSKIN, THOMAS G. MAHERAS, MICHAEL STUART KLEIN, DAVID C. BUSHNELL, JOHN C. GERSPACH, STEPHEN R. VOLK, GEORGE DAVID and KPMG LLP, | |
| Defendants. | |
| TILLIE SALTZMAN, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | Electronically Filed |
| vs. | No. 1:07-cv-9901(SHS) |
| CITIGROUP INC., CHARLES O. PRINCE, ROBERT E. RUBIN, STEPHEN R. VOLK, SALLIE L. KRAWCHECK, GARY L. CRITTENDEN and ROBERT DRUSKIN, | ECF CASE |
| Defendants. | |
| LENNARD HAMMERSCHLAG, Individually, and On Behalf of All Others Similarly Situated, | |
| Plaintiff | Electronically Filed |
| v. | No. 1:07-cv-10258(SHS) |
| CITIGROUP INC., CHARLES PRINCE, SALLIE KRAWCHECK, and GARY CRITTENDEN, | ECF CASE |
| Defendants. | |

## DECLARATION OF ANDREW J. ENTWISTLE

I, the undersigned, Andrew J. Entwistle, do hereby declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.      I am an attorney licensed to practice law in the United States Supreme Court and the State and Federal courts serving the States of Colorado, Illinois, New Jersey, New York, and Texas, and the District of Columbia.  I am the managing partner of the law firm of Entwistle & Cappucci LLP ("Entwistle & Cappucci"), counsel for Public Employees' Retirement Association of Colorado, Tennessee Consolidated Retirement System, Sjunde AP-Fonden, Fjärde AP-Fonden, and Pensionskassernes Administration A/S (together, the "Global Pension Funds").  Entwistle & Cappucci's principal office is located at 280 Park Avenue, 26th Floor, New York, New York 10017.

2.      I submit this Declaration in support of The Global Pension Funds' Motion For an Order Partially Lifting The Private Securities Litigation Reform Act of 1995 ("PSLRA") Discovery Stay, as set forth in Section 21D(b)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(b)(3)(B).

3.      Attached hereto as Exhibit A is a true and correct copy of the House Conference Report No. 104-369, *reprinted in* 1995 U.S.S.C.A.N. 730.

4.      Attached hereto as Exhibit B is a true and correct copy of *Newby v. Enron Corp.*, Civil Action No. H-01-3624 Consolidated Cases, slip op., (S.D. Tex. Aug. 15, 2002).

5.    Attached hereto as Exhibit C is a true and correct copy of *Newby v. Enron Corp.*, Civil Action No. H-01-3624 Consolidated Cases, slip op., (S.D. Tex. Feb. 27, 2002).

6.    Attached hereto as Exhibit D is a true and correct copy of Senate Report No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679.

7.    Attached hereto as Exhibit E is a true and correct copy of *In re Tyco, Int'l Ltd. Multidistrict Litig.,* MDL No. 02-1335-B, slip op., (D.N.H. Jan. 29, 2003).

EXECUTED on the 7th day of January, 2008.

Andrew J. Entwistle

Westlaw.

H.R. CONF. REP. 104-369                                              Page 1
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

**\*\*730** P.L. 104-67, PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995

                    **\*1** SECURITIES LITIGATION REFORM

                  DATES OF CONSIDERATION AND PASSAGE

                  House: March 7, 8, December 5, 1995
            Senate: June 22, 23, 26, 27, 28, December 5, 1995
                      Cong. Record Vol. 141 (1995)
        Senate Report (Banking, Housing, and Urban Affairs Committee) No. 104-98,
                              June 19, 1995
                          (To accompany S. 240)
                  House Conference Report No. 104-369,
                            Nov. 28, 1995
                      (To accompany H.R. 1058)


                  HOUSE CONFERENCE REPORT NO. 104-369
                          November 28, 1995


        Mr. Bliley, from the committee of conference, submitted the following

                          CONFERENCE REPORT

                      [To accompany H.R. 1058]

   The committee of conference on the disagreeing votes of the two Houses on the
amendments of the Senate to the bill (H.R. 1058), to reform Federal securities
litigation, and for other purposes, having met, after full and free conference,
have agreed to recommend and do recommend to their respective Houses as follows:
   That the House recede from its disagreement to the amendment of the Senate to
the text of the bill and agree to the same with an amendment as follows:
   In lieu of the matter proposed to be inserted by the Senate amendment, insert
the following:

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

   (a) Short Title.-This Act may be cited as the "Private Securities Litigation
Reform Act of 1995".
   (b) Table of Contents.-The table of contents for this Act is as follows:


Sec. 1. Short title; table of contents.

                  TITLE I-REDUCTION OF ABUSIVE LITIGATION

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

Sec. 101. Private securities litigation reform.
Sec. 102. Safe harbor for forward-looking statements.
Sec. 103. Elimination of certain abusive practices.
Sec. 104. Authority of Commission to prosecute aiding and
            abetting.
Sec. 105. Loss causation.
Sec. 106. Study and report on protections for senior citizens
            and qualified retirement plans.
Sec. 107. Amendment to Racketeer Influenced and Corrupt
            Organization Act.
Sec. 108. Applicability.

    TITLE II-REDUCTION OF COERCIVE SETTLEMENTS

Sec. 201. Proportionate liability.
Sec. 203. Applicability.
Sec. 204. Rule of construction.

    TITLE III-AUDITOR DISCLOSURE OF CORPORATE FRAUD

Sec. 301. Fraud detection and disclosure.

**\*2** TITLE I-REDUCTION OF ABUSIVE LITIGATION

SEC. 101. PRIVATE SECURITIES LITIGATION REFORM.

   (a) Securities Act of 1933.-Title I of the Securities Act of 1933 (15 U.S.C.
77a et seq.) is amended by adding at the end the following new section:

"SEC. 27. PRIVATE SECURITIES LITIGATION.

   "(a) Private Class Actions.-
   "(1) In general.-The provisions of this subsection shall apply to each private
action arising under this title that is brought as a plaintiff class action pursu-
ant to the Federal Rules of Civil Procedure.
   "(2) Certification filed with complaint.-
   "(A) In general.-Each plaintiff seeking to serve as a representative party on
behalf of a class shall provide a sworn certification, which shall be personally
signed by such plaintiff and filed with the complaint, that-
      "(i) states that the plaintiff has reviewed the complaint and authorized its
filing;
      "(ii) states that the plaintiff did not purchase the security that is the
subject of the complaint at the direction of plaintiff's counsel or in order to
participate in any private action arising under this title;
      "(iii) states that the plaintiff is willing to serve as a representative
party on behalf of a class, including providing testimony at deposition and trial,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369    Page 4

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

if necessary;

"(iv) sets forth all of the transactions of the plaintiff in the security
that is the subject of the complaint during the class period specified in the com-
plaint;

"(v) identifies any other action under this title, filed during the 3- year
period preceding the date on which the certification is signed by the plaintiff,
in which the plaintiff has sought to serve, or served, as a representative party
on behalf of a class; and

"(vi) states that the plaintiff will not accept any payment for serving as a
representative party on behalf of a class beyond the plaintiff's pro rata share of
any recovery, except as ordered or approved by the court in accordance with para-
graph (4).

"(B) Nonwaiver of attorney-client privilege.-The certification filed pursuant
to subparagraph (A) shall not be construed to be a waiver of the attorney-client
privilege.

"(3) Appointment of lead plaintiff.-

"(A) Early notice to class members.-

**\*3** "(i) In general.-Not later than 20 days after the date on which the com-
plaint is filed, the plaintiff or plaintiffs shall cause to be published, in a
widely circulated national business-oriented publication or wire service, a notice
advising members of the purported plaintiff class-

"(I) of the pendency of the action, the claims asserted therein, and the pur-
ported class period; and

"(II) that, not later than 60 days after the date on which the notice is pub-
lished, any member of the purported class may move the court to serve as lead
plaintiff of the purported class.

"(ii) Multiple actions.-If more than one action on behalf of a class assert-
ing substantially the same claim or claims arising under this title is filed, only
the plaintiff or plaintiffs in the first filed action shall be required to cause
notice to be published in accordance with clause (i).

"(iii) Additional notices may be required under federal rules.-Notice re-
quired under clause (i) shall be in addition to any notice required pursuant to
the Federal Rules of Civil Procedure.

"(B) Appointment of lead plaintiff.-

"(i) In general.-Not later than 90 days after the date on which a notice is
published under subparagraph (A)(i), the court shall consider any motion made by a
purported class member in response to the notice, including any motion by a class
member who is not individually named as a plaintiff in the complaint or com-
plaints, and shall appoint as lead plaintiff the member or members of the purpor-
ted plaintiff class that the court determines to be most capable of adequately
representing the interests of class members (hereafter in this paragraph referred
to as the 'most adequate plaintiff') in accordance with this subparagraph.

"(ii) Consolidated actions.-If more than one action on behalf of a class as-
serting substantially the same claim or claims arising under this title has been
filed, and any party has sought to consolidate those actions for pretrial purposes
or for trial, the court shall not make the determination required by clause (i)

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

until after the decision on the motion to consolidate is rendered. As soon as practicable after such decision is rendered, the court shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions in accordance with this subparagraph.

"(iii) Rebuttable presumption.-

"(I) In general.-Subject to subclause (II), for purposes of clause (i), the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person or group of persons that-

**\*4** "(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

"(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

"(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

"(II) Rebuttal evidence.-The presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff-

"(aa) will not fairly and adequately protect the interests of the class; or

"(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

"(iv) Discovery.-For purposes of this subparagraph, discovery relating to whether a member or members of the purported plaintiff class is the most adequate plaintiff may be conducted by a plaintiff only if the plaintiff first demonstrates a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class.

"(v) Selection of lead counsel.-The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.

"(vi) Restrictions on professional plaintiffs.-Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period.

"(4) Recovery by plaintiffs.-The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class.

"(5) Restrictions on settlements under seal.-The terms and provisions of any settlement agreement of a class action shall not be filed under seal, except that on motion of any party to the settlement, the court may order filing under seal for those portions of a settlement agreement as to which good cause is shown for such filing under seal. For purposes of this paragraph, good cause shall exist only if publication of a term or **\*5** provision of a settlement agreement would cause direct and substantial harm to any party.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

"(6) Restrictions on payment of attorneys' fees and expenses.–Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.

"(7) Disclosure of settlement terms to class members.–Any proposed or final settlement agreement that is published or otherwise disseminated to the class shall include each of the following statements, along with a cover page summarizing the information contained in such statements:

"(A) Statement of plaintiff recovery.–The amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis.

"(B) Statement of potential outcome of case.–

"(i) Agreement on amount of damages.–If the settling parties agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this title, a statement concerning the average amount of such potential damages per share.

"(ii) Disagreement on amount of damages.–If the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this title, a statement from each settling party concerning the issue or issues on which the parties disagree.

"(iii) Inadmissibility for certain purposes.–A statement made in accordance with clause (i) or (ii) concerning the amount of damages shall not be admissible in any Federal or State judicial action or administrative proceeding, other than an action or proceeding arising out of such statement.

"(C) Statement of attorneys' fees or costs sought.–If any of the settling parties or their counsel intend to apply to the court for an award of attorneys' fees or costs from any fund established as part of the settlement, a statement indicating which parties or counsel intend to make such an application, the amount of fees and costs that will be sought (including the amount of such fees and costs determined on an average per share basis), and a brief explanation supporting the fees and costs sought.

"(D) Identification of lawyers' representatives.–The name, telephone number, and address of one or more representatives of counsel for the plaintiff class who will be reasonably available to answer questions from class members concerning any matter contained in any notice of settlement published or otherwise disseminated to the class.

"(E) Reasons for settlement.–A brief statement explaining the reasons why the parties are proposing the settlement.

**\*6** "(F) Other information.–Such other information as may be required by the court.

"(8) Attorney conflict of interest.–If a plaintiff class is represented by an attorney who directly owns or otherwise has a beneficial interest in the securities that are the subject of the litigation, the court shall make a determination of whether such ownership or other interest constitutes a conflict of interest sufficient to disqualify the attorney from representing the plaintiff class.

"(b) Stay of Discovery; Preservation of Evidence.–

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H. R. CONF. REP. 104-369    Page 8

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

"(1) In general.-In any private action arising under this title, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds, upon the motion of any party, that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

"(2) Preservation of evidence.-During the pendency of any stay of discovery pursuant to this subsection, unless otherwise ordered by the court, any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

"(3) Sanction for willful violation.-A party aggrieved by the willful failure of an opposing party to comply with paragraph (2) may apply to the court for an order awarding appropriate sanctions.

"(c) Sanctions for Abusive Litigation.-

"(1) Mandatory review by court.-In any private action arising under this title, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

"(2) Mandatory sanctions.-If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure. Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

"(3) Presumption in favor of attorneys' fees and costs.-

"(A) In general.-Subject to subparagraphs (B) and (C), for purposes of paragraph (2), the court shall adopt a presumption that the appropriate sanction-

**\*7** "(i) for failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation; and

"(ii) for substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.

"(B) Rebuttal evidence.-The presumption described in subparagraph (A) may be rebutted only upon proof by the party or attorney against whom sanctions are to be imposed that-

"(i) the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanc-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

tions are to be imposed; or

"(ii) the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis.

"(C) Sanctions.-If the party or attorney against whom sanctions are to be imposed meets its burden under subparagraph (B), the court shall award the sanctions that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil Procedure.

"(d) Defendant's Right to Written Interrogatories.-In any private action arising under this title in which the plaintiff may recover money damages only on proof that a defendant acted with a particular state of mind, the court shall, when requested by a defendant, submit to the jury a written interrogatory on the issue of each such defendant's state of mind at the time the alleged violation occurred.".

(b) Securities Exchange Act of 1934.-Title I of the Securities Exchange Act of 1934 (78a et seq.) is amended by inserting after section 21C the following new section:

"SEC. 21D. PRIVATE SECURITIES LITIGATION.

"(a) Private Class Actions.-

"(1) In general.-The provisions of this subsection shall apply in each private action arising under this title that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure.

"(2) Certification filed with complaint.-

"(A) In general.-Each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint, that-

"(i) states that the plaintiff has reviewed the complaint and authorized its filing;

"(ii) states that the plaintiff did not purchase the security that is the subject of the complaint at the direction **8** of plaintiff's counsel or in order to participate in any private action arising under this title;

"(iii) states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

"(iv) sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;

"(v) identifies any other action under this title, filed during the 3- year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and

"(vi) states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4).

"(B) Nonwaiver of attorney-client privilege.-The certification filed pursuant

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369                                      Page 8

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

to subparagraph (A) shall not be construed to be a waiver of the attorney-client
privilege.

"(3) Appointment of lead plaintiff.-

"(A) Early notice to class members.-

"(i) In general.-Not later than 20 days after the date on which the complaint
is filed, the plaintiff or plaintiffs shall cause to be published, in a widely
circulated national business-oriented publication or wire service, a notice ad-
vising members of the purported plaintiff class-

"(I) of the pendency of the action, the claims asserted therein, and the pur-
ported class period; and

"(II) that, not later than 60 days after the date on which the notice is pub-
lished, any member of the purported class may move the court to serve as lead
plaintiff of the purported class.

"(ii) Multiple actions.-If more than one action on behalf of a class assert-
ing substantially the same claim or claims arising under this title is filed, only
the plaintiff or plaintiffs in the first filed action shall be required to cause
notice to be published in accordance with clause (i).

"(iii) Additional notices may be required under federal rules.- Notice re-
quired under clause (i) shall be in addition to any notice required pursuant to
the Federal Rules of Civil Procedure.

"(B) Appointment of lead plaintiff.-

"(i) In general.-Not later than 90 days after the date on which a notice is
published under subparagraph (A)(i), the court shall consider any motion made by a
purported class member in response to the notice, including any motion by a class
member who is not individually named as a plaintiff in the complaint or **\*9** com-
plaints, and shall appoint as lead plaintiff the member or members of the purpor-
ted plaintiff class that the court determines to be most capable of adequately
representing the interests of class members (hereafter in this paragraph referred
to as the 'most adequate plaintiff') in accordance with this subparagraph.

"(ii) Consolidated actions.-If more than one action on behalf of a class as-
serting substantially the same claim or claims arising under this title has been
filed, and any party has sought to consolidate those actions for pretrial purposes
or for trial, the court shall not make the determination required by clause (i)
until after the decision on the motion to consolidate is rendered. As soon as
practicable after such decision is rendered, the court shall appoint the most ad-
equate plaintiff as lead plaintiff for the consolidated actions in accordance with
this paragraph.

"(iii) Rebuttable presumption.-

"(I) In general.-Subject to subclause (II), for purposes of clause (i), the
court shall adopt a presumption that the most adequate plaintiff in any private
action arising under this title is the person or group of persons that-

"(aa) has either filed the complaint or made a motion in response to a notice
under subparagraph (A)(i);

"(bb) in the determination of the court, has the largest financial interest
in the relief sought by the class; and

"(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369    Page 8

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

Civil Procedure.

"(II) Rebuttal evidence.-The presumption described in subclause (I) may be
rebutted only upon proof by a member of the purported plaintiff class that the
presumptively most adequate plaintiff-

"(aa) will not fairly and adequately protect the interests of the class; or

"(bb) is subject to unique defenses that render such plaintiff incapable of
adequately representing the class.

"(iv) Discovery.-For purposes of this subparagraph, discovery relating to
whether a member or members of the purported plaintiff class is the most adequate
plaintiff may be conducted by a plaintiff only if the plaintiff first demonstrates
a reasonable basis for a finding that the presumptively most adequate plaintiff is
incapable of adequately representing the class.

"(v) Selection of lead counsel.-The most adequate plaintiff shall, subject to
the approval of the court, select and retain counsel to represent the class.

**\*10** "(vi) Restrictions on professional plaintiffs.-Except as the court may
otherwise permit, consistent with the purposes of this section, a person may be a
lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no
more than 5 securities class actions brought as plaintiff class actions pursuant
to the Federal Rules of Civil Procedure during any 3-year period.

"(4) Recovery by plaintiffs.-The share of any final judgment or of any settle-
ment that is awarded to a representative party serving on behalf of a class shall
be equal, on a per share basis, to the portion of the final judgment or settlement
awarded to all other members of the class.  Nothing in this paragraph shall be
construed to limit the award of reasonable costs and expenses (including lost
wages) directly relating to the representation of the class to any representative
party serving on behalf of a class.

"(5) Restrictions on settlements under seal.-The terms and provisions of any
settlement agreement of a class action shall not be filed under seal, except that
on motion of any party to the settlement, the court may order filing under seal
for those portions of a settlement agreement as to which good cause is shown for
such filing under seal.  For purposes of this paragraph, good cause shall exist
only if publication of a term or provision of a settlement agreement would cause
direct and substantial harm to any party.

"(6) Restrictions on payment of attorneys' fees and expenses.-Total attorneys'
fees and expenses awarded by the court to counsel for the plaintiff class shall
not exceed a reasonable percentage of the amount of any damages and prejudgment
interest actually paid to the class.

"(7) Disclosure of settlement terms to class members.-Any proposed or final
settlement agreement that is published or otherwise disseminated to the class
shall include each of the following statements, along with a cover page summariz-
ing the information contained in such statements:

"(A) Statement of plaintiff recovery.-The amount of the settlement proposed to
be distributed to the parties to the action, determined in the aggregate and on an
average per share basis.

"(B) Statement of potential outcome of case.-

"(i) Agreement on amount of damages.-If the settling parties agree on the av-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369    Page 10

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

erage amount of damages per share that would be recoverable if the plaintiff pre-
vailed on each claim alleged under this title, a statement concerning the average
amount of such potential damages per share.

"(ii) Disagreement on amount of damages.-If the parties do not agree on the
average amount of damages per share that would be recoverable if the plaintiff
prevailed on each claim alleged under this title, a statement from each settling
party concerning the issue or issues on which the parties disagree.

**\*11** "(iii) Inadmissibility for certain purposes.-A statement made in accord-
ance with clause (i) or (ii) concerning the amount of damages shall not be admiss-
ible in any Federal or State judicial action or administrative proceeding, other
than an action or proceeding arising out of such statement.

"(C) Statement of attorneys' fees or costs sought.-If any of the settling
parties or their counsel intend to apply to the court for an award of attorneys'
fees or costs from any fund established as part of the settlement, a statement in-
dicating which parties or counsel intend to make such an application, the amount
of fees and costs that will be sought (including the amount of such fees and costs
determined on an average per share basis), and a brief explanation supporting the
fees and costs sought. Such information shall be clearly summarized on the cover
page of any notice to a party of any proposed or final settlement agreement.

"(D) Identification of lawyers' representatives.-The name, telephone number,
and address of one or more representatives of counsel for the plaintiff class who
will be reasonably available to answer questions from class members concerning any
matter contained in any notice of settlement published or otherwise disseminated
to the class.

"(E) Reasons for settlement.-A brief statement explaining the reasons why the
parties are proposing the settlement.

"(F) Other information.-Such other information as may be required by the
court.

"(8)  Security for payment of costs in class actions.-In any private action
arising under this title that is certified as a class action pursuant to the Fed-
eral Rules of Civil Procedure, the court may require an undertaking from the at-
torneys for the plaintiff class, the plaintiff class, or both, or from the attor-
neys for the defendant, the defendant, or both, in such proportions and at such
times as the court determines are just and equitable, for the payment  of fees and
expenses that may be awarded under  this subsection.

"(9) Attorney conflict of interest.-If a plaintiff class is represented by an
attorney who directly owns or otherwise has a beneficial interest in the securit-
ies that are the subject of the litigation, the court shall make a determination
of whether such ownership or other interest constitutes a conflict of interest
sufficient to disqualify the attorney from representing the plaintiff class.

"(b) Requirements for Securities Fraud Actions.-

"(1) Misleading statements and omissions.-In any private action arising under
this title in which the plaintiff alleges that the defendant-

"(A) made an untrue statement of a material fact; or

"(B) omitted to state a material fact necessary in order to make the state-
ments made, in the light of the circumstances in which they were made, not mis-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

leading;

    **\*12** the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

    "(2) Required state of mind.-In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

    "(3) Motion to dismiss; stay of discovery.-

    "(A) Dismissal for failure to meet pleading requirements.-In any private action arising under this title, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

    "(B) Stay of discovery.-In any private action arising under this title, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

    "(C) Preservation of evidence.-

    "(i) In general.-During the pendency of any stay of discovery pursuant to this paragraph, unless otherwise ordered by the court, any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a  continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

    "(ii) Sanction  for willful violation.-A party aggrieved by the willful failure of an opposing party to comply with clause (i) may apply to the court for an order awarding appropriate sanctions.

    "(4) Loss causation.-In any private action arising under this title, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages.

    "(c) Sanctions for Abusive Litigation.-

    "(1) Mandatory review by court.-In any private action arising under this title, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

    "(2) Mandatory sanctions.-If the court makes a finding under paragraph (1) that a party or attorney violated any requirement **\*13** of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance

H.R. Conf. Rep. 104-369    Page 12
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

with Rule 11 of the Federal Rules of Civil Procedure. Prior to making a finding
that any party or attorney has violated Rule 11 of the Federal Rules of Civil Pro-
cedure, the court shall give such party or attorney notice and an opportunity to
respond.

"(3) Presumption in favor of attorneys' fees and costs.-

"(A) In general.-Subject to subparagraphs (B) and (C), for purposes of para-
graph (2), the court shall adopt a presumption that the appropriate sanction-

"(i) for failure of any responsive pleading or dispositive motion to comply
with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an
award to the opposing party of the reasonable attorneys' fees and other expenses
incurred as a direct result of the violation; and

"(ii) for substantial failure of any complaint to comply with any requirement
of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing
party of the reasonable attorneys' fees and other expenses incurred in the action.

"(B) Rebuttal evidence.-The presumption described in subparagraph (A) may be
rebutted only upon proof by the party or attorney against whom sanctions are to be
imposed that-

"(i) the award of attorneys' fees and other expenses will impose an unreason-
able burden on that party or attorney and would be unjust, and the failure to make
such an award would not impose a greater burden on the party  in whose favor sanc-
tions are to be imposed; or

"(ii) the violation of Rule 11(b) of the Federal Rules of Civil Procedure was
de minimis.

"(C) Sanctions.-If the party or attorney against whom sanctions are to be im-
posed meets its burden under subparagraph (B), the court shall award the sanctions
that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil
Procedure.

"(d) Defendant's Right to Written Interrogatories.-In any private action
arising under this title in which the plaintiff may recover money damages, the
court shall, when requested by a defendant, submit to the jury a written interrog-
atory on the issue of each such defendant's state of mind at the time the alleged
violation occurred.

"(e) Limitation on Damages.-

"(1) In general.-Except as provided in paragraph (2), in any private action
arising under this title in which the plaintiff seeks to establish damages by ref-
erence to the market price of a security, the award of damages to the plaintiff
shall not exceed the difference between the purchase or sale price paid or re-
ceived, as appropriate, by the plaintiff for the subject security **14 and the mean
trading price of that security during the 90-day period beginning on the date on
which the information correcting the misstatement or omission that is the basis
for the action is disseminated to the market.

"(2) Exception.-In any private action arising under this title in which the
plaintiff seeks to establish damages by reference to the market price of a secur-
ity, if the plaintiff sells or repurchases the subject security prior to the ex-
piration of the 90-day period described in paragraph (1), the plaintiff's damages
shall not exceed the difference between the purchase or sale price paid or re-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369    Page 13

Case 1:07-cv-10258-SHS    Document 23-2    Filed 01/07/2008    Page 13 of 48

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

ceived, as appropriate, by the plaintiff for the security and the mean trading
price of the security during the period beginning immediately after dissemination
of information correcting the misstatement or omission and ending on the date on
which the plaintiff sells or repurchases the security.

"(3) Definition.-For purposes of this subsection, the 'mean trading price' of
a security shall be an average of the daily trading price of that security, de-
termined as of the close of the market each day during the 90-day period referred
to in paragraph (1).".

SEC. 102. SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS.

(a) Amendment to the Securities Act of 1933.-Title I of the Securities Act of
1933 (15 U.S.C. 77a et seq.) is amended by inserting after section 27 (as added by
this Act) the following new section:

"SEC. 27A. APPLICATION OF SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS.

"(a) Applicability.-This section shall apply only to a forward-looking state-
ment made by-
"(1) an issuer that, at the time that the statement is made, is subject to the
reporting requirements of section 13(a) or section 15(d) of the Securities Ex-
change Act of 1934;
"(2) a person acting on behalf of such issuer;
"(3) an outside reviewer retained by such issuer making a statement on behalf
of such issuer; or
"(4) an underwriter, with respect to information provided by such issuer or
information derived from information provided by the issuer.
"(b) Exclusions.-Except to the extent otherwise specifically provided by rule,
regulation, or order of the Commission, this section shall not apply to a forward-
looking statement-
"(1) that is made with respect to the business or operations of the issuer, if
the issuer-
"(A) during the 3-year period preceding the date on which the statement was
first made-
"(i) was convicted of any felony or misdemeanor described in clauses (i)
through (iv) of section 15(b)(4)(B) of the Securities Exchange Act of 1934; or
"(ii)  has been made the subject of a judicial or administrative decree or
order arising out of a governmental action that-
"(I) prohibits future violations of the antifraud provisions of the securit-
ies laws;
**\*15** "(II) requires that the issuer cease and desist from violating the anti-
fraud provisions of the securities laws; or
"(III) determines that the issuer violated the antifraud provisions of the
securities laws;
"(B) makes the forward-looking statement in connection with an offering of se-
curities by a blank check company;
"(C) issues penny stock;

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369 Page 14

Case 1:07-cv-10258-SHS    Document 23-2    Filed 01/07/2008    Page 14 of 48
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**


"(D) makes the forward-looking statement in connection with a rollup transac-
tion; or

"(E) makes the forward-looking statement in connection with a going private
transaction; or

"(2) that is-

"(A) included in a financial statement prepared in accordance with generally
accepted accounting principles;

"(B) contained in a registration statement of, or otherwise issued by, an in-
vestment company;

"(C) made in connection with a tender offer;

"(D) made in connection with an initial public offering;

"(E) made in connection with an offering by, or relating to the operations of,
a partnership, limited liability company, or a direct participation investment
program; or

"(F) made in a disclosure of beneficial ownership in a report required to be
filed with the Commission pursuant to section 13(d) of the Securities Exchange Act
of 1934.

"(c) Safe Harbor.-

"(1) In general.-Except as provided in subsection (b), in any private action
arising under this title that is based on an untrue statement of a material fact
or omission of a material fact necessary to make the statement not misleading, a
person referred to in subsection (a) shall not be liable with respect to any for-
ward-looking statement, whether written or oral, if and to the extent that-

"(A) the forward-looking statement is-

"(i) identified as a forward-looking statement, and is accompanied by mean-
ingful cautionary statements identifying important factors that could cause actual
results to differ materially from those in the forward-looking statement; or

"(ii) immaterial; or

"(B) the plaintiff fails to prove that the forward-looking statement-

"(i) if made by a natural person, was made with actual knowledge by that per-
son that the statement was false or misleading; or

"(ii) if made by a business entity; was-

"(I) made by or with the approval of an executive officer of that entity, and

"(II) made or approved by such officer with actual knowledge by that officer
that the statement was false or misleading.

"(2) Oral forward-looking statements.-In the case of an oral forward-looking
statement made by an issuer that is subject to the reporting requirements of sec-
tion 13(a) or section **16** 15(d) of the Securities Exchange Act of 1934, or by a
person acting on behalf of such issuer, the requirement set forth in paragraph
(1)(A) shall be deemed to be satisfied-

"(A) if the oral forward-looking statement is accompanied by a cautionary
statement-

"(i) that the particular oral statement is a forward-looking statement; and

"(ii) that the actual results could differ materially from those projected in
the forward-looking statement; and

"(B) if-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

"(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to differ materially from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

"(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

"(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

"(3) Availability.-Any document filed with the Commission or generally disseminated shall be deemed to be readily available for purposes of paragraph (2).

"(4) Effect on other safe harbors.-The exemption provided for in paragraph (1) shall be in addition to any exemption that the Commission may establish by rule or regulation under subsection (g).

"(d) Duty To Update.-Nothing in this section shall impose upon any person a duty to update a forward-looking statement.

"(e) Dispositive Motion.-On any motion to dismiss based upon subsection (c)(1), the court shall consider any statement cited in the complaint and cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant.

"(f) Stay Pending Decision on Motion.-In any private action arising under this title, the court shall stay discovery (other than discovery that is specifically directed to the applicability of the exemption provided for in this section) during the pendency of any motion by a defendant for summary judgment that is based on the grounds that-

"(1) the statement or omission upon which the complaint is based is a forward-looking statement within the meaning of this section; and

"(2) the exemption provided for in this section precludes a claim for relief.

"(g) Exemption Authority.-In addition to the exemptions provided for in this section, the Commission may, by rule or regulation, provide exemptions from or under any provision of this title, including with respect to liability that is based on a statement or that is based on projections or other forward-looking information, if **17** and to the extent that any such exemption is consistent with the public interest and the protection of investors, as determined by the Commission.

"(h) Effect on Other Authority of Commission.-Nothing in this section limits, either expressly or by implication, the authority of the Commission to exercise similar authority or to adopt similar rules and regulations with respect to forward-looking statements under any other statute under which the Commission exercises rulemaking authority.

"(i) Definitions.-For purposes of this section, the following definitions shall apply:

"(1) Forward-looking statement.-The term 'forward-looking statement' means-

"(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

"(B) a statement of the plans and objectives of management for future opera-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369          Page 16

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

tions, including plans or objectives relating to the products or services of the
issuer;

    "(C) a statement of future economic performance, including any such statement
contained in a discussion and analysis of financial condition by the management or
in the results of operations included pursuant to the rules and regulations of the
Commission;

    "(D) any statement of the assumptions underlying or relating to any statement
described in subparagraph (A), (B), or (C);

    "(E) any report issued by an outside reviewer retained by an issuer, to the
extent that the report assesses a forward-looking statement made by the issuer; or

    "(F) a statement containing a projection or estimate of such other items as
may be specified by rule or regulation of the Commission.

    "(2) Investment company.-The term 'investment company' has the same meaning as
in section 3(a) of the Investment Company Act of 1940.

    "(3) Penny stock.-The term 'penny stock' has the same meaning as in section
3(a)(51) of the Securities Exchange Act of 1934, and the rules and regulations, or
orders issued pursuant to that section.

    "(4) Going private transaction.-The term 'going private transaction' has the
meaning given that term under the rules or regulations of the Commission issued
pursuant to section 13(e) of the Securities Exchange Act of 1934.

    "(5) Securities laws.-The term 'securities laws' has the same meaning as in
section 3 of the Securities Exchange Act of 1934.

    "(6) Person acting on behalf of an issuer.-The term 'person acting on behalf
of an issuer' means an officer, director, or employee of the issuer.

    "(7) Other terms.-The terms 'blank check company', 'rollup transaction', 'part-
nership', 'limited liability company', 'executive officer of an entity' and 'dir-
ect participation investment program', **\*18** have the meanings given those terms by
rule or regulation of the Commission.".

    (b) Amendment to the Securities Exchange Act of 1934.-The Securities Exchange
Act of 1934 (15 U.S.C. 78a et seq.) is amended by inserting after section 21D (as
added by this Act) the following new section:

"SEC. 21E. APPLICATION OF SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS.

    "(a) Applicability.-This section shall apply only to a forward-looking state-
ment made by-

    "(1) an issuer that, at the time that the statement is made, is subject to the
reporting requirements of section 13(a) or section 15(d);

    "(2) a person acting on behalf of such issuer;

    "(3) an outside reviewer retained by such issuer making a statement on behalf
of such issuer; or

    "(4) an underwriter, with respect to information provided by such issuer or
information derived from information provided by such issuer.

    "(b) Exclusions.-Except to the extent otherwise specifically provided by rule,
regulation, or order of the Commission, this section shall not apply to a forward-
looking statement-

    "(1) that is made with respect to the business or operations of the issuer, if

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369    Page 18
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

the issuer-

"(A) during the 3-year period preceding the date on which the statement was first made-

"(i) was convicted of any felony or misdemeanor described in clauses (i) through (iv) of section 15(b)(4)(B); or

"(ii)  has been made the subject of a judicial or administrative decree or order arising out of a governmental action that-

"(I) prohibits future violations of the antifraud provisions of the securities laws;

"(II) requires that the issuer cease and desist from violating the antifraud provisions of the securities laws; or

"(III) determines that the issuer violated the antifraud provisions of the securities laws;

"(B) makes the forward-looking statement in connection with an offering of securities by a blank check company;

"(C) issues penny stock;

"(D) makes the forward-looking statement in connection with a rollup transaction; or

"(E) makes the forward-looking statement in connection with a going private transaction; or

"(2) that is-

"(A) included in a financial statement prepared in accordance with generally accepted accounting principles;

"(B) contained in a registration statement of, or otherwise issued by, an investment company;

"(C) made in connection with a tender offer;

"(D) made in connection with an initial public offering;

**\*19** "(E) made in connection with an offering by, or relating to the operations of, a partnership, limited liability company, or a direct participation investment program; or

"(F) made in a disclosure of beneficial ownership in a report required to be filed with the Commission pursuant to section 13(d).

"(c) Safe Harbor.-

"(1) In general.-Except as provided in subsection (b), in any private action arising under this title that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that-

"(A) the forward-looking statement is-

"(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

"(ii) immaterial; or

"(B) the plaintiff fails to prove that the forward-looking statement-

"(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369    Page 18
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

"(ii) if made by a business entity; was-

"(I) made by or with the approval of an executive officer of that entity; and

"(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

"(2) Oral forward-looking statements.-In the case of an oral forward-looking statement made by an issuer that is subject to the reporting requirements of section 13(a) or section 15(d), or by a person acting on behalf of such issuer, the requirement set forth in paragraph (1)(A) shall be deemed to be satisfied-

"(A) if the oral forward-looking statement is accompanied by a cautionary statement-

"(i) that the particular oral statement is a forward-looking statement; and

"(ii) that the actual results might differ materially from those projected in the forward-looking statement; and

"(B) if-

"(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

"(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, **\*20** that contains the additional information about those factors relating to the forward-looking statement; and

"(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

"(3) Availability.-Any document filed with the Commission or generally disseminated shall be deemed to be readily available for purposes of paragraph (2).

"(4) Effect on other safe harbors.-The exemption provided for in paragraph (1) shall be in addition to any exemption that the Commission may establish by rule or regulation under subsection (g).

"(d) Duty To Update.-Nothing in this section shall impose upon any person a duty to update a forward-looking statement.

"(e) Dispositive Motion.-On any motion to dismiss based upon subsection (c)(1), the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant.

"(f) Stay Pending Decision on Motion.-In any private action arising under this title, the court shall stay discovery (other than discovery that is specifically directed to the applicability of the exemption provided for in this section) during the pendency of any motion by a defendant  for summary judgment that is based on the grounds that-

"(1) the statement or omission upon which the complaint is based is a forward-looking statement within the meaning of this section; and

"(2) the exemption provided for in this section precludes a claim for relief.

"(g) Exemption Authority.-In addition to the exemptions provided for in this section, the Commission may, by rule or regulation, provide exemptions from or under any provision of this title, including with respect to liability that is based on a statement or that is based on projections or other forward-looking informa-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

tion, if and to the extent that any such exemption is consistent with the public
interest and the protection of investors, as determined by the Commission.

"(h) Effect on Other Authority of Commission.-Nothing in this section limits,
either expressly or by implication, the authority of the Commission to exercise
similar authority or to adopt similar rules and regulations with respect to for-
ward-looking statements under any other statute under which the Commission exer-
cises rulemaking authority.

"(i) Definitions.-For purposes of this section, the following definitions
shall apply:

"(1) Forward-looking statement.-The term 'forward-looking statement' means-

"(A) a statement containing a projection of revenues, income (including income
loss), earnings (including earnings loss) per share, capital expenditures, di-
vidends, capital structure, or other financial items;

**21** "(B) a statement of the plans and objectives of management for future op-
erations, including plans or objectives relating to the products or services of
the issuer;

"(C) a statement of future economic performance, including any such statement
contained in a discussion and analysis of financial condition by the management or
in the results of operations included pursuant to the rules and regulations of the
Commission;

"(D) any statement of the assumptions underlying or relating to any statement
described in subparagraph (A), (B), or (C);

"(E) any report issued by an outside reviewer retained by an issuer, to the
extent that the report assesses a forward-looking statement made by the issuer; or

"(F) a statement containing a projection or estimate of such other items as
may be specified by rule or regulation of the Commission.

"(2) Investment company.-The term 'investment company' has the same meaning as
in section 3(a) of the Investment Company Act of 1940.

"(3) Going private transaction.-The term 'going private transaction' has the
meaning given that term under the rules or regulations of the Commission issued
pursuant to section 13(e).

"(4) Person acting on behalf of an issuer.-The term 'person acting on behalf
of an issuer' means any officer, director, or employee of such issuer.

"(5) Other terms.-The terms 'blank check company', 'rollup transaction', 'part-
nership', 'limited liability company', 'executive officer of an entity' and 'dir-
ect participation investment program', have the meanings given those terms by rule
or regulation of the Commission.".

SEC. 103. ELIMINATION OF CERTAIN ABUSIVE PRACTICES.

(a) Prohibition of Referral Fees.-Section 15(c) of the Securities Exchange Act
of 1934 (15 U.S.C. 78o(c)) is amended by adding at the end the following new para-
graph:

"(8) Prohibition of referral fees.-No broker or dealer, or person associated
with a broker or dealer, may solicit or accept, directly or indirectly, remunera-
tion for assisting an attorney in obtaining the representation of any person in
any private action arising under this title or under the Securities Act of 1933.".

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369                                        Page 20

Case 1:07-cv-10258-SHS     Document 23-2     Filed 01/07/2008     Page 20 of 48

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

(b) Prohibition of Attorneys' Fees Paid From Commission Disgorgement Funds.-
(1) Securities act of 1933.-Section 20 of the Securities Act of 1933 (15 U.S.C. 77t) is amended by adding at the end the following new subsection:

"(f) Prohibition of Attorneys' Fees Paid From Commission Disgorgement Funds.-Except as otherwise ordered by the court upon motion by the Commission, or, in the case of an administrative action, as otherwise ordered by the Commission, funds disgorged as the result of an action brought by the Commission in Federal court, or as a result of any Commission administrative action, shall not be distributed as payment for attorneys' fees or expenses **22** incurred by private parties seeking distribution of the disgorged funds.".

(2) Securities exchange act of 1934.-Section 21(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78u(d)) is amended by adding at the end the following new paragraph:

"(4) Prohibition of attorneys' fees paid from commission disgorgement funds.-Except as otherwise ordered by the court upon motion by the Commission, or, in the case of an administrative action, as otherwise ordered by the Commission, funds disgorged as the result of an action brought by the Commission in Federal court, or as a result of any Commission administrative action, shall not be distributed as payment for attorneys' fees or expenses incurred by private parties seeking distribution of the disgorged funds.".

SEC. 104. AUTHORITY OF COMMISSION TO PROSECUTE AIDING AND ABETTING.

Section 20 of the Securities Exchange Act of 1934 (15 U.S.C. 78t) is amended-
(1) by striking the section heading and inserting the following:

"LIABILITY OF CONTROLLING PERSONS AND PERSONS WHO AID AND ABET VIOLATIONS";

and
(2) by adding at the end the following new subsection:

"(f) Prosecution of Persons Who Aid and Abet Violations.-For purposes of any action brought by the Commission under paragraph (1) or (3) of section 21(d), any person that knowingly provides substantial assistance to another person in violation of a provision of this title, or of any rule or regulation issued under this title, shall be deemed to be in violation of such provision  to the same extent as the person to whom such assistance is provided.".

SEC. 105. LOSS CAUSATION.

Section 12 of the Securities Act of 1933 (15 U.S.C. 77l) is amended-
(1) by inserting "(a) In General.-" before "Any person";
(2) by inserting ", subject to subsection (b)," after "shall be liable"; and
(3) by adding at the end the following:
"(b) Loss Causation.-In an action described in subsection (a)(2), if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

being true or omitting to state a material fact required to be stated therein or
necessary to make the statement not misleading, then such portion or amount, as
the case may be, shall not be recoverable.".

**\*23** SEC. 106. STUDY AND REPORT ON PROTECTIONS FOR SENIOR CITIZENS AND QUALIFIED
RETIREMENT PLANS.

(a) In General.-Not later than 180 days after the date of enactment of this
Act, the Securities and Exchange Commission shall-

(1) determine whether investors that are senior citizens or qualified retire-
ment plans require greater protection against securities fraud than is provided in
this Act and the amendments made by this Act;

(2) determine whether investors that are senior citizens or qualified retire-
ment plans have been adversely impacted by abusive or unnecessary securities fraud
litigation, and whether the provisions in this Act or amendments made by this Act
are sufficient to protect their investments from such litigation; and

(3) if so, submit to the Congress a report containing recommendations on pro-
tections from securities fraud and abusive or unnecessary securities fraud litiga-
tion that the Commission determines to be appropriate to thoroughly protect such
investors.

(b) Definitions.-For purposes of this section-

(1) the term "qualified retirement plan" has the same meaning as in  section
4974(c) of the Internal Revenue Code of 1986; and

(2) the term "senior citizen" means an individual who is 62 years of age or
older as of the date of the securities transaction at issue.

SEC. 107. AMENDMENT TO RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT.

Section 1964(c) of title 18, United States Code, is amended by inserting be-
fore the period ", except that no person may rely upon any conduct that would have
been actionable as fraud in the purchase or sale of securities to establish a vi-
olation of section 1962. The exception contained in the preceding sentence does
not apply to an action against any person that is criminally convicted in connec-
tion with the fraud, in which case the statute of limitations shall start to run
on the date on which the conviction becomes final".

SEC. 108. APPLICABILITY.

The amendments made by this title shall not affect or apply to any private ac-
tion arising under title I of the Securities Exchange Act of 1934 or title I of
the Securities Act of 1933, commenced before and pending on the date of enactment
of this Act.

TITLE II-REDUCTION OF COERCIVE SETTLEMENTS

SEC. 201. PROPORTIONATE LIABILITY.

(a) Amendment to Securities and Exchange Act of 1934.-Section 21D the Securit-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

ies Exchange Act of 1934 (as added by this Act) is amended by adding at the end
the following new subsection:

"(g) Proportionate Liability.-

"(1) Applicability.-Nothing in this subsection shall be construed to create,
affect, or in any manner modify, the standard **24** for liability associated with
any action arising under the securities laws.

"(2) Liability for damages.-

"(A) Joint and several liability.-Any covered person against whom a final
judgment is entered in a private action shall be liable for damages jointly and
severally only if the trier of fact specifically determines that such covered per-
son knowingly committed a violation of the securities laws.

"(B) Proportionate liability.-

"(i) In general.-Except as provided in paragraph (1), a covered person
against whom a final judgment is entered in a private action shall be liable
solely for the portion of the judgment that corresponds to the percentage of re-
sponsibility of that covered person, as determined under paragraph (3).

"(ii) Recovery by and costs of covered person.-In any case in which a con-
tractual relationship permits, a covered person that prevails in any private ac-
tion may recover the attorney's fees and costs of that covered person in connec-
tion with the action.

"(3) Determination of responsibility.-

"(A) In general.-In any private action, the court shall instruct the jury to
answer special interrogatories, or if there is no jury, shall make findings, with
respect to each covered person and each of the other persons claimed by any of the
parties to have caused or contributed to the loss incurred by the plaintiff, in-
cluding persons who have entered into settlements with the plaintiff or
plaintiffs, concerning-

"(i) whether such person violated the securities laws;

"(ii) the percentage of responsibility of such person, measured as a percent-
age of the  total fault of all persons who caused or contributed to the loss in-
curred by the plaintiff; and

"(iii) whether such person knowingly committed a violation of the securities
laws.

"(B) Contents of special interrogatories or findings.-The responses to inter-
rogatories, or findings, as appropriate, under subparagraph (A) shall specify the
total amount of damages that the plaintiff is entitled to recover and the percent-
age of responsibility of each covered person found to have caused or contributed
to the loss incurred by the plaintiff or plaintiffs.

"(C) Factors for consideration.-In determining the percentage of responsibil-
ity under this paragraph, the trier of fact shall consider-

"(i) the nature of the conduct of each covered person found to have caused or
contributed to the loss incurred by the plaintiff or plaintiffs; and

"(ii) the nature and extent of the causal relationship between the conduct of
each such person and the damages incurred by the plaintiff or plaintiffs.

**25** "(4) Uncollectible share.-

"(A) In general.-Notwithstanding paragraph (2)(B), upon motion made not later

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

than 6 months after a final judgment is entered in any private action, the court
determines that all or part of the share of the judgment of the covered person is
not collectible against that covered person, and is also not collectible against a
covered person described in paragraph (2)(A), each covered person described in
paragraph (2)(B) shall be liable for the uncollectible share as follows:

"(i) Percentage of net worth.-Each covered person shall be jointly and sever-
ally liable for the uncollectible share if the plaintiff establishes that-

"(I) the plaintiff is an individual whose recoverable damages under the final
judgment are equal to more than 10 percent of the net worth of the plaintiff; and

"(II) the net worth of the plaintiff is equal to less than $200,000.

"(ii) Other plaintiffs.-With respect to any plaintiff not described in sub-
clauses (I) and (II) of clause (i), each covered person shall be liable for the
uncollectible share in proportion to the percentage of responsibility of that
covered person, except that the total liability of a covered person under this
clause may not exceed 50 percent of the proportionate share of that covered per-
son, as determined under paragraph (3)(B).

"(iii) Net worth.-For purposes of this subparagraph, net worth shall be de-
termined as of the date immediately preceding the date of the purchase or sale (as
applicable) by the plaintiff of the security that is the subject of the action,
and shall be equal to the fair market value of assets, minus liabilities, includ-
ing the net value of the investments of the plaintiff in real and personal prop-
erty (including personal residences).

"(B) Overall limit.-In no case shall the total payments required pursuant to
subparagraph (A) exceed the amount of the uncollectible share.

"(C) Covered persons subject to contribution.-A covered person against whom
judgment is not collectible shall be subject to contribution and to any continuing
liability to the plaintiff on the judgment.

"(5) Right of contribution.-To the extent that a covered person is required to
make an additional payment pursuant to paragraph (4), that covered person may re-
cover contribution-

"(A) from the covered person originally liable to make the payment;

"(B) from any covered person liable jointly and severally pursuant to para-
graph (2)(A);

"(C) from any covered person held proportionately liable pursuant to this
paragraph who is liable to make the same payment and has paid less than his or her
proportionate share of that payment; or

**\*26** "(D) from any other person responsible for the conduct giving rise to the
payment that would have been liable to make the same payment.

"(6) Nondisclosure to jury.-The standard for allocation of damages under para-
graphs (2) and (3) and the procedure for reallocation of uncollectible shares un-
der paragraph (4) shall not be disclosed to members of the jury.

"(7) Settlement discharge.-

"(A) In general.-A covered person who settles any private action at any time
before final verdict or judgment shall be discharged from all claims for contribu-
tion brought by other persons.  Upon entry of the settlement by the court, the
court shall enter a bar order constituting the final discharge of all obligations

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369   Page 24
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

to the plaintiff of the settling covered person arising out of the action. The or-
der shall bar all future claims for contribution arising out of the action-

"(i) by any person against the settling covered person; and

"(ii) by the settling covered person against any person, other than a person
whose liability has been extinguished by the settlement of the settling covered
person.

"(B) Reduction.-If a covered person enters into a settlement with the
plaintiff prior to final verdict or judgment, the verdict or judgment shall be re-
duced by the greater of-

"(i) an amount that corresponds to the percentage of responsibility of that
covered person; or

"(ii) the amount paid to the plaintiff by that covered person.

"(8) Contribution.-A covered person who becomes jointly and severally liable
for damages in any private action may recover contribution from any other person
who, if joined in the original action, would have been liable for the same dam-
ages. A claim for contribution shall be determined based on the percentage of re-
sponsibility of the claimant and of each person against whom a claim for contribu-
tion is made.

"(9) Statute of limitations for contribution.-In any private action determin-
ing liability, an action for contribution shall be brought not later than 6 months
after the entry of a final, nonappealable judgment in the action, except that an
action for contribution brought by a covered person who was required to make an
additional payment pursuant to paragraph (4) may be brought not later than 6
months after the date on which such payment was made.

"(10) Definitions.-For purposes of this subsection-

"(A) a covered person 'knowingly commits a violation of the securities laws'-

"(i) with respect to an action that is based on an untrue statement of mater-
ial fact or omission of a material fact necessary to make the statement not mis-
leading, if-

"(I) that covered person makes an untrue statement of a material fact, with
actual knowledge that the representation is false, or omits to state a **\*27** fact
necessary in order to make the statement made not misleading, with actual know-
ledge that, as a result of the omission, one of the material representations of
the covered person is false; and

"(II) persons are likely to reasonably rely on that misrepresentation or
omission; and

"(ii) with respect to an action that is based on any conduct that is not de-
scribed in clause (i), if that covered person engages in that conduct with actual
knowledge of the facts and circumstances that make the  conduct of that covered
person a violation of the securities laws;

"(B) reckless conduct by a covered person shall not be construed to constitute
a knowing commission of a violation of the securities laws by that covered person;

"(C) the term 'covered person' means-

"(i) a defendant in any private action arising under this title; or

"(ii) a defendant in any private action arising under section 11 of the Se-
curities Act of 1933, who is an outside director of the issuer of the securities

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

that are the subject of the action; and

"(D) the term 'outside director' shall have the meaning given such term by rule or regulation of the Commission.".

(b) Amendments to the Securities Act of 1933.-Section 11(f) of the Securities Act of 1933 (12 U.S.C. 77k(f)) is amended-

(1) by striking "All" and inserting "(1) Except as provided in paragraph (2), all"; and

(2) by adding at the end the following new paragraph:

"(2)(A) The liability of an outside director under subsection (e) shall be determined in accordance with section 38 of the Securities Exchange Act of 1934.

"(B) For purposes of this paragraph, the term 'outside director' shall have the meaning given such term by rule or regulation of the Commission .".

SEC. 202. APPLICABILITY.

The amendments made by this title shall not affect or apply to any private action arising under the securities laws commenced before and pending on the date of enactment of this Act.

SEC. 203. RULE OF CONSTRUCTION.

Nothing in this Act or the amendments made by this Act shall be deemed to create or ratify any implied private right of action, or to prevent the Commission, by rule or regulation, from restricting or otherwise regulating private actions under the Securities Exchange Act of 1934.

**\*28** TITLE III-AUDITOR DISCLOSURE OF CORPORATE FRAUD

SEC. 301. FRAUD DETECTION AND DISCLOSURE.

(a) In General.-The Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is amended by inserting immediately after section 10 the following new section:

"SEC. 10A. AUDIT REQUIREMENTS.

"(a) In General.-Each audit required pursuant to this title of the financial statements of an issuer by an independent public accountant shall include, in accordance with generally accepted auditing standards, as may be modified or supplemented from time to time by the Commission-

"(1) procedures designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts;

"(2) procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure therein; and

"(3) an evaluation of whether there is substantial doubt about the ability of the issuer to continue as a going concern during the ensuing fiscal year.

"(b) Required Response To Audit Discoveries.-

"(1) Investigation and report to management.-If, in the course of conducting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369      Page 28

Case 1:07-cv-10258-SHS      Document 23-2      Filed 01/07/2008      Page 26 of 48
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

an audit pursuant to this title to which subsection (a) applies, the independent
public accountant detects or otherwise becomes aware of information indicating
that an illegal act (whether or not perceived to have a material effect on the
financial statements of the issuer) has or may have occurred, the accountant
shall, in accordance with generally accepted auditing standards, as may be modi-
fied or supplemented from time to time by the Commission-

"(A)(i) determine whether it is likely that an illegal act has occurred; and

"(ii) if so, determine and consider the possible effect of the illegal act on
the financial statements of the issuer, including any contingent monetary effects,
such as fines, penalties, and damages; and

"(B) as soon as practicable, inform the appropriate level of the management of
the issuer and assure that the audit committee of the issuer, or the board of dir-
ectors of the issuer in the absence of such a committee, is adequately informed
with respect to illegal acts that have been detected or have otherwise come to the
attention of such accountant in the course of the audit, unless the illegal act is
clearly inconsequential.

"(2) Response to failure to take remedial action.-If, after determining that
the audit committee of the board of directors of the issuer, or the board of dir-
ectors of the issuer in the absence of an audit committee, is adequately informed
with respect to illegal acts that have been detected or have otherwise come to the
attention of the accountant in the course of the **\*29** audit of such accountant, the
independent public accountant concludes that-

"(A) the illegal act has a material effect on the financial statements of the
issuer;

"(B) the senior management has not taken, and the board of directors has not
caused senior management to take, timely and appropriate remedial actions with re-
spect to the illegal act; and

"(C) the failure to take remedial action is reasonably expected to warrant de-
parture from a standard report of the auditor, when made, or warrant resignation
from the audit engagement;

the independent public accountant shall, as soon as practicable, directly re-
port its conclusions to the board of directors.

"(3) Notice to commission; response to failure to notify.-An issuer whose
board of directors receives a report under paragraph (2) shall inform the Commis-
sion by notice not later than 1 business day after the receipt of such report and
shall furnish the independent public accountant making such report with a copy of
the notice furnished to the Commission. If the independent public accountant fails
to receive a copy of the notice before the expiration of the required
1-business-day period, the independent public accountant shall-

"(A) resign from the engagement; or

"(B) furnish to the Commission a copy of its report (or the documentation of
any oral report given) not later than 1 business day following such failure to re-
ceive notice.

"(4) Report after resignation.-If an independent public accountant resigns
from an engagement under paragraph (3)(A), the accountant shall, not later than 1
business day following the failure by the issuer to notify the Commission under

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

paragraph (3), furnish to the Commission a copy of the accountant's report (or the
documentation of any oral report given).

"(c) Auditor Liability Limitation.-No independent public accountant shall be
liable in a private action for any finding, conclusion, or statement expressed in
a report made pursuant to paragraph (3) or (4) of subsection (b), including any
rule promulgated pursuant thereto.

"(d) Civil Penalties in Cease-and-Desist Proceedings.-If the Commission finds,
after notice and opportunity for hearing in a proceeding instituted pursuant to
section 21C, that an independent public accountant has willfully violated para-
graph (3) or (4) of subsection (b), the Commission may, in addition to entering an
order under section 21C, impose a civil penalty against the independent public ac-
countant and any other person that the Commission finds was a cause of such viola-
tion. The determination to impose a civil penalty and the amount of the penalty
shall be governed by the standards set forth in section 21B.

"(e) Preservation of Existing Authority.-Except as provided in subsec-
tion  (d), nothing in this section shall be held to limit or otherwise affect the
authority of the Commission under this title.

"(f) Definition.-As used in this section, the term 'illegal act' means an act
or omission that violates any law, or any rule or regulation having the force of
law.".

**\*30** (b) Effective Dates.-The amendment made by subsection (a) shall apply to
each annual report-

(1) for any period beginning on or after January 1, 1996, with respect to any
registrant that is required to file selected quarterly financial data pursuant to
the rules or regulations of the Securities and Exchange Commission; and

(2) for any period beginning on or after January 1, 1997, with respect to any
other registrant.

And the Senate agree to the same.

That the House recede from its disagreement to the amendment of the Senate to
the title of the bill, and agree to the same.

From the Committee on Commerce, for consideration of the House bill, and the
Senate amendment, and modifications committed to conference:

Thomas Bliley,

Billy Tauzin,

Jack Fields,

Chris Cox,

Richard F. White,

Anna G. Eshoo,

As additional conferees from the Committee on the Judiciary, for consideration
of the House bill, and the Senate amendment, and modifications committed to con-
ference:

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369 Page 28

Case 1:07-cv-10258-SHS    Document 23-2    Filed 01/07/2008    Page 28 of 48
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**


        Bill McCollum,

        Managers on the Part of the House.

        Alfonse D'Amato,

        Phil Gramm,

        Robert F. Bennett,

        Rod Grams,

        Pete V. Domenici,

        Christopher Dodd,

        John F. Kerry,

        Managers on the Part of the Senate.


        **\*31** JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

   The managers on the part of the House and the Senate at the conference on the
disagreeing votes of the two Houses on the amendments of the Senate to the bill
(H.R. 1058) to reform Federal securities litigation, and for other purposes, sub-
mit the following joint statement to the House and the Senate in explanation of
the effect of the action agreed upon by the managers and recommended in the accom-
panying conference report:

   STATEMENT OF MANAGERS-THE "PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995"

   The overriding purpose of our Nation's securities laws is to protect investors
and to maintain confidence in the securities markets, so that our national sav-
ings, capital formation and investment may grow for the benefit of all Americans.
   The private securities litigation system is too important to the integrity of
American capital markets to allow this system to be undermined by those who seek
to line their own pockets by bringing abusive and meritless suits. Private secur-
ities litigation is an indispensable tool with which defrauded investors can re-
cover their losses without having to rely upon government action. Such private
lawsuits promote public and global confidence in our capital markets and help to
deter wrongdoing and to guarantee that corporate officers, auditors, directors,
lawyers and others properly perform their jobs. This legislation seeks to return
the securities litigation system to that high standard.
   Congress has been prompted by significant evidence of abuse in private securit-
ies lawsuits to enact reforms to protect investors and maintain confidence in our
capital markets. The House and Senate Committees heard evidence that abusive prac-
tices committed in private securities litigation include: (1) the routine filing
of lawsuits against issuers of securities and others whenever there is a signific-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-10258-SHS       Document 23-2       Filed 01/07/2008       Page 29 of 48

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

ant change in an issuer's stock price, without regard to any underlying culpabil-
ity of the issuer, and with only faint hope that the discovery process might lead
eventually to some plausible cause of action; (2) the targeting of deep pocket de-
fendants, including accountants, underwriters, and individuals who may be covered
by insurance, without regard to their actual culpability; (3) the abuse of the
discovery process to impose costs so burdensome that it is often economical for
the victimized party to settle; and (4) the manipulation by class action lawyers
of the clients whom they purportedly represent. These serious injuries to innocent
parties are compounded by the reluctance of many judges to impose sanctions under
Federal Rule of Civil Procedure 11, except in those cases involving truly out-
rageous misconduct. At the same time, the investing public and the entire U.S.
economy have been injured by the **731 *32 unwillingness of the best qualified
persons to serve on boards of directors and of issuers to discuss publicly their
future prospects, because of fear of baseless and extortionate securities law-
suits.

   In these and other examples of abusive and manipulative securities litigation,
innocent parties are often forced to pay exorbitant "settlements." When an insurer
must pay lawyers' fees, make settlement payments, and expend management and em-
ployee resources in defending a meritless suit, the issuers' own investors suffer.
Investors always are the ultimate losers when extortionate "settlements" are ex-
tracted from issuers.

   This Conference Report seeks to protect investors, issuers, and all who are as-
sociated with our capital markets from abusive securities litigation. This legis-
lation implements needed procedural protections to discourage frivolous litiga-
tion. It protects outside directors, and others who may be sued for non-knowing
securities law violations, from liability for damage actually caused by others. It
reforms discovery rules to minimize costs incurred during the pendency of a motion
to dismiss or a motion for summary judgment. It protects investors who join class
actions against lawyer-driven lawsuits by giving control of the litigation to lead
plaintiffs with substantial holdings of the securities of the issuer. It gives
victims of abusive securities lawsuits the opportunity to recover their attorneys'
fees at the conclusion of an action. And it establishes a safe harbor for forward
looking statements, to encourage issuers to disseminate relevant information to
the market without fear of open-ended liability.

                    PRIVATE SECURITIES LITIGATION REFORM

   Section 101 contains provisions to reform abusive securities class action litig-
ation. It amends the Securities Act of 1933 (the "1933 Act") by adding a new sec-
tion 27 and the Securities Exchange Act of 1934 (the "1934 Act") by adding a new
section 21D. These provisions are intended to encourage the most capable repres-
entatives of the plaintiff class to participate in class action litigation and to
exercise supervision and control of the lawyers for the class. These provisions
are intended to increase the likelihood that parties with significant holdings in
issuers, whose interests are more strongly aligned with the class of shareholders,
will participate in the litigation and exercise control over the selection and ac-
tions of plaintiff's counsel. The legislation also provides that all discovery is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369    Page 30
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

stayed during the pendency of any motion to dismiss or for summary judgment. These
stay of discovery provisions are intended to prevent unnecessary imposition of
discovery costs on defendants.

### THE PROFESSIONAL PLAINTIFF AND LEAD PLAINTIFF PROBLEMS

  House and Senate Committee hearings on securities litigation reform demonstrated
the need to reform abuses involving the use of "professional plaintiffs" and the
race to the courthouse to file the complaint.
  Professional plaintiffs who own a nominal number of shares in a wide array of
public companies permit lawyers readily to file abusive securities class action
lawsuits. Floor debate in the Senate highlighted that many of the "world's unluck-
iest investors" repeatedly **\*33 \*\*732** appear as lead plaintiffs in securities class
action lawsuits. These lead plaintiffs often receive compensation in the form of
bounty payments or bonuses.
  The Conference Committee believes these practices have encouraged the filing of
abusive cases. Lead plaintiffs are not entitled to a bounty for their services.
Individuals who are motivated by the payment of a bounty or bonus should not be
permitted to serve as lead plaintiffs. These individuals do not adequately repres-
ent other shareholders-in many cases the "lead plaintiff" has not even read the
complaint.
  The Conference Committee believes that several new rules will effectively dis-
courage the use of professional plaintiffs.

Plaintiff certification of the complaint

  This legislation requires, in new section 27(a)(2) of the 1933 Act and new sec-
tion 21D(a)(2) of the 1934 Act, that the lead plaintiff file a sworn certified
statement with the complaint. The statement must certify that the plaintiff: (a)
reviewed and authorized the filing of the complaint; (b) did not purchase the se-
curities at the direction of counsel or in order to participate in a lawsuit; and
(c) is willing to serve as the lead plaintiff on behalf of the class. To further
deter the use of professional plaintiffs, the plaintiff must also identify any
transactions in the securities covered by the class period, and any other lawsuits
in which the plaintiff has sought to serve as lead plaintiff in the last three
years. [FN1]

Method for determining the "most adequate plaintiff"

  The Conference Committee was also troubled by the plaintiffs' lawyers  "race to
the courthouse" to be the first to file a securities class action complaint. This
race has caused plaintiffs' attorneys to become fleet of foot and sleight of hand.
Most often speed has replaced diligence in drafting complaints. The Conference
Committee believes two incentives have driven plaintiffs' lawyers to be the first
to file. First, courts traditionally appoint counsel in class action lawsuits on a
"first come, first serve" basis. Courts often afford insufficient consideration to
the most thoroughly researched, but later filed, complaint. The second incentive
involves the court's decision as to who will become lead plaintiff. Generally, the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369    Page 33

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

first lawsuit filed also determines the lead plaintiff.

The Conference Committee believes that the selection of the lead plaintiff and lead counsel should rest on considerations other than how quickly a plaintiff has filed its complaint. As a result, this legislation establishes new procedures for the appointment of the lead plaintiff and lead counsel in securities class actions in new section 27(a)(3) of the 1933 Act and new section 21D(a)(3) of the 1934 Act.

A plaintiff filing a securities class action must, within 20 days of filing a complaint, provide notice to members of the purported class in a widely circulated business publication. This notice must identify the claims alleged in the lawsuit and the purported class period and inform potential class members that, within 60 days, they may move to serve as the lead plaintiff. Members of the purported **\*34 \*\*733** class who seek to serve as lead plaintiff do not have to file the certification filing as part of this motion. "Publication" includes a variety of media, including wire, electronic or computer services. [FN2]

Within 90 days of the published notice, the court must consider motions made under this section and appoint the lead plaintiff. If a motion has been filed to consolidate multiple class actions brought on behalf of the same class, the court will not appoint a lead plaintiff until after consideration of the motion.

The current system often works to prevent institutional investors from selecting counsel or serving as lead plaintiff in class actions. [FN3]  The Conference Committee seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the "most adequate plaintiff."

The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions. Institutional investors are America's largest shareholders, with about $9.5 trillion in assets, accounting for 51% of the equity market. According to one representative of institutional investors: "As the largest shareholders in most companies, we are the ones who have the most to gain from meritorious securities litigation." [FN4]

Several Senators expressed concern during floor consideration of this legislation that preference would be given to large investors, and that large investors might conspire with the defendant company's management. The Conference Committee believes, however, that with pension funds accounting for $4.5 trillion [FN5] or nearly half of the institutional assets, in many cases the beneficiaries of pension funds-small investors-ultimately have the greatest stake in the outcome of the lawsuit. Cumulatively, these small investors represent a single large investor interest. Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake. The claims of both types of class members generally will be typical.

The Conference Committee recognizes the potential conflicts that could be caused by the shareholder with the "largest financial stake" serving as lead plaintiff. As a result, this presumption may be rebutted by evidence that the plaintiff would not fairly and adequately represent the interests of the class or is subject to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

unique defenses. Members of the purported class may seek discovery on whether the presumptively most adequate plaintiff would not adequately represent the class. The provisions of the bill relating to the appointment of a lead plaintiff are not intended to affect current law with regard to challenges to the adequacy of the class representative or typicality of the claims among the class.

Although the most adequate plaintiff provision does not confer any new fiduciary duty on institutional investors-and the courts should not impose such a duty-the Conference Committee nevertheless intends that the lead plaintiff provision will encourage institutional investors to take a more active role in securities class action lawsuits. Scholars predict that increasing the role of institutional **35 **734 investors will benefit both injured shareholders and courts: "Institutions with large stakes in class actions have much the same interests as the plaintiff class generally; thus, courts could be more confident settlements negotiated under the supervision of institutional plaintiffs were 'fair and reasonable' than is the case with settlements negotiated by unsupervised plaintiffs' attorneys." [FN6]

Finally, this lead plaintiff provision solves the dilemma of who will serve as class counsel. Subject to court approval, the most adequate plaintiff retains class counsel. As a result, the Conference Committee expects that the plaintiff will choose counsel rather than, as is true today, counsel choosing the plaintiff. The Conference Committee does not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

The Conference Report seeks to restrict professional plaintiffs from serving as lead plaintiff by limiting a person from serving in that capacity more than five times in three years. Institutional investors seeking to serve as lead plaintiff may need to exceed this limitation and do not represent the type of professional plaintiff this legislation seeks to restrict. As a result, the Conference Committee grants courts discretion to avoid the unintended consequence of disqualifying institutional investors from serving more than five times in three years. The Conference Committee does not intend for this provision to operate at cross purposes with the "most adequate plaintiff" provision. The Conference Committee does expect, however, that it will be used with vigor to limit the activities of professional plaintiffs.

Limitation on lead plaintiff's recovery

This legislation also removes the financial incentive for becoming a lead plaintiff. New section 27(a)(4) of the 1933 Act and section 21D(a)(4) of the 1934 Act limits the class representative's recovery to his or her pro rata share of the settlement or final judgment. The lead plaintiff's share of the final judgment or settlement will be calculated in the same manner as the shares of the other class members. The Conference Committee recognizes that lead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages, and grants the courts discretion to award fees accordingly.

IMPROVEMENTS TO THE SETTLEMENT PROCESS

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-10258-SHS    Document 23-2    Filed 01/07/2008    Page 33 of 48

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

Restriction on sealed settlement agreements

   New section 27(a)(5) of the 1933 Act and section 21D(a)(5) of the 1934 Act gen-
erally bar the filing of settlement agreements under seal. The Conference Commit-
tee recognizes that legitimate reasons may exist for the court to permit the entry
of a settlement or portions of a settlement under seal. A party must show "good
cause," i.e., that the publication of a portion or portions of the settlement
agreement would result in direct and substantial harm to any party, whether or not
a party to the action. The Conference Committee intends "direct and substantial
harm" to include proof of reputational injury to a party.

**\*\*735 \*36** Limitation on attorney's fees

   The House and Senate heard testimony that counsel in securities class actions
often receive a disproportionate share of settlement awards.
   Under current practice, courts generally award attorney's fees based on the so-
called "lodestar" approach-i.e., the court multiplies the attorney's hours by a
reasonable hourly fee, which may be increased by an additional amount based on
risk or other relevant factors. [FN7]  Under this approach, attorney's fees can
constitute 35% or more of the entire settlement awarded to the class. The Confer-
ence Committee limits the award of attorney's fees and costs to counsel for a
class in new section 27(a)(6) of the 1933 Act and new section 21D(a)(6) of the
1934 Act to a  reasonable percentage of the amount of recovery awarded to the
class. By not fixing the percentage of fees and costs counsel may receive, the
Conference Committee intends to give the court flexibility in determining what is
reasonable on a case-by-case basis. The Conference Committee does not intend to
prohibit use of the lodestar approach as a means of calculating attorney's fees.
The provision focuses on the final amount of fees awarded, not the means by which
such fees are calculated.

Improved settlement notice to class members

   The House and Senate heard testimony that class members frequently lack meaning-
ful information about the terms of the proposed settlement. [FN8]  Class members
often receive insufficient notice of the terms of a proposed settlement and, thus,
have no basis to evaluate the settlement. As one bar association advised the Sen-
ate Securities Subcommittee, "settlement notices provided to class members are of-
ten obtuse and confusing, and should be written in plain English." [FN9]  The Sen-
ate received similar testimony from a class member in two separate securities
fraud lawsuits: "Nowhere in the settlement notices were the stockholders told of
how much they could expect to recover of their losses. . . . I feel that the set-
tlement offer should have told the stockholders how little of their losses will be
recovered in the settlement, and that this is a material fact to the shareholder's
decision to approve or disapprove the settlement." [FN10]
   In new  section 27(a)(7) of the 1933 Act and new section 21D(a)(7) of the 1934
Act, the Conference Committee requires that certain information be included in any
proposed or final settlement agreement disseminated to class members. To ensure

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369    Page 36

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

that critical information is readily available to class members, the Conference
Committee requires that such information appear in summary form on the cover page
of the notice. The notice must contain a statement of the average amount of dam-
ages per share that would be recoverable if the settling parties can agree on a
figure, or a statement from each settling party on why there is disagreement. It
must also explain the attorney's fees and costs sought. The name, telephone number
and address of counsel for the class must be provided. Most importantly, the no-
tice must include a brief statement explaining the reason for the proposed settle-
ment.

### **736 *37 MAJOR SECURITIES CLASS ACTION ABUSES

Limits on abusive discovery to prevent "fishing expedition" lawsuits

   The cost of discovery often forces innocent parties to settle frivolous securit-
ies class actions. According to the general counsel of an investment bank, "discov-
ery costs account for roughly 80% of total litigation costs in securities fraud
cases." [FN11]  In addition, the threat that the time of key employees will be
spent responding to discovery requests, including providing deposition testimony,
often forces coercive settlements.
   The House and Senate heard testimony that discovery in securities class actions
often resembles a fishing expedition. As one witness noted, "once the suit is
filed, the plaintiff's law firm proceeds to search through all of the company's
documents and take endless depositions for the slightest positive comment which
they can claim induced the plaintiff to invest and any shred of evidence that the
company knew a downturn was coming." [FN12]
   The Conference Committee provides in new section 27(b) of the 1933 Act and new
section 21D(b)(3) of the 1934 Act that courts must stay all discovery pending a
ruling on a motion to dismiss, unless exceptional circumstances exist where par-
ticularized discovery is necessary to preserve evidence or to prevent undue preju-
dice to a party. For example, the terminal illness of an important witness might
require the deposition of the witness prior to the ruling on the motion to dis-
miss.
   To ensure that relevant evidence will not be lost, new section 27(b) of the 1933
Act and new section 21D(b)(3) of the 1934 Act make it unlawful for any person,
upon receiving actual notice that names that person as a defendant, willfully to
destroy or otherwise alter relevant evidence. The Conference Committee intends
this provision to prohibit only the willful alteration or destruction of evidence
relevant to the litigation. The provision does not impose liability where parties
inadvertently or unintentionally destroy what turn out later to be relevant docu-
ments. Although this prohibition expressly applies only to defendants, the Confer-
ence Committee believes that the willful destruction of evidence by a plaintiff
would be equally improper, and that courts have ample authority to prevent such
conduct or to apply sanctions as appropriate.

"Fair share" rule of proportionate liability

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-10258-SHS    Document 23-2    Filed 01/07/2008    Page 35 of 48

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

   One of the most manifestly unfair aspects of the current system of securities
litigation is its imposition of liability on one party for injury actually caused
by another. Under current law, a single defendant who has been found to be 1% li-
able may be forced to pay 100% of the damages in the case. The Conference Commit-
tee remedies this injustice by providing a "fair share" system of proportionate
liability. As former SEC Chairman Richard Breeden testified, under the current re-
gime of joint and several liability, "parties who are central to perpetrating a
fraud often pay little, if anything. At the same time, those whose involvement
might be only peripheral and lacked any deliberate and knowing participation in
the fraud often pay the most in damages." [FN13]

   The current system of joint and several liability creates coercive pressure for
entirely innocent parties to settle meritless claims **737 *38 rather than risk
exposing themselves to liability for a grossly disproportionate share of the dam-
ages in the case.

   In many cases, exposure to this kind of unlimited and unfair risk has made it
impossible for firms to attract qualified persons to serve as outside directors.
Both the House and Senate Committees repeatedly heard testimony concerning the
chilling effect of unlimited exposure to meritless securities litigation on the
willingness of capable people to serve on company boards. SEC Chairman Levitt him-
self testified that "there [were] the dozen or so entrepreneurial firms whose in-
vitations [to be an outside director] I turned down because they could not ad-
equately insure their directors . . . . [C]ountless colleagues in business have
had the same experience, and the fact that so many qualified people have been un-
able to serve is, to me, one of the most lamentable problems of all." [FN14]  This
result has injured the entire U.S. economy.

   Accordingly, the Conference Committee has reformed the traditional rule of joint
and several liability. The Conference Report specifically applies this reform to
the liability of outside directors under Section 11 of the 1933 Act, [FN15] be-
cause the current imposition of joint and several liability for non-knowing Sec-
tion 11 violations by outside directors presents a particularly glaring example of
unfairness. By relieving outside directors of the specter of joint and several li-
ability under Section 11 for non-knowing conduct, Section 201 of the Conference
Report will reduce the pressure placed by meritless litigation on the willingness
of capable outsiders to serve on corporate boards.

   In addition, Section 201 will provide the same "fair share" rule of liability,
rather than joint and several liability, for all 1934 Act cases in which liability
can be predicated on non-knowing conduct. [FN16]

   In applying the "fair share" rule of proportionate liability to cases involving
non-knowing securities violations, the Conference Committee explicitly determined
that the legislation should make no change to the state of mind requirements of
existing law. Accordingly, the definition of "knowing" conduct in the Conference
Report is written to conform to existing statutory standards, and Section 201 of
the Conference Report makes clear that the "fair share" rule of proportionate li-
ability does not create any new cause of action or expand, diminish, or otherwise
affect the substantive standard for liability in any action under the 1933 Act or
the 1934 Act. This section of the Conference Report further provides that the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

standard of liability in any such action should be determined by the pre-existing, unamended statutory provision that creates the cause of action, without regard to this provision, which applies solely to the allocation of damages.

The Conference Report imposes full joint and several liability, as under current law, on defendants who engage in knowing violations of the securities laws. Defendants who are found liable but have not engaged in knowing violations are responsible only for their share of the judgment (based upon the fact finder's apportionment of responsibility), with two key exceptions. First, all defendants are jointly and severally liable with respect to the claims of certain plaintiffs. Such plaintiffs are defined in the Conference Report as those who establish that (i) they are entitled to damages **738 *39 exceeding 10% of their net worth, and (ii) their net worth is less than $200,000. The $200,000 net worth test does not reflect a judgment by the Conference Committee that investors who fall below this standard are "small," unsophisticated, or in need of or entitled to any special protection under the securities laws. Second, if a defendant cannot pay their allocable share of the damages due to insolvency, each of the other defendants must make an additional payment-up to 50% of their own liability-to make up the shortfall in the plaintiff's recovery.

The Conference Committee recognizes that private parties may wish to allocate attorney's fees and costs according to a formula negotiated previously by contract. Accordingly, the Conference Report provides that where authorized by contract a prevailing defendant may recover attorney's fees and costs. The Conference Report does not change the enforceability of indemnification contracts in the event of settlement.

Attorneys' fees awarded to prevailing parties in abusive litigation

The Conference Committee recognizes the need to reduce significantly the filing of meritless securities lawsuits without hindering the ability of victims of fraud to pursue legitimate claims. The Conference Committee seeks to solve this problem by strengthening the application of Rule 11 of the Federal Rules of Civil Procedure in private securities actions.

Existing Rule 11 has not deterred abusive securities litigation. [FN17] Courts often fail to impose Rule 11 sanctions even where such sanctions are warranted. When sanctions are awarded, they are generally insufficient to make whole the victim of a Rule 11 violation: the amount of the sanction is limited to an amount that the court deems sufficient to deter repetition of the sanctioned conduct, rather than imposing a sanction that equals the costs imposed on the victim by the violation. Finally, courts have been unable to apply Rule 11 to the complaint in such a way that the victim of the ensuing lawsuit is compensated for all attorneys' fees and costs incurred in the entire action.

The legislation gives teeth to Rule 11 in new section 27(c) of the 1933 Act and new section 21D(c) of the 1934 Act by requiring the court to include in the record specific findings, at the conclusion of the action, as to whether all parties and all attorneys have complied with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure.

These provisions also establish the presumption that the appropriate sanction

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369                                                                                      Page 39

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

for filing a complaint that violates Rule 11(b) is an award to the prevailing
party of all attorney's fees and costs incurred in the entire action. The Confer-
ence Report provides that, if the action is brought for an improper purpose, is
unwarranted by existing law or legally frivolous, is not supported by facts, or
otherwise fails to satisfy the requirements set forth in Rule 11(b), the prevail-
ing party presumptively will be awarded its attorneys' fees and costs for the en-
tire action. This provision does not mean that a party who is sanctioned for only
a partial failure of the complaint under Rule 11, such as one count out of a
20-count complaint, must pay for all of the attorney's fees and costs associated
with the action. The Conference Committee expects that courts will **739 *40 grant
relief from the presumption where a de minimis violation of the Rule has occurred.
Accordingly, the Conference Committee specifies that the failure of the complaint
must be "substantial" and makes the presumption rebuttable.

   For Rule 11(b) violations involving responsive pleadings or dispositive motions,
the rebuttable presumption is an award of attorneys' fees and costs incurred by
the victim of the violation as a result of that particular pleading or motion.

   A party may rebut the presumption of sanctions by providing that: (i) the viola-
tion was de minimis; or (ii) the imposition of fees and costs would impose an un-
due burden and be unjust, and it would not impose a greater burden for the pre-
vailing party to have to pay those same fees and costs. The premise of this test
is that, when an abusive or frivolous action is maintained, it is manifestly un-
just for the victim of the violation to bear substantial attorneys' fees. The Con-
ference Committee recognizes that little in the way of justice can be achieved by
attempting to compensate the prevailing party for lost time and such other meas-
ures of damages as injury to reputation; hence it has written into law the pre-
sumption that a prevailing party should not have the cost of attorney's fees added
as insult to the underlying injury. If a party successfully rebuts the presump-
tion, the court then impose sanctions consistent with Rule 11(c)(2). [FN18]  The
Conference Committee intends this provision to impose upon courts the affirmative
duty to scrutinize filings closely and to sanction attorneys or parties whenever
their conduct violates Rule 11(b).

Limitation on attorney's conflict of interest

   The Conference Committee believes that, in the context of class action lawsuits,
it is a conflict of interest for a class action lawyer to benefit from the outcome
of the case where the lawyer owns stock in the company being sued. Accordingly,
new section 27(a)(8) of the 1933 Act and new section 21D(a)(9) requires the court
to determine whether a lawyer who owns securities in the defendant company and who
seeks to represent the plaintiff class in a securities class action should be dis-
qualified from representing the class.

Bonding for payment of fees and expenses

   The house hearings on securities litigation reform revealed the need for expli-
cit authority for courts to require undertakings for attorney's fees and costs
from parties, or their counsel, or both, in order to ensure the viability of po-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369                                                    Page 38

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**

tential sanctions as a deterrent to meritless litigation. [FN19] Congress long ago
authorized similar undertakings in the express private right of action in Section
11 of the 1933 Act and in Sections 9 and 18 of the 1934 Act. The availability of
such undertakings in private securities actions will be an important means of en-
suring that the provision of the Conference Report authorizing the award of attor-
neys' fees and costs under Rule 11 will not become, in practice, a one-way mechan-
ism only usable to sanction parties with deep pockets. [FN20]

The legislation expressly provides that such undertakings may be required of
parties' attorneys in lieu of, or in addition to, the parties themselves. In this
regard, the Conference Committee intends to preempt any contrary state bar re-
strictions that much inhibit **41 **740 attorneys' provision of such undertakings
in behalf of their clients. The Conference Committee anticipates, for example,
that where a judge determines to require an undertaking in a class action, such an
undertaking would ordinarily be imposed on plaintiffs' counsel rather than upon
the plaintiff class, both because the financial resources of counsel would ordin-
arily be more extensive than those of an individual class member and because coun-
sel are better situated than class members to evaluate the merits of cases and in-
dividual motions. This provision is intended to effectuate the remedial purposes
of the bill's Rule 11 provision.

### REQUIREMENTS FOR SECURITIES FRAUD ACTIONS

#### Heightened pleading standard

Naming a party in a civil suit for fraud is a serious matter. Unwarranted fraud
claims can lead to serious injury to reputation for which our legal system effect-
ively offers no redress. For this reason, among others, Rule 9(b) of the Federal
Rules of Civil Procedure requires that plaintiffs plead allegations of fraud with
"particularity." The Rule has not prevented abuse of the securities laws by
private litigants. [FN21] Moreover, the courts of appeals have interpreted Rule
9(b)'s requirement in conflicting ways, creating distinctly different standards
among the circuits. [FN22] The House and Senate hearings on securities litigation
reform included testimony on the need to establish uniform and more stringent
pleading requirements to curtail the filing of meritless lawsuits.

The Conference Committee language is based in part on the pleading standard of
the Second Circuit. The standard also is specifically written to conform the lan-
guage to Rule 9(b)'s notion of pleading with "particularity."

Regarded as the most stringent pleading standard, the Second Circuit requirement
is that the plaintiff state facts with particularity, and that these facts, in
turn, must give rise to a "strong inference" of the defendant's fraudulent intent.
Because the Conference Committee intends to strengthen existing pleading require-
ments, it does not intend to codify the Second Circuit's case law interpreting
this pleading standard. [FN23] The plaintiff must also specifically plead with
particularity each statement alleged to have been misleading. The reason or reas-
ons why the statement is misleading must also be set forth in the compliant in de-
tail. If an allegation is made on information and belief, the plaintiff must state
with particularity all facts in the plaintiff's possession on which the belief is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

formed.

Loss causation

   The Conference Committee also requires the plaintiff to plead and then to prove
that the misstatement or omission alleged in the complaint actually caused the
loss incurred by the plaintiff in new Section 21D(b)(4) of the 1934 Act. For ex-
ample, the plaintiff would have to prove that the price at which the plaintiff
bought the stock was artificially inflated as the  result of the misstatement or
omission.

**\*\*741 \*42 DAMAGES**

Written interrogatories

   In an action to recover money damages, the Conference Committee requires the
court to submit written interrogatories to the jury on the issue of defendant's
state of mind at the time of the violation. In expressly providing for certain in-
terrogatories, the Committee does not intend to otherwise prohibit or discourage
the submission of interrogatories concerning the mental state or relative fault of
the plaintiff and of persons who could have been joined as defendants. For ex-
ample, interrogatories may be appropriate in contribution proceedings among de-
fendants or in computing liability when some of the defendants have entered into
settlement with the plaintiff prior to verdict or judgment.

Limitation on "windfall" damages

   The current method of calculating damages in 1934 Act securities fraud cases is
complex and uncertain. As a result, there are often substantial variations in the
damages calculated by the defendants and the plaintiffs. Typically, in an action
involving a fraudulent misstatement or omission, the investor's damages are pre-
sumed to be the difference between the price the investor paid for the security
and the price of the security on the day the corrective information gets dissemin-
ated to the market.
   Between the time a misrepresentation is made and the time the market receives
corrected information, however, the price of the security may rise or fall for
reasons unrelated to the alleged fraud. According to an analysis provided to the
Senate Securities Subcommittee, on average, damages in securities litigation com-
prise approximately 27.7 [FN24]  of market loss. Calculating damages based on the
date corrective information is disclosed may end up substantially overestimating
plaintiff's damages. [FN25]  The Conference Committee intends to rectify the un-
certainty in calculating damages in new section 21D(e) of the 1934 Act by provid-
ing a "look back" period, thereby limiting damages to those losses caused by the
fraud and not by other market conditions.
   This provision requires that plaintiff's damages be calculated based on the
"mean trading price" of the security. This calculation takes into account the
value of the security on the date plaintiff originally bought or sold the security
and the value of the security during the 90-day period after dissemination of any

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

information correcting the misleading statement or omission. If the plaintiff
sells those securities or repurchases the subject securities during the 90-day
period, damages will be calculated based on the price of that transaction and the
value of the security immediately after the dissemination of corrective informa-
tion.

### SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS

The muzzling effect of abusive securities litigation

   Abusive litigation severely affects the willingness of corporate managers to
disclose information to the marketplace. Former SEC Chairman Richard Breeden test-
ified in a Senate Securities Subcommittee hearing on this subject: "Shareholders
are also damaged **742 *43 due to the chilling effect of the current system on the
robustness and candor of disclosure. . . . Understanding a company's own assess-
ment of its future potential would be among the most valuable information share-
holders and potential investors could have about a firm." [FN26]
   Fear that inaccurate projections will trigger the filing of securities class ac-
tion lawsuit has muzzled corporate management. One study found that over two-
thirds of venture capital firms were reluctant to discuss their performance with
analysts or the public because of the threat of litigation. [FN27] Anecdotal evid-
ence similarly indicates corporate counsel advise clients to say as little as pos-
sible, because "legions of lawyers scrub required filings to ensure that disclos-
ures are as milquetoast as possible, so as to provide no grist for the litigation
mill." [FN28]
   Technology companies-because of the volatility of their stock prices-are partic-
ularly vulnerable to securities fraud lawsuits when projections do not material-
ize. If a company fails to satisfy its announced earnings projections-perhaps be-
cause of changes in the economy or the timing of an order or new product-the com-
pany is likely to face a lawsuit.

A statutory safe harbor for forward-looking statements

   The Conference Committee has adopted a statutory "safe harbor" to enhance market
efficiency by encouraging companies to disclose forward-looking information. This
provision adds a new section 27A to the 1933 Act and a new section 21E of the 1934
Act which protects from liability in private lawsuits certain "forward-looking"
statements made by persons specified in the legislation. [FN29]
   The Conference Committee has crafted a safe harbor that differs from the safe
harbor provisions in the House and Senate passed bills. The Conference Committee
safe harbor, like the Senate safe harbor, is based on aspects of SEC Rule 175 and
the judicial created "bespeaks caution" doctrine. It is a bifurcated safe harbor
that permits greater flexibility to those who may avail themselves of safe harbor
protection. There is also a special safe harbor for issuers who make oral forward-
looking statements.
   The first prong of the safe harbor protects a written or oral forward-looking
statement that is: (i) identified as forward-looking, and (ii) accompanied by

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)

meaningful cautionary statements identifying important factors that could cause
actual results to differ materially from those projected in the statement.

Under this first prong of the safe harbor, boilerplate warnings will not suffice
as meaningful cautionary statements identifying important factors that could cause
actual results to differ materially from those projected in the statement. The
cautionary statements must convey substantive information about factors that real-
istically could cause results to differ materially from those projected in the
forward-looking statement, such as, for example, information about the issuer's
business.

As part of the analysis of what constitutes a meaningful cautionary statement,
courts should consider the factors identified in the statements. "Important"
factors means the stated factors identified in the cautionary statement must be
relevant to the projection **44 **743 and must be of a nature that the factor or
factors could actually affect whether the forward-looking statement is realized.

The Conference Committee expects that the cautionary statements identify import-
ant factors that could cause results to differ materially-but not all factors.
Failure to include the particular factor that ultimately causes the forward-look-
ing statement not to come true will not mean that the statement is not protected
by the safe harbor. The Conference Committee specifies that the cautionary state-
ments identify "important" factors to provide guidance to issuers and not to
provide an opportunity for plaintiff counsel to conduct discovery on what factors
were known to the issuer at the time the forward-looking statement was made.

The use of the words "meaningful" and "important factors" are intended to
provide a standard for the types of cautionary statements upon which a court may,
where appropriate, decide a motion to dismiss, without examining the state of mind
of the defendant. The first prong of the safe harbor requires courts to examine
only the cautionary statement accompanying the forward-looking statement. Courts
should not examine the state of mind of the person making the statement.

Courts may continue to find a forward-looking statement immaterial-and thus not
actionable under the 1933 Act and the 1934 Act-on other grounds. To clarify this
point, the Conference Committee includes language in the safe harbor provision
that no liability attaches to forward-looking statements that are "immaterial."

The safe harbor seeks to provide certainty that forward-looking statements will
not be actionable by private parties under certain circumstances. Forward-looking
statements will have safe harbor protection if they are accompanied by a meaning-
ful cautionary statement. A cautionary statement that misstates historical facts
is not covered by the Safe harbor, it is not sufficient, however, in a civil ac-
tion to allege merely that a cautionary statement misstates historical facts. The
plaintiff must plead with particularity all facts giving rise to a strong infer-
ence of a material misstatement in the cautionary statement to survive a motion to
dismiss.

The second prong of the safe harbor provides an alternative analysis. This safe
harbor also applies to both written and oral forward-looking statements. Instead
of examining the forward-looking and cautionary statements, this prong of the safe
harbor focuses on the state of mind of the person making the forward-looking
statement. A person or business entity will not be liable in a private lawsuit for

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

a forward-looking statement unless a plaintiff proves that person or business en-
tity made a false or misleading forward-looking statement with actual knowledge
that it was false or misleading. The Conference Committee intends for this altern-
ative prong of the safe harbor to apply if the plaintiff fails to prove the for-
ward-looking statement (1) if made by a natural person, was made with the actual
knowledge by that person that the statement was false or misleading; or (2) if
made by a business entity, was made by or with the approval of an executive of-
ficer of the entity with actual knowledge by that officer that the statement was
false or misleading.

**\*\*744 \*45** The Conference Committee recognizes that, under certain circumstances,
it may be unwieldy to make oral forward-looking statements relying on the first
prong of the safe harbor. Companies who want to make a brief announcement of earn-
ings or a new product would first have to identify the statement as forward-look-
ing and then provide cautionary statements identifying important factors that
could cause results to differ materially from those projected in the statement. As
a result, the Conference Committee has provided for an optional, more flex-
ible   rule for oral forward-looking statements that will facilitate these types
of oral communications by an issuer while still providing to the public informa-
tion it would have received if the forward-looking statement was written. The Con-
ference Committee intends to limit this oral safe harbor to issuers or the of-
ficers, directors, or employees of the issuer acting on the issuer's behalf.

   This legislation permits covered issuers, or persons acting on the issuer's be-
half, to make oral forward-looking statements within the safe harbor. The person
making the forward-looking statement must identify the statement as a forward-
looking statement and state that results may differ materially from those projec-
ted in the statement. The person must also identify a "readily available" written
document that contains factors that could cause results to differ materially. The
written information identified by the person making the forward-looking statement
must qualify as a "cautionary statement" under the first prong of the safe harbor
(i.e., it must be a meaningful cautionary statement or statements that identify
important factors that could cause actual results to differ materially from those
projected in the forward-looking statement.) For purposes of this provision, "read-
ily available" information refers to SEC filed documents, annual reports and other
widely disseminated materials, such as press releases.

Who and what receives safe harbor protection

   The safe harbor provision protects written and oral forward-looking statements
made by issuers and certain persons retained or acting on behalf of the issuer.
The Conference Committee intends the statutory safe harbor protection to make more
information about a company's future plans available to investors and the public.
The safe harbor covers underwriters, but only insofar as the underwriters provide
forward looking information that is based on or "derived from" information
provided by the issuer. Because underwriters have what is effectively an ad-
versarial relationship with issuers in performing due diligence, the use of the
term "derived from" affords underwriters some latitude so that they may disclose
adverse information that the issuer did not necessarily "provide." The Conference

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-10258-SHS   Document 23-2   Filed 01/07/2008   Page 43 of 48

Committee does not intend the safe harbor to cover forward-looking information
made in connection with a broker's sales practices.

The Conference Committee adopts the SEC's present definition, as set forth in
Rule 175, of forward-looking information, with certain additions and clarifying
changes. The definition covers: (i) certain financial items, including projections
of revenues, income and earnings, capital expenditures, dividends, and capital
structure; (ii) management's statement of future business plans and objectives,
**\*46 \*\*745** including with respect to its products or services; and (iii) certain
statements made in SEC required disclosures, including management's discussion and
analysis and results of operations; and (iv) any statement disclosing the assump-
tions underlying the forward-looking statement.

The Conference Committee has determined that the statutory safe harbor should
not apply to certain forward-looking statements. Thus, the statutory safe harbor
does not protect forward-looking statements: (1) included in financial statements
prepared in accordance with generally accepted accounting principles; (2) con-
tained in an initial public offering registration statement; (3) made in connec-
tion with a tender offer; (4) made in connection with a partnership, limited liab-
ility company or direct participation program offering; or (5) made in beneficial
ownership disclosure statements filed with the SEC under Section 13(d) of the 1934
Act.

At this time, the Conference Committee recognizes that certain types of transac-
tions and issuers may not be suitable for inclusion in a statutory safe harbor ab-
sent some experience with the statute. Although this legislation restricts part-
nerships, limited liability companies and direct participation programs from safe
harbor protection, the Conference Committee expects the SEC to consider expanding
the safe harbor to cover these entities where appropriate. The legislation author-
izes the SEC to adopt exemptive rules or grant exemptive orders to those entities
for whom a safe harbor should be available. The SEC should consider granting ex-
emptive orders for established and reputable entities who are excluded from the
safe harbor.

Moreover, the Committee has determined to extend the statutory safe harbor only
to forward-looking information of certain established issuers subject to the re-
porting requirements of section 13(a) or section 15(d) of the 1934 Act. Except as
provided by SEC rule or regulation, the safe harbor does not extend to an issuer
who: (a) during the three year period preceding the date on which the statement
was first made, has been convicted of a felony or misdemeanor described in clauses
(i) through (iv) of Section 15(b)(4) or is the subject of a decree or order in-
volving a violation of the securities laws; (b) makes the statement in connection
with a "blank check" securities offering, "rollup transaction," or "going private"
transaction; or (c) issues penny stock.

The Committee intends for its statutory safe harbor provisions to serve as a
starting point and fully expects the SEC to continue its rulemaking proceedings in
this area. The SEC should, as appropriate, promulgate rules or regulations to ex-
pand the statutory safe harbor by providing additional exemptions from liability
or extending its coverage to additional types of information.

This legislation also makes clear that nothing in the safe harbor provision im-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

poses any duty to update forward-looking statements.

The Conference Committee does not intend for the safe harbor provisions to re-place the judicial "bespeaks caution" doctrine or to foreclose further development of that doctrine by the courts.

**\*\*746 \*47 The safe harbor and stay of discovery**

The legislation provides that, on any motion to dismiss the compliant based on the application of the safe harbor, the court shall consider the statements cited in the complaint and statements identified by the defendant in its moving papers, including any cautionary statements accompanying the forward-looking statement that are not subject to material dispute. The applicability of the safe harbor provisions under subsection (c)(1)(B) shall be based on the "actual knowledge" of the defendant and does not depend on the use of cautionary language. The applicab-ility of the safe harbor provisions under subsections (c)(1)(A)(I) and (c)(2) shall be based upon the sufficiency of the cautionary language under those provi-sions and does not depend on the state of mind of the defendant. In the case of a compliant based on an oral forward-looking statement in which information concern-ing factors that could cause actual results to differ materially is contained in a "readily available" written document, the court shall consider statements in the readily available written documents.

### INAPPLICABILITY OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) TO PRIVATE SECURITIES ACTIONS.

The SEC has supported removing securities fraud as a predicate offense in a civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). SEC Chairman Arthur Levitt testified: "Because the securities laws gen-erally provide adequate remedies for those injured by securities fraud, it is both necessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO." [FN30]

The Conference Committee amends section 1964(c) of title 18 of the U.S. Code to remove any conduct that would have been actionable as fraud in the purchase or sale of securities as racketeering activity under civil RICO. The Committee in-tends this amendment to eliminate securities fraud as a predicate offense in a civil RICO action. In addition, the Conference Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.

### AUDITOR DISCLOSURE OF CORPORATE FRAUD

The Conference Report requires independent public accountants to adopt certain procedures in connection with their audits and to inform the SEC of illegal acts. These requirements would be carried out in accordance with generally accepted auditing standards for audits of SEC registrants-as modified from time to time by the Commission-on the detection of illegal acts, related party transactions and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**

relationships, and evaluation of an issuer's ability to continue as a going con-
cern.

   The Conference Committee does not intend to affect the Commission's authority in
areas not specifically addressed by this provision. The Conference Committee ex-
pects that the SEC will continue its longstanding practice of looking to the
private sector to set **747 *48 and to improve auditing standards. The SEC should
not act to "modify" or "supplement" generally accepted auditing standards for SEC
registrants until after it has determined that the private sector is unable or un-
willing to do so on a timely basis. The Conference Committee intends for the SEC
to have discretion, however, to determine the appropriateness and timeliness of
the private sector response. The SEC should act promptly if required by the public
interest or for the protection of investors.

                                    FOOTNOTES

   **748 *49 From the Committee on Commerce, for consideration of the House bill,
and the Senate amendment, and modifications committed to conference:

     Thomas Bliley,

     Billy Tauzin,

     Jack Fields,

     Chris Cox,

     Richard F. White,

     Anna G. Eshoo,

   As additional conferees from the Committee on the Judiciary, for consideration
of the House bill, and the Senate amendment, and modifications committed to con-
ference:

     Bill McCollum,

     Managers on the Part of the House.

     Alfonse D'Amato,

     Phil Gramm,

     Robert F. Bennett,

     Rod Grams,

     Pete V. Domenici,

     Christopher Dodd,

     John F. Kerry,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Managers on the Part of the Senate.

FN1 This certification should not be construed to waive the attorney-client privilege.

FN2 The notice provisions in this subsection do not replace or supersede other notice provisions provided in the Federal Rules of Civil Procedure.

FN3 See Elliott J. Weiss and John S. Beckerman, "Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions," 104 Yale L.J. 2053 (1995).

FN4 See testimony of Maryellen Anderson, Investor and Corporate Relations Director of the Connecticut Retirement & Trust Funds and Treasurer of the Council of Institutional Investors before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, July 21, 1993.

FN5 See The Brancato Report on Institutional Investment, "Total Assets and Equity Holdings," Vol. 2, Ed. 1.

FN6 See "Let the Money do the Monitoring," note 3, supra.

FN7 See generally Majority Staff Report, May 17, 1994 at page 81 et seq.

FN8 See testimony of Patricia Reilly before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, June 17, 1993.

FN9 See NASCAT Analysis of Pending Legislation on Securities Fraud Litigation, Hearing on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995.

FN10 See testimony of Patricia Reilly, note 8 supra.

FN11 See testimony of former SEC Commissioner J. Carter Beese, Jr., Chairman of the Capital Markets Regulatory Reform Project Center for Strategic and International Studies, before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995 (citing testimony of Philip A. Lacavara before the Telecommunications and Finance Subcommittee of the House Committee on Energy and Commerce, hearing on H.R. 3185.)

FN12 See testimony of Richard J. Egan, Chairman of the Board of EMC Corporation before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, June 17, 1993. See also testimony of Dennis Bakke, President and CEO, AES Corporation, before the Telecommunications and Finance Subcommittee of the House Committee on Commerce, January 19, 1995.

FN13 See testimony of Hon. Richard Breeden, former Chairman, Securities and Exchange Commission, before the Subcommittee on Telecommunications and Finance, House Commerce Committee, February 10, 1995. See also testimony of Daniel Gelzer,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

H.R. Conf. Rep. 104-369
H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369, 1995 U.S.C.C.A.N. 730)**


id. at 274.

FN14 See testimony of Hon. Arthur Levitt, Chairman, Securities and Exchange Com-
mission, before the Subcommittee on Telecommunications and Finance of the House
Commerce Committee, February 10, 1995, at 192. See also id. at 116, 126 (testimony
of Dennis W. Bakke, Chairman and CEO, AES Corporation); id. at 137-8 (testimony of
James Kimsey, Chairman, America Online).

FN15 The Conference Report makes no change in the law with respect to Section 11
claims against other types of defendants. Section 11 expressly provides for a
right of contribution, see Section 11(f), and this right has been construed to es-
tablish contribution and settlement standards like those set forth in the Confer-
ence Report. This section has no effect on the interpretation of Section 11(f)
with respect to defendants other than outside directors.

FN16 See Section 16(b) (short-swing transactions) and Section 18 (liability for
misleading statements).

FN17 See, e.g., testimony of Saul S. Cohen, Rosenman & Colin, before the Tele-
communications and Finance Subcommittee of the House Committee on Commerce, Febru-
ary 10, 1995. ("In our experience, Rule 11 has been largely ineffective in deter-
ring strike suits. As a general matter, courts rarely grant Rule 11 sanctions in
all but the most egregious circumstances".)

FN18 Rule 11(c)(2) limits sanctions to "what is sufficient to deter the repeti-
tion of such conduct or comparable conduct by others similarly situated".

FN19 See testimony of John Olson, Chairman, American Bar Association Business
Law Section, before the Subcommittee on Telecommunications and Finance, House Com-
merce Committee, February 10, 1995.

FN20 See id.

FN21 See, e.g., testimony of Saul S. Cohen, Rosenman & Colin, before the Tele-
communications and Finance Subcommittee of the House Committee on Commerce at
234-35 (February 10, 1995).

FN22 See id.

FN23 For this reason, the Conference Report chose not to include in the pleading
standard certain language relating to motive, opportunity, or recklessness.

FN24 The percentages of damages as market losses in the analysis ranged from
7.9% to 100% See Princeton Venture Research, Inc., "PVR Analysis, Securities Law
Class Actions, Damages as a Percent of Market Losses," June 15, 1993.

FN25 See Lev and de Villiers, "Stock Price Crashes and 10b-5 Damages: A Legal,
Economic and Policy Analysis," Standford Law Review, 7, 9-11 (1994).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-10258-SHS     Document 23-2     Filed 01/07/2008     Page 48 of 48

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)
**(Cite as: H.R. CONF. REP. 104-369,  1995 U.S.C.C.A.N. 730)**


FN26 See testimony of Hon. Richard C. Breeden, former Chairman, SEC, before the
Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Af-
fairs, April 6, 1995.

FN27 See testimony of the National Venture Capital Association before the Secur-
ities Subcommittee on the Senate Committee on Banking, Housing, and Urban Affairs,
March 2, 1995.

FN28 See testimony of Hon. J. Carter Beese, former SEC Commissioner, at  id.

FN29 The concept of a safe harbor for forward-looking statements made under cer-
tain conditions is not new. In 1979, the SEC promulgated Rule 175 to provide a
safe harbor for certain forward looking statements made with a "reasonable basis"
and in "good faith." This safe harbor has not provided companies meaningful pro-
tection from litigation. In a February 1995 letter to the SEC, a major pension
fund stated: "A major failing of the existing safe harbor is that while it may
provide theoretical protection to issuers from liability when disclosing projec-
tions, it fails to prevent the threat of frivolous lawsuits that arises every time
a legitimate projection is not realized." See February 14, 1995 letter from the
California Public Employees' Retirement System to the SEC. Courts have also craf-
ted a safe harbor for forward-looking statements or projections accompanied by
sufficient cautionary language. The First, Second, Third, Sixth and Ninth Circuits
have adopted a version of the "bespeaks caution" doctrine. See, e.g., In re Worlds
of Wonder Securities Litigation, 35 F. 3d 1407 (9th Cir. 1994); Rubinstein v.
Collins, 20 F.3d 169 (5th Cir. 1994); Kline v. First Western Government Securit-
ies, Inc., 24 F. 3d 480 (3d Cir. 1994); Sinay v. Lamson & Sessions Company, 948
F.2d 1037 (6th Cir. 1991); I. Meyer Pincus & Associates v. Oppenheimer & Co.,
Inc., 936 F.2d 759 (2d Cir. 1991); Romani v. Shearson Lehman Hutton, 929 F.2d 875
(1st Cir. 1991); Luce v. Edelstein, 802 F.2d 49 (2d Cir. 1986); In re Donald J.
Trump Casino, 7 F.3d 357 (3d Cir. 1993).

FN30 See testimony of Hon. Arthur Levitt, Chairman, SEC, before the Telecommu-
nications and Finance Subcommittee of the House Commerce Committee, February 10,
1995.

 H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995,
1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

United States Courts
Southern District of Texas
ENTERED

AUG 1 6 2002

Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA Litigation | } } } } | MDL-1446 |
| THIS DOCUMENT RELATES TO: | } | |
| All Cases | } } | |
| MARK NEWBY, ET AL., | } } | |
| Plaintiffs | } } | |
| VS. | } } | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | } } | |
| Defendants | } | |



## ORDER

Pending before the Court is Lead Plaintiff the Regents of the University of California's motion for a limited production of Enron documents (instrument #802).

Lead Plaintiff explains that in the New York bankruptcy court it moved for a limited modification of the automatic stay as to Debtor Enron Corporation to obtain copies of all documents and materials produced by the Debtor related to any inquiry or investigation by any legislative branch committee, the executive branch, including the Department of Justice and the Securities and Exchange Commission, and all transcripts of witness interviews or depositions related to those inquiries. After review of the briefing and oral argument, on May 22, 2002 Judge Arthur Gonzalez lifted the automatic stay, provided that this Court determines that the PSLRA's discovery stay should be lifted, to require Enron to produce such documents, subject to any attorney-client privilege or work product protection asserted by Enron and a reasonable time for review. Ex. to Motion. Because these materials have already been made available to and reviewed by numerous governmental entities and others, Lead Plaintiff asks the Court to order the PSLRA's discovery stay to be lifted for the same reasons it did in its February 27, 2002 scheduling order,

when it lifted the stay as to certain ERISA documents and made them available to both <u>Tittle</u> and <u>Newby</u> Plaintiffs because the PSLRA's discovery stay "was designed to prevent fishing expeditions in frivolous securities lawsuits" and "was not designed to keep secret from counsel in securities cases documents that have already become available for review by means other than discovery in the securities case." Feb. 27, 2002 Order (#326) at 3-4.

Opposition has been filed by Enron Corporation (#883), joined by Defendant Kenneth Lay (#884) and Certain Officer Defendants (Richard Buy, Richard Causey, Kenneth Rice, Joseph M. Hirko, Stanley C. Horton, Steven Kean, Kevin Hannon, Mark Frevert, Mark Koenig, Jeff McMahon, Lawrence Whalley and Cindy K. Olson)(#890). Emphasizing the unambiguous text of 15 U.S.C. § 78u-4(b)(3)(B),[1] which allows only two exceptions to the PSLRA's ban on discovery during pendency of motions to discuss, Defendants note that Lead Plaintiff does not claim that it can show that particularized discovery is essential to preserve evidence or to prevent prejudice to Lead Plaintiff. They complain, "Plaintiff offers no authority or rationale for expanding the Court's Scheduling Order's accommodation of the ERISA claims to order wholesale production of hundreds of thousands of pages of documents in the securities case." Defendants insist that the PSLRA prohibits discovery requests, whether a "fishing expedition" or a "surgical strike." They argue that until the Court rules on the motions to dismiss challenging the legal sufficiency of the amended consolidated complaint, the securities action "should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed," as Congress intended. <u>SG Cowan Securities Corp. v. U.S.D.C. of the N.D. Cal.</u>, 189 F.3d 909, 912 (9th Cir. 1999).

---

[1] Section 78u-4(b)(3)(B) provides,

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon motion of any party that particularized discovery is necessary to preserve evidence or to prevent prejudice to that party.

In reply, Lead Plaintiff underlines the point that this request does not "pose . . . a threat of the abusive litigation threatened by the PSLRA" and that "Defendants therefore should not be allowed to hide behind the statute."  While recognizing that the PSLRA's discovery stay protected Defendants from unnecessary discovery costs, Lead Plaintiff argues that here the burden would be slight because Enron has already found, reviewed, and organized the documents.  The Court agrees.  In a sense this discovery has already been made, and it is merely a question of keeping it from a party because of the strictures of a statute designed to prevent discovery abuse.  Accordingly, the Court

**ORDERS** that the motion for limited production is **GRANTED**.

**SIGNED** at Houston, Texas, this _15_ th day of August, 2002.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

FEB 28 2002

Michael N. Milby, Clerk of Court

| | |
|---|---|
| MARK NEWBY, ET AL., | } |
| Plaintiffs | } |
| | } |
| VS. | } CIVIL ACTION NO. H-01-3624 |
| | } AND CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | } |
| Defendants | } |

| | |
|---|---|
| PIRRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, Derivatively On Behalf of ENRON CORPORATION, ET. AL., | } |
| Plaintiffs | } |
| | } |
| VS. | } CIVIL ACTION NO. H-01-3645 |
| | } AND CONSOLIDATED CASES |
| KENNETH LAY, ET AL., | } |
| Defendants | } |

| | |
|---|---|
| PAMELA M. TITTLE, on behalf of herself and a class of persons similarly situated, ET AL., | } |
| Plaintiffs | } |
| | } |
| VS. | } CIVIL ACTION NO. H-01-3913 |
| | } AND CONSOLIDATED CASES |
| ENRON CORP., an Oregon Corporation, ET AL., | } |
| Defendants. | } |

## SCHEDULING ORDER

On February 25, 2002 this Court held a scheduling conference participated in by the consolidated *Tittle* parties and the consolidated *Newby* parties. The Court heard

326

from plaintiffs and defendants in each case and has considered the arguments of all sides. The consolidated *Pirrelli* case has been automatically stayed by the Enron bankruptcy proceeding and remains so.[1] That stay of claims against Enron Corporation in the *Tittle* consolidated action was lifted by The Hon. Arthur J. Gonzalez, United States Bankruptcy Judge, Southern District of New York, for the limited purpose of allowing, *inter alia*, Enron to participate in the scheduling of the *Tittle* case.

The Court is mindful that the eyes of the nation are on this Court and the civil justice system to see if we are up to the challenge of giving to all parties in these suits their day in court. It is the nation's impression that the justice system grinds slowly in a Dickensian fashion, and it is the hope of this Court that that impression can be changed by an efficient resolution of these cases. To that end, the Court finds that the agreed to and proposed schedules submitted by the plaintiffs and defendants are each deficient in some respect. The Court has taken into account the positions and arguments of each group of parties and has fashioned what the Court believes to be a workable schedule, one that will require the expenditure of a great deal of time and energy by the lawyers and parties, but one that will bring this case to resolution in as short a time frame as humanly possible, while serving the interests of justice. The scheduled dates are considered by this Court to be FIRM DATES. These are not floating dates subject to change without sufficient reason. By separate order the Court will establish a monthly conference call so that counsel and the Court may confer. Accordingly, it is hereby

---

[1] At this time, because the Detective Endowment Association Annuity Fund has moved in the Bankruptcy Court to lift the stay as to the shareholder derivative suits, the Court chooses not to administratively close the *Pirrelli* action.

**ORDERED** that the *Newby* and *Tittle* plaintiffs and defendants shall confer within the next ten days and as promptly as possible take the steps necessary to set up and fund in Houston, Texas, a document depository for the receipt and maintenance of discovery in all of these consolidated cases. The depository shall be accessible to the attorneys for all parties. The logistics of setting up the depository and protocols for access and copying will be left to the professionalism of experienced counsel. It is further

**ORDERED** that, pursuant to the order of the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge for the Southern District of New York, partially lifting the bankruptcy stay, Enron Corporation will produce, subject to attorney client privilege or work product protection:

(1) a copy of all documents and materials Enron has produced since filing for bankruptcy in connection with any inquiry(ies) or investigation(s) into the Company's handling of its ERISA-governed pension plans, that were provided, or that may be provided, pursuant to subpoena

   (a) by any committee of the Legislative branch of the United States Government, or

   (b) by the Executive branch of the United States Government, including, but not limited to, the Department of Labor, and

(2) copies of all transcripts of witness interviews or depositions in Enron's possession, custody or control, given or taken in connection with said inquiry(ies) or investigation(s).

These copies of documents, transcripts and depositions shall be deposited in the document depository in Houston, Texas by April 1, 2002 and made available to all lawyers in both the consolidated *Tittle* and *Newby* cases. The automatic stay of discovery

mandated by the PSLRA was designed to prevent fishing expeditions in frivolous securities lawsuits. It was not designed to keep secret from counsel in securities cases documents that have become available for review by means other than discovery in the securities case. Furthermore, as pointed out during the hearing, the *Tittle* plaintiffs are included within the putative class of the *Newby* case. Any materials withheld because of privilege or work product shall be documented in a privileged log. It is further

**ORDERED** that interrogatories, requests for admissions, and document requests that plaintiffs in the *Newby* or *Tittle* case wish to propound to defendants, including Enron, be proposed as soon as possible so that, should any claims survive the motions to dismiss, the *Newby* and *Tittle* defendants will have had an opportunity to review the discovery requests during the pendency of the motions to dismiss and can respond within a reasonable time frame after a ruling on the motions, should a response be necessary. In no event shall Enron's answer, objection, or other response to the discovery be required until the bankruptcy stay is lifted for all purposes on June 21, 2002, pursuant to Judge Gonzalez's Order. It is further

**ORDERED** that the plaintiffs in the *Tittle* case, inasmuch as they are not subject to the PSLRA stay of discovery, may immediately begin any discovery unique to their case that has not been stayed in the *Newby* case by the PSLRA. All discovery shall be placed in the document depository in Houston, Texas. It is further

**ORDERED** that expert witnesses, whether on the class issues or on the merits of the case, shall be designated by a party and shall file at that time a comprehensive expert report. The counter expert must then be designated and provide his or her comprehensive report. Waiting to depose the counter expert until after a first

designated expert has been deposed will unnecessarily prolong the discovery process.

Accordingly, it is hereby

ORDERED that the Pretrial Scheduling Order, which shall apply to the

consolidated *Tittle* and *Newby* cases shall be as follows:

| | |
|---|---|
| Consolidated Complaints filed by | April 1, 2002 |
| Motions to dismiss due | May 1, 2002 |
| Opposition to Motions to dismiss | June 3, 2001 |
| Replies to Opposition to Motions to dismiss | June 17, 2002 |
| Class discovery begins | July 1, 2002 |
| Class discovery ends | September 2, 2002 |
| Plaintiffs' Motions for Class Certification | October 1, 2002 |
| Defendants' Opposition | November 1, 2002 |
| Plaintiffs' Replies | December 2, 2002 |
| Deadline to join new parties or to file third party complaints or cross complaints/claims: | January 2, 2003 |
| All fact discovery completed by | April 1, 2003 |
| Plaintiffs' expert witnesses named and a comprehensive report of the experts' opinions furnished by | April 15, 2003 |
| Defendants' expert witnesses named and a comprehensive report of the experts' opinions furnished by | May 15, 2003 |
| Expert Discovery completed by | July 2, 2003 |
| Motions for Summary Judgment and all other dispositive motions filed and served by | August 15, 2003 |
| Joint Pretrial Order filed by | October 15, 2003 |
| Plaintiffs are responsible for filing the Pretrial Order on time. | |
| Docket Call is set for 1:30 pm | November 14, 2003 |
| Trial is set for 9:00 am | December 1, 2003 |

**SIGNED** at Houston, Texas, this 27th day of February, 2002.

_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

Westlaw.

S. REP. 107-205                                                      Page 1
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

*1 PUBLIC COMPANY ACCOUNTING REFORM AND INVESTOR PROTECTION ACT OF
2002

SENATE REPORT NO. 107-205
July 3, 2002

Mr. Sarbanes, from the Committee on Banking, Housing, and Urban Affairs,
submitted the following

REPORT

[To accompany S. 2673]

The Committee on Banking, Housing and Urban Affairs reported an original bill to
improve quality and transparency in financial reporting and independent audits and
accounting services for public companies, to create a Public Company Accounting
Oversight Board, to enhance the standard setting process for accounting practices,
to strengthen the independence of firms that audit public companies, to increase
corporate responsibility and the usefulness of corporate financial disclosure, to
protect the objectivity and independence of securities analysts, to improve Secur-
ities and Exchange Commission resources and oversight, and for other purposes, and
reports favorably thereon and recommends that the bill do pass.

COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

(II)

CONTENTS

                                                                    Page
Introduction ............................................................... 1
Purpose of the Legislation ................................................. 2
Hearings ................................................................... 2
Title-by-Title Summary of Major Provisions ................................. 4
Title I-Public Company Accounting Oversight Board .......................... 4
A. Appointment and Operation of Board ...................................... 6
B. Registration of Accounting Firms ........................................ 7
C. Auditing, QualityControl, Ethics, and Independence Standards and Rules ... 8
D. Inspections of Registered Accounting Firms .............................. 9
E. Investigations and Disciplinary Proceedings ............................ 10
F. Foreign Public Accounting Firms ........................................ 11
G. SEC Oversight of the Board ............................................. 12
H. Accounting Principles .................................................. 12
I. Funding ................................................................ 13
Title II-Auditor Independence ............................................. 14

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523 (Leg.Hist.)
**(Cite as: S. REP. 107-205)**

A. Services Outside the Scope of Practice of Auditors ....................... 15
B. Audit Committee Pre-Approval of Audit and Non-Audit Services ............ 19
C. Audit Partner Rotation ................................................... 21
D. Disclosures of Accounting Issues ........................................ 21
E. Cooling Off Period ...................................................... 22
F. The Bill Does Not Create State Regulatory Standards .................... 23
Title III-Corporate Responsibility ........................................ 23
A. Issuer Audit Committees ................................................. 23
B. Corporate Responsibility for Financial Reports ......................... 25
C. Prohibited Influence .................................................... 26
D. Forfeiture of Bonuses and Profits ...................................... 26
E. Officer and Director Bars and Penalties ................................ 26
F. Prohibition on Insider Trades During Pension Fund Blackout Periods ...... 27
Title IV-Enhanced Financial Disclosures ................................... 28
A. Accounting Adjustments .................................................. 28
B. Off-Balance Sheet Transactions ......................................... 28
C. Pro-Forma Financial Disclosures ........................................ 28
D. Enhanced Disclosures of Loans .......................................... 29
E. Disclosures of Transactions Involving Management ....................... 30
F. Management Assessment of Internal Controls ............................. 31
G. Exemptions for Investment Companies .................................... 31
H. Code of Ethics for Senior Financial Officers ........................... 32
I. Disclosure of Audit Committee Financial Expert ......................... 32
Title V-Analyst Conflicts of Interest ..................................... 32
Title VI-Commission Resources and Authority ............................... 39
Title VII-Studies and Reports ............................................. 42
Section-by-Section Analysis ............................................... 43
Section 1. Short title and table of contents ............................. 43
Section 2. Definitions .................................................... 43
Section 3. Commission Rules and Enforcement ............................... 44
Title I-Public Company Accounting Oversight Board ......................... 44
Section 101. Establishment ................................................ 44
Section 102. Registration with the Board ................................. 45
Section 103. Auditing, qualitycontrol, and independence standardsand
    rules ................................................................. 46
Section 104. Inspections of registered public accounting firms ............ 47
Section 105. Investigations and disciplinary proceedings ................. 48
Section 106. Foreign public accounting firms ............................. 49
Section 107. Commission oversight of the Board ........................... 49
Section 108. Accounting standards ........................................ 50
Section 109. Funding ..................................................... 50
Title II-Auditor Independence ............................................. 51
Section 201. Services outside the auditor scope of practice .............. 51
Section 202. Pre-approval requirements ................................... 51
Section 203. Audit partner rotation ...................................... 51
Section 204. Auditor report to Audit Committees .......................... 52

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

Section 205. Conforming amendments ......................................... 52
Section 206. Conflicts of interest ........................................ 52
Section 207. Studyofmandatoryrotationofregisteredpubl accounting firms ... 52
Section 208. Commission authority ......................................... 52
Section 209. Considerationsbyappropriatestateregulato authorities ........ 52
Title III-Corporate Responsibility ........................................ 52
Section 301. Issuer Audit Committees ...................................... 52
Section 302. Corporate responsibility for financial reports ............... 53
Section 303. Prohibited influence ......................................... 53
Section 304. Forfeiture of certain bonuses and profits .................... 53
Section 305. Officer and director bars and penalties ...................... 53
Section 306. Insider trades during pension fund black outperiods
  prohibited .............................................................. 53
Title IV-Enhanced Financial Disclosures ................................... 54
Section 401. Disclosures in periodic reports .............................. 54
Section 402. Enhanced disclosures of loans ................................ 54
Section 403. Disclosures of transactions involving management ............. 54
Section 404. Management assessment of internal controls ................... 54
Section 405. Exemption .................................................... 54
Section 406. Code of ethics for senior financial officers ................. 54
Section 407. Audit Committee financial expert ............................. 55
Title V-Analyst Conflicts of Interest ..................................... 55
Section 501. Treatment of securities analysts by registered securities
  associations ........................................................... 55
Title VI-Commission Resources and Authority ............................... 56
Section 601. Authorization of appropriations .............................. 56
Section 602. Appearance and practice before the SEC ....................... 56
Section 603. Federal court authority to impose penny stock bars ........... 56
Section 604. Qualificationsofassociatedpersonsofbroke dealers ......... 56
Title VII-Studies and Reports ............................................. 56
Section 701. GAO study and report regarding consolidation of public
  accounting firms ....................................................... 56
Section 702. Commission study and report regarding rating agencies ........ 57
Changes in Existing Law ................................................... 57
Regulatory Impact Statement ............................................... 57
Cost of Legislation ....................................................... 58
Additional views of:Senator Gramm ........................................ 66
Senator Enzi .............................................................. 68

107th Congress

INTRODUCTION

On June 18, 2002, the Senate Committee on Banking, Housing, and Urban Affairs
considered the "Public Company Accounting Reform and Investor Protection Act of
2002," a bill to improve quality and transparency in financial reporting and inde-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

pendent audits and accounting services for public companies, to create a Public
Company Accounting Oversight Board, to enhance the standard-setting process for
accounting practices, to strengthen the independence of firms audit public compan-
ies; state authorities should not presume that the standards applied under the
bill should apply to those companies under state regulatory schemes.

The bill also requires steps to enhance the direct responsibility of senior cor-
porate management for financial reporting and for the quality of financial dis-
closures made by public companies. The bill establishes clear statutory rules to
limit, and expose to public view, possible conflicts of interest affecting secur-
ities analysts. Finally, the bill authorizes substantially higher funding for the
Securities and Exchange Commission.

HEARINGS

The Banking Committee's action followed ten hearings on the accounting and in-
vestor protection issues raised by the financial revelations involving Enron and
other public companies. These issues include: the integrity of certified financial
audits; appropriate accounting principles and auditing standards; the effective-
ness of the accounting regulatory oversight system; the importance of auditor in-
dependence for the quality of audits; conflicts of interest, and the compromise to
auditor independence, raised by accounting firms' increased offering of consulting
services to audit clients; the completeness of corporate disclosure in SEC filings
and shareholder communications; conflicts of interest among securities under-
writers and affiliated stock analysts; insider abuses; corporate responsibility;
and the adequacy of resources available to the Securities and Exchange Commission
to meet its responsibilities.

On February 12, 2002, the Committee heard from a panel of five former Chairmen
of the Securities and Exchange Commission: Roderick M. Hills, Chairman, 1975-77;
Harold M. Williams, Chairman, **3** 1977-81; David Ruder, Chairman, 1987-89; Richard
C. Breeden, Chairman, 1989-93; and Arthur Levitt, Jr., Chairman, 1993-2000. [FN1]

On February 14, 2002, Paul Volcker, Chairman of the Trustees of the Internation-
al Accounting Standards Committee, and former Chairman of the Board of Governors
of the Federal Reserve System, and Sir David Tweedie, Chairman of the Internation-
al Accounting Standards Board, and former Chairman of the United Kingdom's Ac-
counting Standards Board, appeared before the Committee to discuss "International
Accounting Standards and Necessary Reforms to Improve Financial Reporting."

On February 26, 2002, a panel of three former Chief Accountants of the Securit-
ies and Exchange Commission and a former Chairman of the Financial Accounting
Standards Board testified on "Oversight of the Accounting Profession, Audit Qual-
ity and Independence, and Formulation of Accounting Principles." The witnesses
were Walter P. Schuetze, Chief Accountant, 1992-95; Michael H. Sutton, Chief Ac-
countant, 1995-98; Lynn E. Turner, Chief Accountant, 1998-2001; and Dennis R.
Beresford, Chairman, Financial Accounting Standards Board, 1987-97.

On February 27, 2002, the Committee heard testimony on "Corporate Governance"
from John H. Biggs, Chairman, President, and Chief Executive Officer, Teachers'
Insurance and Annuity Association-College Retirement Equities Fund (TIAA CREF),
and former member of the Public Oversight Board; and Ira M. Millstein, Senior

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

Partner, Weil, Gotshal & Manges LLP, and Co-Chair of the Blue Ribbon Committee on
Improving the Effectiveness of Corporate Audit Committees.

On March 5, 2002, the Committee heard from David M. Walker, Comptroller General
of the United States; as well as Robert Glauber, Chairman and Chief Executive Of-
ficer, National Association of Securities Dealers, Inc., and former Under Secret-
ary for Finance, Department of Treasury, under President Bush (1989-1992); Joel
Seligman, Dean and Ethan A. H. Shepley University Professor, Washington University
School of Law; and John C. Coffee, Jr., Adolf A. Berle Professor of Law, Columbia
University Law School.

On March 6, 2002, the Committee heard testimony on "Oversight of the Accounting
Profession, Audit Quality and Independence, and Formulation of Accounting Prin-
ciples" from Shaun O'Malley, Chairman, 2000 Public Oversight Board Panel on Audit
Effectiveness, and former Chairman, Price Waterhouse LLP; Lee Seidler, Deputy
Chairman, 1978 American Institute of Certified Public Accountants ("AICPA") Com-
mission on Auditors' Responsibilities, and Managing Director Emeritus, Bear Ste-
arns & Co.; Arthur R. Wyatt, former President, American Accounting Association,
and Professor of Accountancy Emeritus, University of Illinois; Abraham Briloff,
Emanuel Saxe Distinguished Professor Emeritus, Baruch College, City University of
New York; and Bevis Longstreth, Member, 2000 Public Oversight Board Panel on Audit
Effectiveness, and former Commissioner, Securities and Exchange Commission
(1981-84).

On March 14, 2002, the Committee heard from representatives of the accounting
industry, the American Enterprise Institute, and The Brookings Institution. The
witnesses were James G. Castellano, Chairman, AICPA, and Managing Partner, Rubin,
**\*4** Brown, Gornstein & Co. LLP; James S. Gerson, Chairman, Auditing Standards
Board, AICPA, and Partner, PricewaterhouseCoopers LLP; William Balhoff, Chairman,
AICPA Private Company Practice Section; Olivia F. Kirtley, former Chair, AICPA;
James E. Copeland, Jr., Chief Executive Officer, Deloitte & Touche LLP; Peter J.
Wallison, Resident Fellow and Co-Director, Financial Deregulation Project, Americ-
an Enterprise Institute; and Robert E. Litan, Director, Economic Studies Program,
The Brookings Institution.

On March 19, 2002, the Committee heard from two members of the recently-disban-
ded Public Oversight Board ("P.O.B."): Charles A. Bowsher, former Comptroller Gen-
eral of the United States, who was the P.O.B.'s Chairman; and Aulana L. Peters,
former Commissioner, Securities and Exchange Commission (1984-88), who was a mem-
ber of the P.O.B.; as well as from L. William Seidman, former Chairman, Federal
Deposit Insurance Corporation and Resolution Trust Corporation, and former Part-
ner, Seidman & Seidman; John C. Whitehead, former Co-Chairman, Goldman Sachs &
Co., Co-Chair of the Blue Ribbon Committee on Improving the Effectiveness of Cor-
porate Audit Committees, and former Deputy Secretary of State (1985-89); and Mi-
chael Mayo, Managing Director, Prudential Securities, Inc.

On March 20, 2002, the Committee heard from a variety of interested parties in-
cluding Thomas A. Bowman, President and Chief Executive Officer, Association for
Investment Management and Research; Howard M. Metzenbaum, Chairman, Consumer Fed-
eration of America, and former U.S. Senator; Damon Silvers, Associate General
Counsel, AFL-CIO; and Sarah Teslik, Executive Director, Council of Institutional

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-10258-SHS     Document 23-5     Filed 01/07/2008     Page 6 of 71
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Investors.

   On March 21, 2002, the Committee heard testimony from Harvey L. Pitt, Chairman,
Securities and Exchange Commission.

                    TITLE-BY-TITLE SUMMARY OF MAJOR PROVISIONS

              TITLE I-PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD


   Title I of the bill creates a Public Company Accounting Oversight Board (the
"Board"), to provide for more effective oversight of the part of the nation's ac-
counting industry that audits public companies. Title I reflects significant por-
tions of S. 2004, authored by Senators Dodd and Corzine, as well as the terms of
an amendment offered at the Committee's June 18 mark-up by Senator Enzi, which was
adopted by voice vote.

   The new Board may, subject to review by the Securities and Exchange Commission
(the "SEC" or the "Commission"), establish, adopt, or modify auditing, quality
control, ethics, and independence standards for public company audits, inspect ac-
counting firms, investigate potential violations of applicable rules relating to
audits, and impose sanctions if those violations are established. The Board will
have authority only with respect to audits of public companies. It has no juris-
diction over the work of accountants in auditing other companies.

   The Board will bring together various issues and responsibilities that have in
the past been subject to what one Committee witness **5 characterized as " a bewil-
dering array of monitoring groups" [FN2] under the auspices of the accounting pro-
fession. As Shaun O'Malley, Chairman of the 2000 Panel on Audit Effectiveness (and
former Chairman of Price Waterhouse LLP), explained to the Committee in greater
detail:

      The profession's combination of public oversight and voluntary self-regulation
   is extensive, Byzantine, and insufficient. The Panel found that the current system
   of governance lacks sufficient public representation, suffers from divergent views
   among its members as to the profession's priorities, implements a disciplinary
   system that is slow and ineffective, lacks efficient communication among its vari-
   ous entities and with the SEC, and lacks unified leadership and oversight. [FN3]

   Twenty witnesses who appeared before the Committee in its ten days of hearings
on accounting reform and investor protection stressed the need for a strong Board
to oversee the auditors of public companies. Paul Volcker, the former Chairman of
the Federal Reserve Board, told the Committee that:

      [o]ver the years, there have also [i.e., in addition to the SEC] been repeated
   efforts to provide oversight by industry or industry/public member boards. By and
   large, I think we have to conclude that those efforts at self-regulation have been
   unsatisfactory. Thus, experience strongly suggests that governmental oversight,
   with investigation and enforcement powers, is necessary to assure discipline.
   [FN4]

      Charles W. Bowsher, the Comptroller General of the United States from
   1981-1996 and the last Chairman of the Public Oversight Board (P.O.B.), [FN5] as
   well as former SEC Commissioner Aulana Peters and John Biggs, who were also mem-
   bers of the P.O.B., made the same recommendation when they testified before the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

Committee. [FN6] They were also among the number of witnesses who emphasized that
any Board must be created by statute to establish its authority properly and
firmly.

  The concerns of the Committee extend beyond immediate allegations of wrongdoing,
to the fundamental principles on which the functioning of free markets and the
protection of investors are based. Each of the country's federal securities laws-
the 1933, **6** 1934, 1935, and 1940 Acts-requires comprehensive financial statements
that must be prepared, in the words of the Securities Act of 1933, by "an inde-
pendent public or certified accountant." [FN7] Professor Benjamin Graham's seminal
textbook for securities analysts explains why:

    Prior to the SEC legislation * * * it was by no means unusual to encounter
semi-fraudulent distortions of corporate accounts * * * almost always for the pur-
pose of making the results look better than they were, and it was generally asso-
ciated with some scheme of stock-market manipulation in which the management was
participating. [FN8]

    However, the franchise given to public accountants by the securities laws is
conditional; it comes in return for the CPA's faithful assumption of a public
trust. (The Supreme Court's now-classic statement of that trust, in United States
v. Arthur Young, 465 U.S.C. 805 (1984) is discussed below.) The testimony heard by
the Committee repeatedly indicated that a number of forces have undermined the
fulfillment of this public trust over the years. Lee Seidler, Deputy Chairman of a
1978 commission organized to review "auditors' responsibilities," told the Commit-
tee that, twenty-five years ago, that commission had found a gap between the reas-
onable expectations of users of financial statements and the performance of audit-
ors that has not improved since. He continued:

    in 1978 [the commission] also said: the public accounting profession has
failed to react and evolve rapidly enough to keep pace with the speed of change in
the American business environment. And unfortunately, a quarter of a century
later, I have to repeat that. It's identical. [FN9]

A. Appointment and operation of board

  The successful operation of the Board depends upon its independence and profes-
sionalism. The Board will have five members, each of whom must have a demonstrated
commitment to the interests of investors, as well as an understanding of the fin-
ancial disclosures required of public companies, and the responsibilities for
those disclosures, under the federal securities laws. Three members of the Board
will have a general background, and two members will have an accountancy back-
ground. [FN10] (The Board's Chairperson may have an accountancy background, but if
so, he or she may not have been a practicing accountant for at least five years
prior to appointment to the Board.)

  Board members are to be appointed by the SEC after consultation with the Federal
Reserve Board and the Department of the Treasury. They will serve full-time, for
five-year (staggered) terms, with a two-term limit. To further assure their inde-
pendence, Board members may engage in no other business activities of any nature,
**7** or receive any payments from any accounting firms (except for standard retire-
ment payments) or other persons. In addition, former Board members will be subject

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

to a one-year "cooling off" period at the end of their Board service, during which time they may not work for an accounting firm registered with the Board.

It is essential that the Board have a strong, well-trained, and experienced staff, of sufficient size to carry out its responsibilities. A number of witnesses emphasized, for example, that inspections must no longer be left to "peer reviews" of one accounting firm by another. [FN11] The bill makes it plain, as the Committee intends, that the Board is to provide for staff salaries that are fully competitive with those for comparable private-sector self-regulatory, accounting, technical, supervisory, or related staff or management positions. [FN12]

Prompt Action is Essential. The Committee believes that the new oversight arrangements must come into effect quickly. The SEC is to appoint the initial Board within three months of the bill's enactment, so that the Board can take the steps necessary to begin its operation within six months of its appointment, and the registration of accounting firms (below) can be completed within six months after the Board begins operation.

B. Registration of accounting firms

Accounting firms that audit public companies must register with the Board, no later than six months after the SEC determines that the Board is ready to begin operation. It is unlawful for a firm that has not registered to continue to audit public companies.

Conditioning eligibility to audit public companies on registration with the Board is the linchpin of the Board's authority. Suspension or revocation of registration renders a firm unable to continue its public company audit practice.

As part of its registration process, each accounting firm must execute a consent to comply with any requests, within the Board's authority, for documents or testimony made in the course of the Board's operation. The firm must also agree to obtain (and ultimately, if necessary, to enforce) similar consents from the firm's partners and employees, who are subject to the Board's investigative and disciplinary jurisdiction.

Certain necessary information is to accompany the registration materials (including a list of the firm's accountants who perform public company audits), and the Board will determine within 45 days of receipt whether an application is complete and the applicant can be registered. Basic registration information is to be public, but each accounting firm may protect from public disclosure information that it reasonably identifies as proprietary or that is otherwise **8** protected by law. Each registrant is to file a report annually to update the required information.

The Board is to assess a registration fee, and an annual fee, to recover the costs of processing and reviewing applications and annual reports.

C. Auditing, quality control, ethics, and independence standards and rules

The bill requires the Board to establish or adopt auditing, quality control, and ethics standards for the audit of public companies. The Committee has concluded that the Board's plenary authority in this area is essential for the Board's ef-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

fective operation, a position taken during the hearings by a number of witnesses,
including former SEC Chairman Levitt, former Comptroller General Bowsher, and
former FDIC Chairman Seidman (himself once a principal of a substantial accounting
firm). [FN13]

The Board's standard-setting authority, however, is neither intended nor struc-
tured to exclude practicing accountants from participation in the standard-setting
process. The Board may adopt as part of its rules (and modify as appropriate for
that purpose, at the time of adoption or thereafter), any portion of a statement
of auditing, quality control, or ethics standards that meets the bill's statutory
tests and that is proposed (i) by a professional group of accountants (designated
by a rule of the Board for that purpose), or (ii) by one or more advisory groups
of practicing accountants or other interested parties convened by the Board.
(Pre-existing standards of designated professional groups of accountants may be
adopted during the Board's transitional period.) The Board is to cooperate on an
ongoing basis with the designated professional groups of accountants noted above,
with its own advisory groups, and with other interested groups (and the accounting
profession and the investing public at large), in examining the need for changes
in any standards subject to Board authority. It is to recommend issues for inclu-
sion on the agendas of these groups, take other steps to facilitate the standard-
setting process, and respond in a timely fashion to requests for changes in the
standards. Finally, rules are open to comment by accountants and any other inter-
ested persons in a public process before they are approved either by the Board or,
ultimately, by the SEC. Many of these provisions were suggested by Senator Enzi.

Particular Standards Required by the Bill. Although the Board's power to estab-
lish or adopt auditing and related standards extends to the full range of those
standards, the bill specifies certain provisions that must be part of the stand-
ards. These include (i) preparation, and maintenance for at least seven years, by
public company auditors of audit work papers and related information in sufficient
detail to support each audit's conclusions, (ii) "second partner" review and ap-
proval of each public company audit report and its issuance, and (iii) inclusion
in each audit report of a description of the auditor's testing of the public com-
pany's systems for compliance with the requirements of section 13(b)(2) of the Se-
curities Exchange **9** Act and of the company's controls over its receipts and ex-
penditures, together with specific notation of any significant defects or material
noncompliance of which the auditor should know on the basis of such testing. In
addition, the quality control standards adopted by the Board must address an ac-
counting firm's monitoring of ethics and independence; internal and external con-
sulting on audit issues; audit supervision; hiring, development, and advancement
of audit personnel; acceptance and continuance of engagements; and internal in-
spection.

Auditor Independence. The Board is also authorized to issue rules to implement
the provisions of title II of the bill relating to auditor independence. That au-
thority is discussed in greater detail in connection with title II, below.

D. Inspections of registered accounting firms

Virtually every witness who addressed the details of auditor oversight agreed on

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

the critical need for a regular and comprehensive review, by an independent body
of inspectors, of each audit firm's compliance with audit standards and proced-
ures. A program of inspections is essential to identify problems in firm proced-
ures, training, and "culture" before those problems can produce audit failures
that trigger large investor losses and threaten confidence in the capital markets.
[FN14]

   The Board is to inspect the operations of each registered accounting firm, in
order to assess compliance of that firm, and of its partners and employees, with
the new statute, the Board's rules, and professional accounting standards. Ini-
tially, firms that audit more than 100 public companies are to be inspected each
year, and firms that audit 100 or fewer public companies are to be inspected at
least every three years. The Board is given the power to adjust these inspection
schedules if it finds different schedules to be consistent with the bill's pur-
poses, the protection of investors, and the public interest.

   During an inspection, the Board is to review particular audit engagements  (that
it selects) of a firm and the firm's general quality control systems and policies,
as well as to perform such other testing of the firm's audit, supervisory, and
quality control procedures as is necessary or appropriate. The Board is specific-
ally given authority to require firms to retain their records for inspection pur-
poses regardless of whether retention of those records is otherwise required.

   After each inspection, the Board will prepare an inspection report, which will
be available for comment in draft form by the firm under inspection. Quality con-
trol defects found by the Board may be disposed of simply by corrective action,
but specific violations identified during inspections may form the basis for a
more formal investigation or disciplinary action by the Board and are to be repor-
ted, if appropriate, to the SEC and relevant state accountancy boards; final in-
spection reports are to be sent to the SEC and relevant state accountancy boards
in any event. The reports will also be made public, subject to appropriate protec-
tion of confidential or proprietary information. However, firms will be given 12
months to **\*10** correct defects in their quality control systems, to the satisfac-
tion of the Board, before portions of the reports dealing with those defects are
added to the public record. [FN15]

E. Investigations and disciplinary proceedings

   Committee witnesses stressed that the Board must possess investigative and dis-
ciplinary authority. Arthur Levitt, who served as Chairman of the SEC during most
of the 1990s, told the Committee that:

   We need a truly independent oversight body that has the power not only to set
the standards by which audits are performed, but also to conduct timely investiga-
tions that cannot be deferred for any reason and to discipline accountants. [FN16]

   Robert Glauber, the Chairman and CEO of the National Association of Securities
Dealers, explained that:

   Any form of private-sector regulation must be empowered to effectively enforce
the rules: [it must possess] the ability to levy meaningful fines, place condi-
tions on continued participation in the industry, suspend, and where appropriate,
banish those who misbehave from the industry. This "ultimate sanction" is both a

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

powerful deterrent for would-be violators and an important investor protection.
[FN17]

In response, the bill grants the Board broad authority to investigate any act
or practice, or omission, by a registered accounting firm, or its associated per-
sons, that may violate the new statute, the Board's rules, professional accounting
standards, or the portions of the Federal securities laws (and SEC rules) relating
to the preparation and issuance of audit reports and the obligations and liabilit-
ies of accountants with respect to those reports.

The Board's rules are to prescribe fair investigative and disciplinary proced-
ures. It may, under those rules, require testimony or the production of audit work
papers and other documents from (and may inspect the records of) registered firms
or their associated persons, and it may suspend or revoke the registration of a
firm, or suspend or bar from further association with a firm an "associated per-
son," for non-cooperation with a Board investigation, subject to review of that
action by the SEC. [FN18]

Committee witnesses also emphasized that information gathered by Board investig-
ators should be "privileged from outsiders" during the investigative process. Un-
der the bill, any information gathered in the course of an investigation is to be
confidential and privileged for all purposes (including civil discovery), unless
and until particular information is presented in connection with a public proceed-
ing. However, the Board may disclose investigative information, if it determines
that such disclosure is "necessary to accomplish the purposes of the Act or to
protect investors," to the SEC, **\*11** any federal financial supervisor (if the in-
vestigation pertains to an institution under the latter's supervision), the Attor-
ney General, and, with the SEC's permission, to state attorneys general, in con-
nection with criminal investigations, or state accountancy boards. (The Board may
also refer an investigation to the SEC or other agencies to which disclosure of
information is permitted.)

A full range of sanctions is available if the Board finds that a registered firm
(or its partners or employees) has violated one or more of the rules within the
Board's investigative jurisdiction. Potential sanctions include revocation or sus-
pension of an accounting firm's registration, or of the ability of particular in-
dividuals to remain associated with that firm or become associated with any other
registered accounting firm (effectively barring the subject of the sanction from
participating in audits of public companies), substantial civil money penalties,
[FN19] required professional education or training, and censure; the breadth of
these sanctions is intended to encourage flexible and appropriate action, designed
to correct if possible. The Board's ability to suspend or bar an associated person
from the auditing of public companies, and its ability to impose civil money pen-
alties above a certain amount, is limited to situations involving intentional,
knowing, or reckless conduct, or repeated negligent conduct.

An important provision of the bill permits the Board to impose sanctions upon a
registered accounting firm for failure reasonably to supervise a partner or em-
ployee who is found to have violated applicable rules. The terms for liability for
failure to supervise are similar to those that apply to broker-dealers under sec-
tion 15(b)(4) of the Securities Exchange Act of 1934; they permit an accounting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

firm to defend itself from supervisory liability by showing that its internal con-
trol procedures were reasonable and were operating fully in the situation at is-
sue.

   The Board's determination that a violation has occurred and that a sanction
should be imposed may be appealed to the Commission (as described below). Disci-
plinary sanctions must be reported to the Commission, appropriate state or foreign
boards of accountancy, and the public (once any stay of enforcement pending appeal
has been lifted).

## F. Foreign public accounting firms

   Companies that sell shares to U.S. investors, and are subject to the federal se-
curities laws, can be organized and operate in any part of the world. Their finan-
cial statements are not necessarily audited by U.S. accounting firms, and the Com-
mittee believes that there should be no difference in treatment of a public com-
pany's auditors under the bill simply because of a particular auditor's place of
operation. Otherwise, a significant loophole in the protection offered U.S. in-
vestors would be built into the statutory system.

   Thus, accounting firms organized under the laws of countries other than the
United States that issue audit reports for public companies subject to the U.S.
securities laws are covered by the bill in the same manner as domestic accounting
firms, subject to the exemptive authority of both the Board and the SEC.
(Registration **\*12** under the bill will not in itself provide a basis for subjecting
a foreign accounting firm to U.S. jurisdiction other than with respect to contro-
versies between such a firm and the Board.) The Board is also authorized to de-
termine that other foreign accounting firms play a sufficiently substantial role
in the preparation and furnishing of such reports for particular issuers that
their coverage under the bill is necessary or appropriate to protect investors and
the public interest.

   Finally, the bill sets terms for the production in the United States by a for-
eign public accounting firm of its audit work papers, for any audit in which the
foreign accounting firm issues an opinion or otherwise performs material services
upon which an accounting firm registered under the bill relies in issuing all or
part of a public company audit report. The foreign firm is deemed, by performing
such work, to have consented to production, and the domestic accounting firm that
relies on the foreign accounting firm's work must have secured, as a condition of
its reliance, the foreign firm's agreement to the production.

## G. SEC oversight of the Board

   The Board is subject to SEC oversight and review to assure that the Board's
policies are consistent with the administration of the federal securities laws,
and to protect the rights of accounting firms and individuals subject to the
Board's jurisdiction. Oversight also allows the public an important forum for com-
menting on Board rules relating to auditing, quality control, and related stand-
ards.

   The rules for SEC oversight of the Board are generally the same as those that

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                    Page 13
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

apply to SEC oversight of the National Association of Securities Dealers, under
section 19 of the Securities Exchange Act. Thus, the Board's proposed rules will
be filed with the SEC and published by the SEC for public comment; SEC approval is
necessary in most cases before rules of the Board take effect, and the SEC may it-
self abrogate or amend Board rules (as well as disapprove proposed Board rules).
(Transitional rules are to be separately approved by the SEC at the time of the
SEC's determination that the Board is ready to begin operation.) Disciplinary
sanctions imposed by the Board are subject to SEC review and may be canceled or
modified (or in some cases enhanced) by the SEC. The SEC can relieve the Board of
any responsibility to enforce any provision of the bill, or censure or limit oper-
ations of the Board, or remove a Board member, for cause. Finally, the bill makes
clear that any violations of its terms will constitute a violation of the Securit-
ies Exchange Act itself for purposes of the SEC's enforcement (including injunct-
ive and cease-and-desist) authority under that Act, so that the SEC may proceed
under the bill's provisions directly if appropriate.

H. Accounting principles

   Since 1973, the SEC has generally required public companies operating in the
United States to prepare their financial statements in accordance with "prin-
ciples, standards, and practices" promulgated by the Financial Accounting Stand-
ards Board (the "FASB") in the absence of specific SEC pronouncements on particu-
lar accounting **13** questions. [FN20] The bill seeks to formalize the SEC's reli-
ance on the FASB and, as discussed below, to strengthen the independence of the
FASB by assuring its funding and eliminating any need for it to seek contributions
from accounting firms or companies whose financial statements must conform to
FASB's rules. Thus, the bill amends the Securities Act of 1933 specifically to al-
low the SEC to recognize as "generally accepted" (for securities law purposes) ac-
counting principles established by a private entity that is funded as outlined in
the bill (described below) and that has adopted procedures (including acting by
majority vote) to ensure prompt consideration of necessary changes to the body of
accounting principles.
   An important issue presented to the Committee was the potential difference
between an accounting regime that contains detailed rules for the treatment of
particular items, and a regime that simply outlines general concepts (or "prin-
ciples") to be applied to particular items. Witnesses noted the possibility that
the overly-detailed approach of U.S. standard-setters may have delayed updating of
necessary guidance and at the same time drawn the focus of auditors away from the
overriding principle that a set of financial statements, taken as a whole, must
fairly and completely reflect the economic results and operations of the company
being audited. To allow more careful consideration of the differences between
various formulations of accounting standards, the bill requires the Commission to
conduct a study, within 12 months, of the adoption by the U.S. financial reporting
system of a principles-based accounting system.

I. Funding

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

The Committee's witnesses overwhelmingly agreed that both the Board and the FASB
required guaranteed sources of funding, in order to protect their independence.
Several witnesses testified to the problems various attempts at oversight of aud-
itors had encountered when voluntary funding was withheld. With respect to the
FASB, Michael Sutton, a former SEC Chief Accountant, testified to the Committee
that "[t]o restore confidence in our standards setters, we should take immediate
steps to secure independent funding for the FASB-funding that does not depend on
contributions from constituents that have a stake in the outcome of the process."
[FN21]

Under the bill, public companies are required to pay "accounting support fees"
to support the annual budgets of the Board and the FASB. (The Board's budget will
be subject to approval by the SEC.) Amounts payable by public companies to either
body will generally be allocated among those companies based on relative average
annual monthly market capitalization for the 12 months prior to the year to which
the support fee relates; both the Board and the FASB are permitted to differenti-
ate among various classes of public companies in allocating fees.

### *14 TITLE II-AUDITOR INDEPENDENCE

The issue of auditor independence is at the center of this legislation. Public
confidence in the integrity of financial statements of publicly-traded companies
is based on belief in the independence of the auditor from the audit client. As
noted above, each of the country's federal securities laws requires comprehensive
financial statements that must be prepared, in the words of the Securities Act of
1933, by "an independent public or certified accountant."

The statutory independent audit requirement has two sides. It grants a franchise
to the nation's public accountants-their services, and only their services, and
certification, must be secured before an issuer of securities can go to market,
have the securities listed on the nation's stock exchanges, or comply with the re-
porting requirements of the securities laws. This is a source of significant
private benefit to the public accountants.

But the franchise is conditional. It comes in return for the CPA's assumption of
a public duty and obligation. As a unanimous Supreme Court noted nearly 20 years
ago: "In certifying the public reports that collectively depict a corporation's
financial status, the independent auditor assumes a public responsibility. * * *
[That auditor] owes ultimate allegiance to the corporation's creditors and stock-
holders, as well as to the investing public. This 'public watchdog' function de-
mands that the accountant maintain total independence from the client at all times
and requires complete fidelity to the public trust." United States v. Arthur
Young, 465 U.S. 805, 817-18 (1984) (emphasis added).

Richard Breeden, Chairman of the SEC from 1989-93, put it succinctly in testi-
mony before the Committee:

While companies in the U.S. do not have to employ a law firm, an underwriter,
or other types of professionals, federal law requires a publicly-traded company to
hire an independent accounting firm to perform an annual audit. In addition to
this shared federal monopoly, more than a hundred million investors in the U.S.
depend on audited financial statements to make investment decisions. This imbues

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

accounting firms with a high level of public trust, and also explains why there is
a strong federal interest in how well the accounting system functions. [FN22]

   There is arguably an inherent conflict in the fact that an auditor is paid by
the company for which the audit is being performed. That conflict is implicit in
the relationship between the auditor and the audit client. In the last 15 years,
however, the rapid growth in management consulting services offered by the major
accounting firms has created a second, more substantial conflict that has eroded
the independence that the auditor must bring to the audit function.

   According to the SEC, 55 percent of the average revenue of the big five account-
ing firms came from accounting and auditing services in 1988. Twenty-two percent
of the average revenue came from management consulting services. By 1999, those
figures had fallen to 31 percent for accounting and auditing services, and risen
to 50 **15** percent for management consulting services. Recent data reported to the
SEC showed on average public accounting firms' non-audit fees comprised 73 percent
of their total fees, or $2.69 in non-audit fees for every $1.00 in audit fees. At
the same time, the frequency of financial restatements by public companies has
dramatically increased. From 1990-97, the number of public company financial re-
statements averaged 49 per year, but jumped to an average of 150 per year in 1999
and 2000.

   For these reasons, the bill includes a number of provisions directed to the is-
sue of auditor independence.

A. Services outside the scope of practice of auditors

   A number of the witnesses who testified before the Committee during the course
of the hearings, as well as other informed observers, argued that the growth in
the non-audit consulting business done by the large accounting firms for their
audit clients has so compromised the independence of the audits that a complete
prohibition is required on the provision of consulting services by accounting
firms to their audit clients.

   Perhaps the strongest advocates of this view have been the managers of large
pension funds who are entrusted with people's retirement savings. James E. Burton,
Chief Executive Officer of the California Public Employees' Retirement System
(CalPERS), which manages pension and health benefits for more than 1.3 million
members with aggregate holdings totaling almost $150 billion, has stated: "We be-
lieve that the inherent conflicts created when an external auditor is simulta-
eously receiving fees from a company for non-audit work cannot be remedied by any-
thing less than a bright-line ban. An accounting firm should be an auditor or a
consultant, but not both to the same client." [FN23]

   John Biggs is Chairman of Teachers Insurance and Annuity Association-College Re-
tirement Equities Fund (TIAA-CREF), the largest private pension system in the
world providing pensions and other financial products to the education and re-
search community. TIAA-CREF manages approximately $275 billion in pension assets
for over 2 million participants. Mr. Biggs has stated:

   Another critical element in reforming audit practices is a bright line divi-
sion between audit and consulting functions. We believe such separation will help
restore public trust in corporate financial statements. For example, TIAA-CREF

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

does not allow our public audit firm to provide any consulting services to us, and
our policy even bars our auditor from providing tax services. * * *

    Our long-term policy has served us well in assuring the independence of our
auditors. Because auditors owe their primary duty to the shareholders, questions
about the primacy of that duty are raised if the audit firm provides other, poten-
tially more lucrative, consulting services to the company. The board and the pub-
lic auditor should both see to it that, in fact as well as in appearance, the aud-
itor reports to the independent board audit committee and acts on behalf of share-
holders. The key reason why awarding **\*16** consulting contracts and other non-audit
work to the audit firm is troubling is because it results in conflicting loyal-
ties. While the board's audit committee is formally responsible for hiring and
firing the outside auditor, management controls virtually all the other types of
non-audit work the audit firm may do for the company. Those contracts with manage-
ment blur the reporting relationship-it is difficult to believe that auditors do
not feel pressure for the overall success of their firm with the client. Even
their own compensation packages may be tied to consulting and non-audit services
being provided by their firm to the company. * * *

    Congress has a clear mandate from the shareholders and the general public to
act strongly and swiftly. By requiring public companies to use different account-
ing firms for their audit and consulting services and by establishing an independ-
ent board with real authority to oversee the accounting profession you will be
taking important steps toward reversing the crisis of confidence in financial mar-
kets that exists today. [FN24]

    In addition, respected former corporate leaders and former public officials en-
dorsed this approach. For example, John Whitehead, former Co-Chairman of Goldman
Sachs and former Co-Chairman of the Blue Ribbon Committee on Improving the Effect-
iveness of Corporate Audit Committees, told the Committee:

    I have reached the conclusion that the accounting firm that does the audit
should not do other advisory work for the company. Without that, the independence
of the auditor's work will always be suspect. I reach that decision reluctantly
but I don't see that it is possible to restore public confidence in the independ-
ence of the auditors without it. [FN25]

    Walter Schuetze, a former SEC Chief Accountant (who is also a former Big 8 ac-
counting firm partner and an original member of the FASB), stated, "I would sup-
port a complete separation and allow the audit firm to provide only audit services
to the audit client. No other services whatsoever." [FN26] Former SEC Chairman
Harold Williams also suggested that a complete ban on consulting services be con-
sidered for audit clients of accounting firms. [FN27]

    The Committee considered adopting a complete prohibition on non-audit services
by accounting firms for their audit clients, but instead decided on a somewhat
more flexible approach. The approach adopted by the Committee is supported by
former Comptroller General Bowsher, former SEC Chairman Arthur Levitt, and former
Federal Reserve Board Chairman Paul Volcker. [FN28]

    **\*17** The bill provides that it shall be unlawful for a public accounting firm re-
gistered with the Board which performs an audit for a public company to provide,
contemporaneously with the audit, the following non-audit services:

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


    (1) bookkeeping or other services related to the accounting records or finan-
cial statements of the audit client;

    (2) financial information systems design and implementation;

    (3) appraisal or valuation services, fairness opinions, or contribution-
in-kind reports;

    (4) actuarial services;

    (5) internal audit outsourcing services;

    (6) management functions or human resources;

    (7) broker or dealer, investment adviser, or investment banking services;

    (8) legal services and expert services unrelated to the audit; and

    (9) any other services that the Board determines, by regulation, is impermiss-
ible.

  The Board may, on a case-by-case basis, exempt any person, issuer, public ac-
counting firm, or transaction from the prohibition on the provision of non-audit
services to the extent that such exemption is necessary or appropriate in the pub-
lic interest and is consistent with the protection of investors. A registered pub-
lic accounting firm may engage in any non-audit service, including tax services,
that is not on the list for an audit client only if the activity is approved in
advance by the audit committee of the issuer. No limitations are placed on ac-
counting firms in providing non-audit services to public companies which they do
not audit or to any non-public companies.

  The need for this provision was clearly stated by David M. Walker, Comptroller
General of the United States, in a statement he released on June 18, in which he
said:

    I believe that legislation that will provide a framework and guidance for the
SEC to use in setting independence standards for public company audits is needed.
History has shown that the AICPA [American Institute of Certified Public Account-
ants] and the SEC have failed to update their independence standards in a timely
fashion and that past updates have not adequately protected the public's in-
terests. In addition, the accounting profession has placed too much emphasis on
growing non-audit fees and not enough emphasis on modernizing the auditing profes-
sion for the 21st century environment. Congress is the proper body to promulgate a
framework for the SEC to use in connection with independence related regulatory
and enforcement actions in order to help ensure confidence in financial reporting
and safeguard investors and the public's interests.

    The independence provision [of the bill] * * * strikes a reasoned and reason-
able balance that will enable auditors to perform a range of non-audit services
for their audit clients and an unlimited range of non-audit services for their
non-audit clients. Most importantly, the proposed legislation adopts a "principle
based" and "substance over form" approach that can stand the test of time and, if
adopted, **\*18** will better protect the public's interests. In my opinion, the time
to act on independence legislation is now. [FN29]

  Some argue that standards for auditor independence should be left to the SEC and
the new Board. The approach adopted by the bill reflects the Committee's belief
that the issue of auditor independence is so fundamental to the problems currently
being experienced in our financial markets that statutory standards are needed to

S. REP. 107-205                                                    Page 73
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

assure the independence of the auditor from the audit client.

The intention of this provision is to draw a clear line around a limited list of non-audit services that accounting firms may not provide to public company audit clients because their doing so creates a fundamental conflict of interest for the accounting firms. The list is based on simple principles. An accounting firm, in order to be independent of its audit client, should not audit its own work, which would be involved in providing bookkeeping services, financial information systems design, appraisal or valuation services, actuarial services, and internal audit outsourcing services to an audit client. The accounting firm should not function as part of management or as an employee of the audit client, which would be required if the accounting firm provides human resources services such as recruiting, hiring, and designing compensation packages for the officers, directors, and managers of an audit client. The accounting firm should not act as an advocate of the audit client, which would be involved in providing legal and expert services to an audit client in legal, administrative, or regulatory proceedings, or serving as a broker-dealer, investment adviser, or investment banker to an audit client, which places the auditor in the role of promoting a client's stock or other interests.

The accounting industry itself has announced voluntarily that it will not provide two of these non-audit services-internal audit services and financial information systems design and implementation-to public company audit clients because of the conflicts they present. The other prohibited non-audit services also pose clear conflicts of interest for accounting firms when provided for audit clients. For example, in its oversight hearing earlier this year on the failure of Superior Bank, FSB, in Hinsdale, Illinois, the Committee learned first-hand the risks associated with allowing accounting firms to audit their own work. [FN30] In that case, the accounting firm audited and certified a valuation of risky residual assets calculated according to a methodology it had provided as a consultant. The valuation was excessive and led to the failure of the institution.

The Board is given authority to make case-by-case exemptions in instances where the Board believes an exemption is in the public interest and consistent with the protection of investors. Further, no limitations are placed on accounting firms in providing non-audit services to public companies that they do not audit or to any private companies. The purpose is to assure the independence of the audit, not to put an end to the provision of non-audit services by accounting firms.

**\*19** In summary, the bill adopts a strong, balanced approach to assure that in return for the significant private benefits conferred on accounting firms by our securities laws, they maintain their independence from the companies they audit and fulfill their "public trust."

B. Audit committee pre-approval of audit and non-audit services

The legislation requires that audit services, as well as non-audit services other than those proscribed by the bill, must be pre-approved by the audit committee of the public company's board of directors. The Committee heard testimony on the role that the audit committee of a public company should play in connection with the engagement of an auditor to provide audit and non-audit services contemporan-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

eously. Michael Sutton, former Chief Accountant of the SEC, said, "Whatever non-audit services might be permitted, I think they should be permitted only with the approval of the audit committee." [FN31] Former SEC Commissioner Bevis Longstreth told the Committee:

 I suggest a simple exclusionary rule covering virtually all non-audit services, in place of the deeply complex, existing rule that I hope, by now, to have convinced you is ineffective. This rule would redefine the category of services to be barred as including everything other than the work involved in performing an audit and other work that is integral to the function of the audit. Use of such an exception should require at least the following: (a) Before any such service is rendered, a finding by the client's audit committee that special circumstances make it obvious that the best interests of the company and its shareholders will be served by retaining its audit firm to render such service and that no other vendor of such service can serve those interests as well; (b) Forthwith upon the making of such a finding, submission of a written copy thereof to the SEC and the SRO having jurisdiction over the profession; and (c) In the company's next proxy statement for election of directors, disclosure of such finding by the audit committee and the amount paid and expected to be paid to the auditor for such service. [FN32]

 After studying this issue, the Committee believes the protection of investors warrants a requirement that a public company's audit committee approve in advance the services that the auditor will provide to such company (if those services are not explicitly prohibited under the bill). Accordingly, the bill requires the audit committee of a public company to pre-approve all of the services, both audit and non-audit, provided to that company by a registered public accounting firm. The bill does not require an issuer's audit committee to pre-approve non-audit services provided by an accounting firm that is not auditing the issuer.

 The bill does not require the audit committee to make a particular finding in order to pre-approve an activity. The members of the audit committee shall vote consistent with the standards they **\*20** determine to be appropriate in light of their fiduciary responsibilities and such other considerations they deem to be relevant.

 The audit committee must pre-approve a non-audit service before it commences. The audit committee may pre-approve at any time in advance of the activity. For example, an audit committee may grant pre-approval at its March meeting for a non-audit service that would begin in August. However, the Commission or the Board under its general authority may specify a maximum period of time in advance of which the approval may not be granted, such as, for example, requiring the pre-approval to be granted no earlier than one year prior to the commencement of the service.

 The bill does not limit the number of non-audit services that the audit committee may pre-approve at one meeting or occasion. The Committee intends, however, that each non-audit service be specifically identified in order to be approved by the audit committee. The Committee does not intend for the statutory requirement to be satisfied by an audit committee voting, for example, to permit "any service that management determines appropriate for the auditor to perform" or "all non-audit services permissible under law."

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

The Committee has chosen to offer audit committees a delegation option in their administration of the pre-approval requirement. The bill permits the audit committee to delegate to one or more of its members (who are members of the board of directors) the authority to pre-approve non-audit services. After a delegated member has granted a pre-approval, he or she is required to report the decision at the next meeting of the full audit committee. This delegation of authority may be useful where, for example, the audit committee is asked to determine whether or not to permit the issuer's auditor to perform a new non-audit service within a short period of time.

The Committee has taken into account the atypical circumstance where an auditor is providing to the issuer a service that was anticipated to be an audit service within the scope of the engagement, but is later discovered to be a non-audit service. The bill provides that the pre-approval requirement is waived with respect to a non-audit service if: (1) the service was not recognized by the issuer at the time of the audit engagement to be a non-audit service, (2) the aggregate amount paid for all services described in (1) is not more than 5 percent of the total amount of revenues paid by the issuer to the auditor, and (3) the service is promptly brought to the attention of the audit committee, and (4) the audit committee approves the activity prior to the conclusion of the audit. This post-approval may be granted by the entire audit committee or by one or more audit committee members (who are members of the board of directors) to whom authority to grant such approvals has been delegated by the audit committee. This flexibility was suggested by Senator Enzi.

The bill requires that the audit committee approvals be disclosed to investors in periodic reports filed with the Commission.

The bill specifically notes that audit services "may entail providing comfort letters in connection with securities underwriting" in order to make clear that providing such a comfort letter is an audit service.

**\*21** C. Audit partner rotation

The Committee heard testimony from numerous witnesses on whether, in order to maintain the objectivity of its audits, an issuer should be required to rotate its audit firm after a number of consecutive years. For example, former SEC Chairman Arthur Levitt proposed "that serious consideration be given to requiring companies to change their audit firm-not just the partners-every 5-7 years to ensure that fresh and skeptical eyes are always looking at the numbers." [FN33] Former SEC Chairman Harold Williams recommended a requirement that issuers "[h]ire auditors with a fixed term with no right to terminate for five or seven years." [FN34] John Whitehead, former Co-Chairman, Goldman Sachs & Co., recommended requiring "[t]erm limits of 8 to 10 years." [FN35] Lynn Turner, former SEC Chief Accountant, recommended requiring "mandatory rotation (5 to 7 years)." [FN36]

Other witnesses felt that accounting firm rotation could be disruptive to the issuer and that the costs of mandatory rotation might outweigh the benefits. Former SEC Chairman Rod Hills said that "[f]orcing a change of auditors can only lower the quality of audits and increase their costs." [FN37] Shaun O'Malley, Chairman, 2000 Public Oversight Board Panel on Audit Effectiveness, said that "for-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

cing issuers to change auditors every few years * * * would undermine audit ef-
fectiveness." [FN38]

The Committee determined that the possibility of requiring audit firm rotation
merits further study. The bill directs the U.S. General Accounting Office ("GAO")
to analyze the merits and potential effects of requiring mandatory rotation of
auditors, and to report its analysis to Congress within one year.

While the bill does not require issuers to rotate their accounting firms, the
Committee recognizes the strong benefits that accrue for the issuer and its share-
holders when a new accountant "with fresh and skeptical eyes" evaluates the issuer
periodically. Accordingly, the bill requires a registered public accounting firm
to rotate its lead partner and its review partner on audits so that neither role
is performed by the same accountant for the same issuer for more than five consec-
utive years. [FN39]

D. Disclosures of accounting issues.

The Committee believes that it is important for the audit committee to be aware
of key assumptions underlying a company's financial statements and of disagree-
ments that the auditor has with management. The audit committee should be informed
in a timely manner of such disagreements, so that it can independently review them
and intervene if it chooses to do so in order to assure the integrity of the
audit.

**\*22** Accordingly, the bill requires a registered independent public accounting
firm performing an audit for a public company to report in a timely manner to that
company's audit committee (1) the critical accounting policies and practices to be
used; (2) all alternative treatments of financial information within GAAP
(generally accepted accounting principles) that have been discussed with manage-
ment; (3) any accounting disagreements between the auditor and management; and (4)
other material written communications between the auditor and management.

E. Cooling off period

The Committee received extensive testimony on whether to impose a cooling off
period between an accountant's employment by an auditor and his or her employment
by an issuer. Several witnesses advocated this requirement, in order to enhance
the integrity of an audit. Former Comptroller General Bowsher recommended to the
Committee that "[e]ngagement and other partners who are associated with an audit
should be prohibited from taking employment with the affected firm until a two-
year 'cooling off' period has expired." [FN40] Lynn Turner, former SEC Chief Ac-
countant, said, "Cooling off periods should last two years. Close the door between
the audit firm, its partners and employees, and the company being audited." [FN41]
Other witnesses also gave testimony that "the revolving door between audit firms
and their audit clients" should be closed by enacting a cooling off period. James
E. Copeland, Jr., Chief Executive Officer, Deloitte & Touche LLP, opposed a cool-
ing off period because of concerns that it would "impose unwarranted costs on the
public, the client and the profession." [FN42]

The Committee considered various options, including imposing a cooling off peri-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

od of one, two, or three years, and applying a cooling off period to all employees
who worked for the auditor, regardless of whether they worked on the audit of a
particular issuer and regardless of the position they would take with that issuer,
or applying a cooling off period only to certain groups of employees.

The Committee decided to impose a one-year cooling off period that would apply
to an employee of the accounting firm who worked on the issuer's audit and sub-
sequently seeks to be employed by that issuer in a senior management capacity.
Thus, the bill provides that an accounting firm may not provide audit services for
a public company if that company's chief executive officer, controller, chief fin-
ancial officer, chief accounting officer, or other individual serving in an equi-
valent position, was employed by the accounting firm during the one year before
the start of the audit services. The cooling off period does not take effect if
the CEO or other senior official worked for the auditor but did not work on the
issuer's audit or if a member of the audit team is hired by the issuer for a posi-
tion other than CEO, CFO, controller, chief accounting officer, or an equivalent
position. However, if an issuer hires an accountant from the audit team as its
CEO, for example, it would be required to change auditors.

**\*23** F. The bill does not create state regulatory standards

Titles I and II are designed to apply only to accounting firms that audit public
companies. They are not designed to apply to audits of private companies. Nonethe-
less, some have raised the concern that the bill could lead state regulatory au-
thorities to impose similar requirements for audits of private companies.

The bill indicates clearly that Congress does not intend that state regulatory
authorities should find this Act controlling in their regulation of non-registered
accountants. The bill states that it is the intention of the Act that, in super-
vising non-registered accounting firms, state regulatory authorities should make
an independent determination of the proper standards, and should not presume the
standards applied by the Board under this bill to be applicable to small- and me-
dium-sized non-registered accounting firms. Senators Hagel and Enzi proposed this
provision.

TITLE III-B CORPORATE RESPONSIBILITY

In further response to recent corporate failures, title III of the bill makes a
number of changes to improve the responsibility of public companies for their fin-
ancial disclosures. To that end, the bill incorporates a number of reform propos-
als made by the President on March 7, 2002. These reforms are supplemented with
additional provisions that the Committee believes will improve investor protection
in connection with the operation of public companies.

Recent events have highlighted the failure of companies' internal audit commit-
tees to properly police their auditors and have raised awareness of the need for
strong, competent audit committees with real authority. Several witnesses sugges-
ted that the Committee make changes in the role of audit committees in order to
enhance the audit process. In response, under the bill, the SEC must draft rules
directing national securities exchanges and associations to require listed compan-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ies to comply with a number of enumerated provisions regarding audit committees.
The Committee believes that the bill's approach to strengthening audit committees
will help avoid future auditing breakdowns.

   The bill also contains a number of provisions aimed at corporate management. De-
fects in procedures for monitoring financial results and controls have been blamed
for recent corporate failures. The bill therefore requires CEOs and CFOs to certi-
fy their companies' financial reports, outlaws fraud and deception by managers in
the auditing process, prevents CEOs and CFOs from benefitting from profits they
receive as a result of misstatements of their company's financials, and facilit-
ates the imposition of judicial bars against officers and directors who have viol-
ated the securities laws. Finally, title III includes a provision intended to pre-
vent employees from being required to hold company stock in their retirement ac-
counts while officers and directors are free to sell their shares.

A. Issuer audit committees

   Oversight of Auditors. Witnesses at the Committee's hearings suggested that the
auditing process may be compromised when auditors view their main responsibility
as serving the company's management rather than its full board of directors or its
audit committee. For this reason, the bill requires audit committees to be dir-
ectly **\*24** responsible for the appointment, compensation, and oversight of the work
of auditors, and requires auditors to report directly to the audit committee.

   Many witnesses testified as to the importance of these provisions. In particu-
lar, witnesses believed that the hiring and firing of the auditor should be the
exclusive province of the audit committee. A number of witnesses emphasized that
"audit committees [should] be solely responsible for the retention of accounting
firms and be responsible for the fees paid to them." [FN43] Sarah Teslik, Execut-
ive Director of the Council of Institutional Investors, told the Committee that
"perhaps [the] single first step [Congress] should take to increase auditor inde-
pendence is to require a listing standard [of the national securities exchanges
and associations] that the audit committee of the board hire and fire the audit-
ors," the approach taken by the bill. [FN44] Additional witnesses who supported
making the audit committee responsible for hiring and firing the auditors in-
cluded: Robert E. Litan, Director of the Economic Studies Program of The Brookings
Institution; Damon Silvers, Associate General Counsel of the AFL-CIO; and former
U.S. Comptroller General Bowsher. [FN45]

   Audit Committee Member Independence. Many recent failures have been attributed
to close ties between audit committee members and management. In 1998-99, the NYSE
and Nasdaq sponsored the Blue Ribbon Committee on Improving the Effectiveness of
Corporate Audit Committees. The Blue Ribbon Committee, chaired by Committee wit-
nesses Ira Millstein and John Whitehead, made a number of recommendations to en-
hance audit procedures and effectiveness, including recommendations to increase
the independence of audit committee members. Mr. Millstein and Mr. Whitehead, as
well as Blue Ribbon Committee member John Biggs, testified at the hearings in sup-
port of adoption of the Blue Ribbon Committee's recommendations. [FN46] Consistent
with their recommendations, the bill enhances audit committee independence by bar-
ring audit committee members from accepting consulting fees or being affiliated

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

persons of the issuer or the issuer's subsidiaries other than in the member's ca-
pacity as a member of the board of directors or any board committee.

The audit committee independence provisions were supported by a number of wit-
nesses in addition to Messrs. Millstein, Whitehead, and Biggs. Former SEC Chairman
Arthur Levitt testified that "as a listing condition, stock exchanges should re-
quire at least a majority of company boards to meet a strict definition of inde-
pendence," including barring audit committee members from accepting consulting
fees from the company. [FN47] Former SEC Chairman Roderick M. Hills and Washington
University School of Law Dean Seligman also recommended that Congress require that
companies have independent **\*25** audit committees. [FN48] Former Senator Howard Met-
zenbaum, the Chairman of Consumer Federation of America, testified that lack of
independence frequently leads audit committees to have a "fealty to the management
that an audit committee shouldn't have." [FN49]

Additional Audit Committee Responsibilities. The bill contains several addition-
al provisions regarding audit committees. The bill requires audit committees to
have in place procedures to receive and address complaints regarding accounting,
internal control, or auditing issues. Further, the bill includes an amendment by
Senator Stabenow providing protection for corporate "whistleblowers" by specifying
that audit committees must establish procedures for employees' anonymous submis-
sion of concerns regarding accounting or auditing matters.

The bill also requires public companies to provide their audit committees with
authority and funding to engage independent counsel and other advisers as they de-
termine necessary in order to carry out their duties. Comptroller General Walker
agreed that audit committee members must be "adequately resourced," suggesting
that audit committee members "may need their own staff." [FN50]

In light of recent events, the Committee believes that these audit committee
provisions should be codified in the securities laws in order to help rectify
auditing misconduct and to enhance the effectiveness of audit committee oversight
of public company audits.

B. Corporate responsibility for financial reports

The Committee believes that management should be held responsible for the finan-
cial representations of their companies. The bill therefore clearly establishes
that CEOs and CFOs are responsible for the presentation of material in their com-
pany's financial reports. Under one of the recommendations put forward by the
President on March 7, "CEOs would personally attest each quarter that the finan-
cial statements and company disclosures accurately and fairly disclose the inform-
ation of which the CEO is aware that a reasonable investor should have to make an
informed investment decision." In effect the bill adopts this proposal, in an ap-
proach developed with Senator Miller, by requiring CEOs and CFOs to certify, in
periodic reports containing financial statements filed with the Commission pursu-
ant to section 13(a) or 15(d) of the Exchange Act, the appropriateness of finan-
cial statements and disclosures contained therein, and that those financials and
disclosures fairly present the company's operations and financial condition.

These provisions reflect the Committee's concern regarding the reliability of
companies' audited financial statements. In his testimony before the Committee,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

former SEC Chairman Breeden recognized that there is "growing doubt about whether
audited financial statements are believable." [FN51] Council of Institutional In-
vestors Executive Director Sarah Teslik echoed this concern in testifying that **\*26**
"CEOs, audit committee members and outside auditors" should be required to "sign
the financials as true and accurate." [FN52]

C. Prohibited influence

   Numerous witnesses testifying before the Committee, including Shaun O'Malley,
Chair of the 2000 Public Oversight Board Panel on Audit Effectiveness, and Sarah
Teslik, Council of Institutional Investors Executive Director, were concerned with
addressing fraud and misconduct in the audit process. [FN53] In response, title
III of the bill makes it unlawful for any officer or director of an issuer, or
person acting under the direction thereof, to fraudulently influence, coerce, ma-
nipulate, or mislead any accountant engaged in preparing an audit of that issuer,
for the purpose of rendering the audit report misleading. The Commission is
provided with exclusive authority to enforce this section. The bill establishes a
90-day deadline for proposed rules or regulations by the Commission under this
section, and a 270-day deadline for final rules or regulations.

D. Forfeiture of bonuses and profits

   Recent events have raised concern about management benefitting from unsound fin-
ancial statements, many of which ultimately result in corporate restatements. The
President has recommended that "CEOs or other officers should not be allowed to
profit from erroneous financial statements," and that "CEO bonuses and other in-
centive-based forms of compensation [sh]ould be disgorged in cases of accounting
restatement and misconduct."
   Title III includes provisions designed to prevent CEOs or CFOs from making large
profits by selling company stock, or receiving company bonuses, while management
is misleading the public and regulators about the poor health of the company. The
bill requires that in the case of accounting restatements that result from materi-
al non-compliance with SEC financial reporting requirements, CEOs and CFOs must
disgorge bonuses and other incentive-based compensation and profits on stock
sales, if the non-compliance results from misconduct. The required disgorgement
applies to amounts received for the 12 months after the first public issuance or
filing of a financial document embodying such financial reporting requirement. Un-
der this section, the SEC may exempt any person from this requirement as it deems
necessary and appropriate.

E. Officer and director bars and penalties

   Title III also includes several measures affecting officers and directors who
have violated the securities laws. The staff of the Commission indicated to the
Committee staff that when enforcement proceedings are brought under the securities
laws, courts in some cases have been reluctant to impose prospective bars against
violators serving as officers or directors of companies. The bill would facilitate
not only the SEC's prevention of individuals who have violated the securities laws

                © 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

from serving as officers and directors, but also the imposition of penalties on
violators of securities laws.

**\*27** Currently, it must be proved that an officer or director has both violated
the securities laws, and has shown "substantial unfitness" to serve before a bar
can be imposed. The Commission has argued that the "substantial unfitness" stand-
ard for imposing bars is inordinately high, causing courts to refrain from impos-
ing bars even in cases of egregious misconduct. The proposed bill rectifies this
deficiency by modifying the standard governing imposition of officer and director
bars from "substantial unfitness" to "unfitness."

These provisions also reflect the President's recommendation that "CEOs or other
officers who clearly abuse their power should lose their right to serve in any
corporate leadership positions."

The Commission has also suggested that it should be allowed to obtain additional
relief in enforcement cases. For a securities law violation, currently an indi-
vidual may be ordered to disgorge funds that he or she received "as a result of
the violation." Rather than limiting disgorgement to these gains, the bill will
permit courts to impose any equitable relief necessary or appropriate to protect,
and mitigate harm to, investors.

F. Prohibition on insider trades during pension fund blackout periods

As former SEC Chairman Breeden observed, "The spectacle of corporate insiders
plundering their own companies or selling their stock quietly in advance of a
looming collapse has awakened a sense of revulsion among investors who were left
with worthless stock." [FN54] In some cases, officers and directors have profited
by selling off large portions of company stock during a time when employees were
prevented from selling company stock in their section 401(k) retirement plans. To
address this problem, the bill prohibits key individuals from engaging in transac-
tions involving any equity security of the issuer during a "blackout" period when
at least half of the issuer's individual account plan participants are not permit-
ted to purchase, sell, or otherwise transfer their interest in that equity secur-
ity. Upon Senator Miller's recommendation, this section applies to directors and
executive officers in order to ensure that the prohibition is limited to individu-
als in policy-making positions.

The bill provides added protection for participants in retirement plans by re-
quiring that they be provided with written notice at least 30 days before a black-
out period. Two exceptions to the 30-day notice are provided in response to Senat-
or Enzi's recommendations. First, an exception is allowed in cases where a defer-
ral of the blackout period to comply with the 30-day notice requirement would vi-
olate ERISA provisions that require fiduciaries to act exclusively on behalf of
participants, and those that require trustees to act prudently, in their decisions
regarding plan assets. Second, an exception may be provided where the inability to
provide the notice is due to unforeseeable events or circumstances beyond the
reasonable control of the plan administrator.

The Committee is concerned that without the provisions of title III, our finan-
cial markets will witness numerous corporate restatements in the future. The Com-
mittee believes that title III incorporates **\*28** needed reforms that will enhance

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                              Page 24
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
(Cite as: S. REP. 107-205)

corporate responsibility among public companies.

                    TITLE IV-ENHANCED FINANCIAL DISCLOSURES

   The Committee heard testimony about the imperative necessity for investors to
have accurate and full financial information available on a timely basis in order
to make appropriate investment decisions. The Committee has identified certain key
disclosures that require legislative action.

A. Accounting adjustments

   The bill requires that financial statements filed with the Commission reflect
the material adjustments under GAAP that have been identified by the auditor.

B. Off-balance sheet transactions

   Former SEC Chairman Richard Breeden testified, after the problems of Enron Corp.
and its special purpose entities, on the need for "enhance[d] disclosure of 'off-
balance sheet' transactions and debt." [FN55] To address this need, the bill re-
quires annual and quarterly reports filed with the SEC to disclose all material
off-balance sheet transactions, arrangements, obligations (including contingent
obligations), and other relationships of the issuer with unconsolidated entities
or other persons that may have a material current or future effect on financial
condition, changes in financial condition, results of operations, liquidity, cap-
ital expenditures, capital resources, or significant components of revenues or ex-
penses.

C. Pro-forma financial disclosures

   Thomas A. Bowman, President and CEO of the Association for Investment Management
and Research (AIMR), testified before the Committee on his concerns about the use
of pro forma disclosures:
      Another creative way in which managements mislead investors and manipulate in-
   vestor expectations is by communication of "pro forma earnings," company-specific
   variations of earnings, or "earnings before the bad stuff." With all its deficien-
   cies, we believe that earnings data based on Generally Accepted Accounting Prin-
   ciples (GAAP) are still the most useful starting point for analysis of a company's
   performance. Analysts and other investors at least know how GAAP earnings are com-
   puted and, hence, there is some comparability across companies. We believe that
   GAAP earnings should always be displayed more prominently than non-GAAP earnings
   data.
      Unfortunately, just the opposite seems to be the norm, particularly in press
   releases where pro forma earnings get the most emphasis and GAAP earnings may not
   be mentioned at all. GAAP earnings and associated balance sheet may only become
   available to investors in SEC filings one to two weeks after pro forma earnings
   are announced.
      While pro forma earnings can be helpful supplemental information for analysts,
   the practice of providing pro forma earnings is widely abused. Companies select-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ively exclude **\*29** all sorts of financial reporting items, including depreciation,
amortization, payroll taxes on exercises of options, investment gains and losses,
stock compensation expenses, acquisition-related and restructuring costs. John
Bogle, the respected investment professional, recently noted in a speech to the
New York Society of Securities Analysts, "In 2001, 1,500 companies reported pro
forma earnings, what their earnings would have been if bad things hadn't
happened." We recommend that either the FASB or SEC curtail this practice or en-
sure that pro forma earnings data never have more prominence than GAAP earnings in
company communications. [FN56]

   Former Federal Reserve Board Chairman Paul Volcker also testified about con-
cerns with pro forma earnings: "Those problems, building over a period of years,
have now exploded in a sense of crisis, a crisis as exemplified by the Enron col-
lapse. But Enron is not the only symptom. We've had * * * too many doubts about
pro forma earnings." [FN57] Dean Joel Seligman testified that, after taking into
account current regulatory efforts on disclosure of pro forma figures, "[m]ore
needs to be done." [FN58]

   The Committee seeks to address problems attendant to pro forma financial dis-
closures by requiring the SEC to promulgate rules requiring that issuers publish
pro forma data with a reconciliation to comparable financial data calculated ac-
cording to GAAP and in a way that is not misleading and does not contain untrue
statements. The reconciliation presumes, and would require, the issuer to publish
financial data calculated according to GAAP at the same time as it publishes pro
forma data. This should enable investors to, at the least, simultaneously compare
the pro forma financial data with the same types of financial disclosures (e.g.,
earnings) calculated according to GAAP for the comparable reporting period.

   The Committee recognizes from the recent experience of Enron Corp. and other
public companies the need for additional types of disclosures. The Committee sup-
ports public and private efforts that result in greater quality, clarity, and com-
pleteness in the disclosures made by public companies.

D. Enhanced disclosures of loans

   Enron Corp. and other corporations have made loans to directors and executive
officers totaling many millions of dollars. [FN59] Many of **\*30** these insider loans
are disclosed to investors in the annual proxy materials months after they occur.

   In his testimony, former SEC Chairman Richard Breeden recommended that  "immedi-
ate 8-K disclosure" of insider loans be required. [FN60]

   The Committee is aware that investors are concerned about loans to insiders and
want to know this information promptly after the loans are made in order to better
inform their investment decisions. The bill requires an issuer in its current re-
ports to disclose within seven days, or such other time period determined to be
appropriate by the SEC, all loans, except credit card loans, made by the issuer
and its affiliates to any director or executive officer, specifying amounts paid
and balances owed on such obligations and any conflicts of interest, as defined by
the SEC. The Committee created an exemption from reporting for credit card loans
made by the issuer to a director or executive officer in the ordinary course of
the issuer's consumer credit business, of a type generally made available by the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

issuer to the public on market terms. The bill gives the SEC the flexibility to
shorten the period to less than seven days or extend it to more than seven days if
it deems appropriate.

  These provisions will result in information about insider loans and other con-
flicts of interest being disclosed in a timely manner so investors can consider
such data in making their investment decisions.

E. Disclosures of transactions involving management

  The Committee received testimony that insiders should be required to report
their transactions in the stock of their companies more promptly. Ira Millstein,
Senior Partner, Weil, Gotshal & Manges LLP and Co-Chair of the Blue Ribbon Commit-
tee on Improving the Effectiveness of Corporate Audit Committees, testified that,
"SEC rules should be amended to mandate prompt disclosure of transactions between
the corporation (or its affiliates) and members of senior management, directors or
controlling shareholders." [FN61] Former Comptroller General Bowsher echoed this
objective when he testified: "To discourage conflicts of interest involving public
corporations, Congress should amend the Securities Exchange Act of 1934 to require
more meaningful and timely disclosure of related party transactions among of-
ficers, directors, or other affiliated persons and the public corporation." [FN62]

  At present, Section 16(a) of the Exchange Act requires insiders to report trades
by the tenth day of the month following the month in which the transaction was ex-
ecuted. The Committee recognizes **\*31** that some investors find trades by insiders
to be probative of whether investing in a company is desirable and feel that, in
today's markets, the current deadline imposed by Section 16(a) allows too long a
delay in reporting.

  The bill would amend Section 16(a) to require directors, officers and 10 percent
equity holders to report their purchases and sales of securities more promptly,
that is, by the end of the second day following the transaction or such other time
established by the SEC where the two-day period is not feasible. The purpose is to
make available to investors information about insider transactions more promptly
so they can make better informed investment decisions.

F. Management assessment of internal controls

  The Committee heard testimony from former Comptroller General Bowsher, who re-
commended:

    Management of public companies should be required to prepare an annual state-
ment of compliance with internal controls to be filed with the SEC. The corpora-
tion's chief financial officer and chief executive officer should sign this at-
testation and the auditor should review it. An auditor's review and report on the
effectiveness of internal controls would-as the General Accounting Office (GAO)
found in a 1996 report-improve "the auditor's ability to provide more relevant and
timely assurances on the quality of data beyond that contained in traditional fin-
ancial statements and disclosures." Both the POB and the AICPA supported the re-
commendation when the GAO made it, but the SEC did not adopt it. [FN63]

  In order to enhance the quality of reporting and increase investor confidence,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

the bill requires that annual reports filed with the SEC must be accompanied by a
statement by the management of the issuer that management is responsible for cre-
ating and maintaining adequate internal controls. Management must also present its
assessment of the effectiveness of those controls. A similar requirement was en-
acted in 1991 and has been imposed on depository institutions through Section 36
of the Federal Deposit Insurance Act.

In addition, the company's auditor must report on and attest to management's as-
sessment of the company's internal controls. In requiring the registered public
accounting firm preparing the audit report to attest to and report on management's
assessment of internal controls, the Committee does not intend that the auditor's
evaluation be the subject of a separate engagement or the basis for increased
charges or fees. High quality audits typically incorporate extensive internal con-
trol testing. The Committee intends that the auditor's assessment of the issuer's
system of internal controls should be considered to be a core responsibility of
the auditor and an integral part of the audit report.

G. Exemptions for investment companies

The bill exempts investment companies from certain disclosure requirements. The
Committee feels that the objectives of those disclosure sections are adequately
addressed by existing Federal securities **\*32** laws and the rules thereunder affect-
ing investment companies.

For example, Section 17(a) of the Investment Company Act of 1940 and Rule 17j-1
thereunder prohibit affiliated persons of an investment company from borrowing
money or other property from, or selling or buying securities or other property to
or from the investment company, or any company that the investment company con-
trols. Investment company officials therefore would not have any insider loans to
report, as would be required under the bill.

H. Code of ethics for senior financial officers

The problems surrounding Enron Corp. and other public companies raise concerns
about the ethical standards of corporations and their senior financial managers.
The Committee believes that investors have a legitimate interest in knowing wheth-
er a public company holds its financial officers to certain ethical standards in
their financial dealings. The bill requires issuers to disclose whether or not
they have adopted a code of ethics for senior financial officers and, if not, why
not. This section was recommended by Senator Corzine.

I. Disclosure of audit committee financial expert

As discussed above, the Committee received testimony about the important role
played by the audit committee in corporate governance. The Committee believes the
effectiveness of the audit committee depends in part on its members' knowledge of
and experience in auditing and financial matters. Investors may find it relevant
in making their investment decisions whether an issuer's audit committee has at
least one member who has relevant, sophisticated financial expertise with which to
discharge his or her duties.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


The bill requires the SEC to adopt rules requiring issuers to disclose whether
their audit committees include among their members at least one "financial ex-
pert." In defining "financial expert," the SEC shall consider whether a person un-
derstands GAAP and financial statements, has experience preparing or auditing fin-
ancial statements, has experience with internal accounting controls, and under-
stands audit committee functions.

### TITLE V-ANALYST CONFLICTS OF INTEREST

The Committee heard persuasive testimony that a serious problem exists regarding
conflicts of interest between Wall Street stock analysts and their employing
brokerage firms, on the one hand, and the public companies that the stock analysts
cover, on the other hand. Growing knowledge of these conflicts is harming the in-
tegrity and credibility to the public of stock analyst recommendations.

The Committee heard testimony from Thomas A. Bowman, President and CEO of the
Association for Investment Management and Research, who said, "Clearly, the
erosion of investor confidence in the independence and objectivity of 'Wall
Street' research reports and recommendations * * * could seriously harm the repu-
tation of the entire investment profession." [FN64] He added, "Only if the invest-
ing **33 public believes that the information available to them is fair, accurate,
and transparent can they have confidence in the integrity of the financial markets
and the investment professionals who serve them." [FN65] He explained how "some
Wall Street firms may pressure their analysts to issue favorable research on cur-
rent or prospective investment-banking clients" and that investors who receive re-
commendations "may not be aware of the pressures on Wall Street analysts." [FN66]
Former SEC Chairman Richard Breeden suggested as a goal that Congress "[i]mprove
independence of stock analyst recommendations," explaining that "[a]nalyst recom-
mendations should be driven by analysis and fundamentals, not the pursuit of in-
vestment banking business for their firms." [FN67]

The Attorney General of the State of New York, Eliot Spitzer, in a letter to
Chairman Sarbanes, stated, "Problems in this area have existed for several years
and recently appear to have grown worse." [FN68] In his office's extensive invest-
igation of analyst recommendations, he said he has found that "research reports
and stock ratings of companies that were potential banking clients of [a major
broker-dealer] were often distorted to assist the firm in obtaining and retaining
investment banking business. One management document we obtained actually acknow-
ledged the conflict and its results, stating: 'We are off base on how we rate
stocks and how much we bend over backwards to accommodate banking, etc.' We be-
lieve that the lack of research independence from investment banking likely ex-
tends to other firms as well." [FN69]

The Committee feels that it is critical to restore investor confidence in this
area. The bill is intended to prevent certain pressures on analysts which could
compromise their objectivity and to provide disclosure to investors of certain
conflicts of interest that can also influence the objectivity of the analyst in
preparing a research report.

The Committee received testimony specifically demonstrating that conflicts of
interest distort securities analysts' recommendations. Professor John Coffee of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

Columbia Law School told the Committee of a number of studies that sought to as-
sess the impact of conflicts of interest on the objectivity of securities ana-
lysts' recommendations:

    Several studies find that 'independent' analysts (i.e., analysts not associ-
ated with the underwriter for a particular issuer) behave differently than ana-
lysts who are so associated with the issuer's underwriter. For example, Roni Mi-
chaely and Kent Womack find that the long-run performance of firms recommended by
analysts who are associated with an underwriter was significantly worse than the
performance of firms recommended by independent securities analysts.* * *

    Still another study by CFO Magazine reports that analysts who work for full-
service investment banking firms have 6% higher earnings forecasts and close to
25% more **34** buy recommendations than do analysts at firms without such ties. Sim-
ilarly, using a sample of 2,400 seasoned equity offerings between 1989 and 1994,
Lin and McNichols find that lead and co-underwriter analysts' growth forecasts and
particularly their recommendations are significantly more favorable than those
made by unaffiliated analysts. [FN70]

    The Committee also heard testimony on a variety of specific analyst conflicts
and the manner in which they might be addressed. These conflicts included the
firm's manner of compensating the analyst, revenues to the firm from the subject
company, pressure and coercion from the investment banking staff and others on the
analyst, retaliation against the analyst, and the analyst's or the analyst's
firm's ability to profit from stock ownership and trading.

    Chinese Walls. Dean Joel Seligman recommended addressing "whether investment
banks have adequately maintained 'Chinese walls' between retail brokerage and un-
derwriting and whether, more fundamentally, securities firms that underwrite
should be separated from retail brokerage." [FN71] The bill creates new Section
15A(n)(1)(C) of the Securities Exchange Act of 1934, which mandates rules "to es-
tablish structural and institutional safeguards within registered brokers or deal-
ers to assure that securities analysts are separated by appropriate informational
partitions within the firm from the review, pressure, or oversight of those whose
involvement in investment banking activities might potentially bias their judgment
or supervision."

    Blackout Periods. Professor Coffee cited abuses involving the so-called "Boost-
er Shot" and recommended that research reports not be issued during certain peri-
ods. He testified:

    Firms contemplating an IPO increasingly seek to hire as lead underwriter the
firm that employs the star analyst in their field. The issuer's motivation is
fueled in large part by the fact that the issuer's management almost invariably is
restricted from selling its own stock (by contractual agreement with the under-
writers) until the expiration of a lock-up period that typically extends six
months from the date of the offering. The purpose of the lock-up agreement is to
assure investors that management and the controlling shareholders are not "bailing
out" of the firm by means of the IPO. But as a result, the critical date (and mar-
ket price) for the firm's insiders is not the date of the IPO (or the market value
at the conclusion of the IPO), but rather the expiration date of the lock-up
agreement six months later (and the market value of the stock on that date). From

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

the perspective of the issuer's management, the role of the analyst is to "main-
tain a buzz" about the stock and create a price momentum that peaks just before
the lock-up's expiration. To do this, the analyst may issue a favorable research
report just before the lock-up's expiration (a so-called "booster shot" in the
vernacular). To the extent that favorable ratings issued at this point seem par-
ticularly **\*35** conflicted and suspect, an NASD rule might forbid analysts associ-
ated with underwriters from issuing research reports for a reasonable period (say,
thirty days) both before and after the lock-up expiration date. Proposed Rule 2711
[of the NASD] stops well short of this and only extends the "quiet period" so that
it now would preclude research reports for this first 40 days after an IPO. Such a
limited rule in no way interferes with the dubious tactic of "booster shots."
[FN72]

   The bill directs that rules be adopted "to define periods during which brokers
or dealers who have participated, or are to participate, in a public offering of
securities as underwriters or dealers should not publish or otherwise distribute
research reports relating to such securities or to the issuer of such securities."
The "booster shot" is a type of situation that the SEC and the self-regulatory or-
ganizations should consider in framing such rules.

   Services Provided. Mr. Bowman recommended disclosure of "the nature of the rela-
tionship or services provided" by an analyst's firm to the subject company. [FN73]
The bill requires disclosure of the types of services provided.

   Supervision by Investment Bankers and Disclosure of Investment Banking Relation-
ships. Michael Mayo, Managing Director of Prudential Securities, recommended that
Congress "[t]ake actions to minimize the interference of investment bankers with
the job of research analysts" and "[d]isclose investment banking relationships to
investors." [FN74] The bill prohibits the pre-publication clearance of research or
recommendations by investment banking or other staff not directly responsible for
investment research and requires disclosure of whether the issuer is or has re-
cently been a client of the analyst's firm, and if so, the services provided.

   Lynn Turner, former SEC Chief Accountant, testified: "As long as the investment-
banking arm of Wall Street has influence over the work of the research analysts or
their compensation, analysts will not be able to provide independent research."
[FN75] The bill requires the creation of rules that limit the supervision and com-
pensatory evaluation of research personnel to officials who are not engaged in in-
vestment banking activities.

   Compensation from the Subject Firm to the Broker and Deal-Based Analyst Pay. Mr.
Mayo raised the concern, "Does the retail investor know that the brokerage firm
pitching shares is also earning investment banking fees from the company?" and
also recommended that the Congress "eliminate deal-based incentive pay" for re-
search analysts. [FN76] The bill requires disclosure of whether any compensation
has been received by the broker-dealer from the issuer, subject to such exemptions
as the Commission may determine necessary and appropriate to prevent disclosure of
material non-public information regarding specific potential future investment
banking transactions of such issuer, as is appropriate in the public interest and
consistent with the protection of investors. The **\*36** bill, while not eliminating
deal-based pay, requires disclosure of whether the analyst received compensation

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

based on an affiliate's investment banking revenues from the subject of any re-
search report.

  Retaliation. The Committee heard testimony about the serious problem of retali-
ation against analysts who wrote negative research reports. Professor Coffee test-
ified, "In self-reporting studies, securities analysts report that they are fre-
quently pressured to make positive buy recommendations or at least to temper neg-
ative opinions." [FN77] He added, "According to one survey, 61% of all analysts
have experienced retaliation-threats of dismissal, salary reduction, etc.-as the
result of negative research reports. Clearly, negative research reports (and rat-
ings reductions) are hazardous to an analyst's career. Congress could either ad-
opt, or instruct the NASD to adopt, an anti-retaliation rule: no analyst should be
fired, demoted, or economically penalized for issuing a negative report, downgrad-
ing a rating, or reducing an earnings, price, or similar target." [FN78]

  Eliot Spitzer, Attorney General of the State of New York, concluded that the
analyst conflict regulations put forth by the self-regulatory organizations "fall
short of what should be legislated in this area [because], [f]or example, the reg-
ulations fail to address the problem of intimidation or retaliation against ana-
lysts who publish unfavorable research about a company." [FN79]

  The bill requires rules to be promulgated to protect securities analysts from
retaliation or intimidation because of negative, or otherwise unfavorable, re-
search reports, subject to the proviso that such rules may not limit a broker-
dealer from disciplining a securities analyst in accordance with firm policies and
procedures for causes other than writing such a research report.

  Professor Coffee recommended that a no-retaliation rule should:

    not bar staff reductions or reduced bonuses based on economic downturns or in-
dividualized performance assessments. Thus, given the obvious possibility that the
firm could reduce an analyst's compensation in retaliation for a negative report,
but describe its action as based on an adverse performance review of the individu-
al, how can this rule be made enforceable? The best answer may be NASD arbitra-
tion. That is, an employee who felt that he or she had been wrongfully terminated
or that his or her salary had been reduced in retaliation for a negative research
report could use the already existing system of NASD employee arbitration to at-
tempt to reverse the decision. Congress could also establish the burden of proof
in such litigation and place it on the firm, rather than the employee/analyst.
Further, Congress could entitle the employee to some form of treble damages or
other punitive award to make this form of litigation viable. Finally, Congress
could mandate an NASD penalty if retaliation were found, either by an NASD arbit-
ration panel or in an NASD disciplinary proceeding. [FN80]

  **\*37** The exception is intended to make certain that writing a negative research
report does not protect an analyst who is, for example, incompetent or otherwise
deficient. However, it is not intended to be used to permit a broker-dealer to
discipline a good analyst for writing a negative report using a false pretext. In
adopting a proposed rule, the SEC or a self-regulatory organization should con-
sider Professor Coffee's recommendations.

  Additional Analyst Issues. The Committee heard testimony about various addition-
al concerns and recommendations to prevent analyst conflicts of interest and oth-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

erwise enhance investor protection, some of which are discussed below.

Professor Coffee recommended "A No-Selling Rule." He testified:

If we wish the analyst to be a more neutral and objective umpire, one logical step might be to preclude the analyst from direct involvement in selling activities. For example, it is today standard for the "star" analyst to participate in "road shows" managed by the lead underwriters, presenting its highly favorable evaluation of the issuer and even meeting on a one-to-one basis with important institutional investors. Such sales activity seems inconsistent with the much-cited "Chinese Wall" between investment banking and investment research * * *.

Although a "no-selling" rule would do much to restore the objectivity of the analyst's role, one counter-consideration is that the audience at the road show is today limited to institutions and high net worth individuals. Hence, there is less danger that the analyst will overreach unsophisticated retail investors. For all these reasons, this is an area where a more nuanced rule could be drafted by the NASD at the direction of Congress that would be preferable to a legislative command. [FN81]

Dean Joel Seligman also recommended considering "a new form of adviser liability for recommendations without a reasonable basis." [FN82]

Mr. Bowman recommended disclosure of "[i]nvestment holdings of Wall Street analysts, their immediate families, the Wall Street firm's management and the firms themselves" as well as disclosure of "[m]aterial gifts received by the analyst from either the subject company or the Wall Street firm's investment-banking or corporate finance department." [FN83]

Mr. Bowman explained the need for greater explanatory information about analysts' rating systems. He said that "rating systems need to be overhauled so that investors can better understand how ratings are determined and compare ratings across firms. Ratings must be concise, clear, and easily understood by the average investor" and he recommended disclosures of "where and how to obtain information about the firm's rating system." [FN84] He also said that "Wall Street analysts and their firms should also be required to update or re-confirm their recommendations on a timely and regular basis, and more frequently in periods of high market volatility. **38** They should be required to issue a "final" report when coverage is being discontinued and provide a reason for discontinuance. Quietly and unobtrusively discontinuing coverage or moving to a "not rated" category, i.e., a "closet" sell, does not serve investors' interests." [FN85]

The Committee also heard testimony about the intimidation of analysts by issuers. Mr. Bowman testified that:

strong pressure to prepare "positive" reports and make "buy" recommendations comes directly from corporate issuers, who retaliate in both subtle, and not so subtle, ways against analysts they perceive as "negative" or not "understanding" their company. Issuers complain to Wall Street firms' management about "negative" or uncooperative analysts. They bring lawsuits against firms and analysts personally for negative coverage. But more insidiously, they "blackball" analysts by not taking their questions on conference calls or not returning their individual calls to investor relations or other company management. This puts the "negative" analyst at a distinct competitive disadvantage, increases the amount of uncertainty

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                          Page 36

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

an analyst must deal with in doing valuation and making a recommendation, and dis-
advantages the firm's clients, who pay for that research. Such actions create a
climate of fear and intimidation that fosters neither independence nor objectiv-
ity. Analysts walk a tightrope when dealing with company managements. A false step
may cost them an important source of information and ultimately their jobs. [FN86]

    Mr. Mayo, a victim of issuer retaliation, gave testimony from first-hand experi-
ence of the problem. He said, "It is still hard for an analyst to be objective and
critical. When an analyst says "Sell," there can be backlash from investors who
own the stock, from the company being scrutinized, and even from individuals in-
side the analyst's firm. While much attention in Washington is being paid to the
pressures related to a firm's investment banking operations, other pressures can
be as great or more. The main point: Some companies may intimidate analysts into
being bullish. Those who stand up may face less access to company information and
perhaps backlashes, too." [FN87]

    While the bill does not specifically identify remedies to these situations, it
authorizes the Commission, or a registered securities association or exchange at
the Commission's direction, to create rules to address such other issues as it de-
termines appropriate and to require such other disclosures of conflicts of in-
terest that are material to investors, research analysts, or the broker or dealer
as it deems appropriate. The Commission, and the association and exchanges, should
consider the issues noted above as they adopt other rules necessary and appropri-
ate to protect investors in the area of analyst recommendations. The prohibition
of specific activities identified in title V is not an exhaustive solution to the
analyst conflicts problem, and the Committee expects the Commission and **39** the
self-regulatory organizations to use their authority to apply such additional
rules as they deem appropriate.

    The bill requires that rules be adopted within one year. Existing rules that
satisfy the requirements of the bill do not have to be reproposed or readopted.
Existing rules that do not contradict the bill or that impose requirements that
are not imposed by the bill do not have to be withdrawn or reproposed. For ex-
ample, self-regulatory organization rules that require disclosure of statistics
regarding analyst ratings or of the securities holdings of an analyst's family
members in a subject company are not adversely affected by this bill.

    It should be noted that title V of the bill creates a new Section 15A(n)(B),
(C) and (D) of the Exchange Act, which requires disclosure of simply "affirmative"
or "negative" in response to "whether" an event has occurred. Further, Section
15A(n)(C) requires a description of the types of services provided, rather than a
list of all specific services. This requirement is to enable the investor to as-
sess whether the relationship is likely to influence the objectivity of the sub-
jective portions of the research report.

    The new Section 15A(n)(B) of the Exchange Act created by the bill authorizes the
Commission to grant exemptions to prevent disclosure of material non-public in-
formation about specific future investment banking revenues. In determining wheth-
er to grant an exemption, the Commission should take into account the importance
that Congress places on providing investors with this information for making in-
vestment decisions and the likelihood that stating an affirmative response would

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

divulge material non-public information that would be understood by investors,
particularly in light of the size and complexity of the brokerage firm. For ex-
ample, a complex brokerage firm which has received money from an issuer may be far
less likely to disclose material nonpublic information simply by responding "yes,"
and therefore not merit an exception, than a small firm that only is engaged to
find buyers for an issuer and has received compensation.

The Committee heard testimony from authorities which stated that the rules set
forth by self-regulatory organizations are inadequate to address the analyst con-
flicts of interest issue. Former SEC Chairman Arthur Levitt testified, "we must
better expose Wall Street analysts' conflicts of interest * * * the New York Stock
Exchange and the National Association of Securities Dealers [rulemaking] * * * is
not enough." [FN88] Also, Attorney General Spitzer stated "the proposed regula-
tions by the National Association of Securities Dealers and the New York Stock Ex-
change fall short of what should be legislated in this area." [FN89] The Committee
feels that while the NYSE and NASD rules will improve the quality of analysts'
stock recommendations, title V is needed to address analyst conflicts and to
strengthen investor protection.

### TITLE VI-COMMISSION RESOURCES AND AUTHORITY

The Committee determined that it is necessary to increase the resources avail-
able to the SEC and to increase the authority of the **\*40** SEC to enable it more ef-
fectively to accomplish its mission of assuring the integrity of the markets and
protecting investors.

SEC Authorization. Witnesses before the Committee testified consistently and
strongly that the SEC needs additional resources in order to effectively carry out
its mission and protect investors. John Whitehead, former Co-Chairman, Goldman
Sachs & Co., testified: "I think the SEC is under-funded and has been for some
years. When you consider the seriousness [to] the system of just one Enron, it's
dangerous to fool around with relatively small increases in budgets that the SEC
asks for." [FN90] David Walker, U.S. Comptroller General, testified, "[T]he SEC's
ability to fulfill its mission has become increasingly strained due in part to im-
balances between the SEC's workload (such as filings, complaints, inquiries, in-
vestigations, examinations and inspections) and staff resources * * *. Over the
last decade, securities markets have experienced unprecedented growth and change *
* *. At the same time, the SEC has been faced with an ever-increasing workload and
ongoing human capital challenges, most notably high staff turnover and numerous
vacancies." [FN91]

Former SEC Chairmen Roderick Hills, Harold Williams, Richard Breeden, and Arthur
Levitt all supported increasing the SEC's resources. [FN92] Chairman Breeden re-
commended that Congress "[s]trengthen the SEC's resources through expanded budget
authority (offset by increased user fees), immediate and continuing funding of pay
parity provisions, and addition of 200 new accounting positions." [FN93]

Professor John Coffee testified, "I think you're hearing from all of us that the
SEC is resource-constrained and I think the less visible casualty of that are the
offices such as the office of the chief accountant, where you can't really measure
the output until a scandal like Enron comes along." [FN94]

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

The Committee also received and considered the General Accounting Office report,
"SEC OPERATIONS: Increased Workload Creates Challenges," March 5, 2002
(GAO-02-302). GAO found that industry officials said "the SEC's limited staff re-
sources have resulted in substantial delays in SEC regulatory and oversight pro-
cesses, which hampers competition and reduces market efficiencies. In addition,
they said information technology issues need additional funding, and SEC needs
more expertise to keep pace with rapidly changing financial markets. Finally, the
officials said that SEC's reliance on a small number of seasoned staff to do the
majority of the routine work does not allow those staff to adequately deal with
emerging issues."

The bill authorizes an appropriation of $776,000,000 for the SEC for fiscal year
2003. This includes:

$102,700,000 to fund pay on a par with the federal bank regulators for SEC em-
ployees' salaries as well as their fringe benefits, as authorized by the Investor
and Capital Markets Fee Relief Act (P.L. 107-123);

**\*41** $108,400,000 to fund enhanced information technology, security enhance-
ments, and recovery and mitigation activities; and

$98,000,000 to fund at least 200 more professionals to oversee auditors and
auditing services, and additional staff to improve SEC investigative and disci-
plinary efforts and strengthen the SEC's oversight and regulation of market parti-
cipants and of issuer disclosure, securities markets, and investment companies.

Codifying Rule of Procedure. In its Rules of Procedure, the SEC has a procedure
to discipline professionals, including accountants, who lack the requisite quali-
fications to practice before the Commission. Professor Coffee testified before the
Committee that "[t]he SEC's authority under Rule 102(e) was clouded by the D.C.
Circuit's decision in Checkosky v. SEC, 139 F.3d 221 (D.C. Cir. 1998) (dismissing
Rule 102(e) proceeding against two accountants of a "Big Five" firm). The SEC re-
vised Rule 102 in late 1998 in response to this decision (see Securities Act Rel.
No. 7593 (Oct. 18, 1998)), but its authority in this area is still subject to some
doubt that Congress may wish to remove or clarify." [FN95] Lynn E. Turner, former
SEC Chief Accountant, said, "[t]he statutory authority of the SEC also needs to be
examined and beefed up as it relates to Rule 102(e) proceedings." [FN96]

The bill codifies the authority of the SEC in 17 CFR 210.102(e) to censure or
deny, temporarily or permanently, the privilege of appearing or practicing before
it to any person found by the SEC after notice and opportunity for hearing: (i)
not to possess the requisite qualifications to represent others, (ii) to be lack-
ing in character or integrity or to have engaged in unethical or improper profes-
sional conduct, or (iii) to have willfully violated, or willfully aided and abet-
ted the violation of, any provision of the federal securities laws or the rules
and regulations thereunder.

Penny Stock Bar. Under current law, the penny stock bar is available only in ad-
ministrative proceedings. However, the Commission frequently brings cases in-
volving serious microcap or penny stock fraud in federal district court in order
to obtain injunctive relief. In such a case, if the Commission also wishes to ob-
tain a penny stock bar, it must bring a separate administrative proceeding, typi-
cally after the district court case is concluded. The Commission would be able to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

obtain all necessary relief more efficiently if the district courts had the au-
thority to order penny stock bars.

The bill authorizes federal courts to impose penny stock bars, or conditionally
or unconditionally and temporarily or permanently prohibit a person from particip-
ating in a penny stock offering. The Commission has requested this authority in
order to deal more swiftly with penny stock fraud.

Qualifications of Associated Persons of Brokers and Dealers. The SEC staff has
advised the Committee that in recent years, there has been a growing perception
that fraud artists are able to exploit gaps in federal and state regulatory sys-
tems and to move from one sector of the financial services industry to another
without sufficient **\*42** impediment. The SEC lacks the enforcement authority to bar
individuals from coming into the securities industry who have been found by other
financial regulators to have engaged in fraudulent, deceptive, or dishonest con-
duct in other financial industries. The bill gives the SEC this power. In order to
reduce the migration of fraud perpetrators into the securities industry, the bill
authorizes the Commission to bar from the securities industry persons who have
been suspended or barred by a state securities, banking, or insurance regulator
because of fraudulent, manipulative, or deceptive conduct. The Commission reques-
ted this authority.

TITLE VII-STUDIES AND REPORTS

The Committee identified two subjects of concern for additional study: the ongo-
ing consolidation of the accounting industry and the performance of credit rating
agencies.

Historically, the accounting industry has been consolidating into fewer large
accounting firms. James E. Copeland, CPA and Chief Executive Officer, Deloitte &
Touche, testified, "I've been on record since the last spate of proposed mergers
saying that I thought the further consolidation of our industry would not be in
the public's interest." [FN97]

The bill, in a section authored by Senator Akaka, directs the Comptroller Gener-
al, in consultation with the SEC, similar regulatory agencies of the other G-7 na-
tions, and the Department of Justice, to conduct a study identifying the factors
that have led to the consolidation of public accounting firms since 1989, the im-
pact of such consolidation, and solutions to any problems caused by such consolid-
ation. The study shall also examine the problems faced by businesses as a result
of limited competition among public accounting firms, and consider whether federal
or state regulations impede competition among public accounting firms. A report is
to be submitted to the Senate Banking Committee and the House Financial Services
Committee within one year of enactment of this legislation.

The Federal regulation of credit-rating bureaus was raised at the hearing of
March 21, 2002. The bill, in a section authored by Senator Bunning, directs the
SEC to conduct a study of the role of credit rating agencies in the operation of
the securities market, including an examination of the role of credit rating agen-
cies in the evaluation of issuers, the importance of that role to investors, any
impediments to the rating agencies' accurate appraisal of issuers, any barriers to
entry into the business of acting as a credit rating agency, measures to improve

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

the dissemination of information about issuers when credit rating agencies an-
nounce credit ratings, and any conflicts of interest in the operation of credit
rating agencies. A report is to be submitted to the President, the Senate Banking
Committee, and the House Financial Services Committee within 180 days of enact-
ment.

**\*43** SECTION-BY-SECTION ANALYSIS

Section 1. Short title and table of contents

Section 2. Definitions

 Section 2 contains a set of definitions of terms that are used in the bill.
 1. An "appropriate state regulatory authority" is a state authority responsible
for licensing or other regulation of the practice of accounting in a state that
has jurisdiction over an accounting firm or its personnel in connection with a
particular matter.
 2. An "audit" is an examination of the financial statements of an issuer by an
independent public accounting firm, in accordance with rules of the new accounting
oversight board or the SEC, for the purpose of expressing an opinion on those
statements. This definition should be read in connection with the definitions of
"issuer" and "audit report," below.
 3. An "audit committee" is a committee of an issuer's board of directors created
to oversee the accounting and financial reporting processes and audits of the fin-
ancial statements of the issuer.
 4. An "audit report" is a document, prepared following an audit performed for
purposes of an issuer's compliance with the federal securities laws, in which a
public accounting firm sets forth its opinion regarding a financial statement, re-
port, or other document, or asserts that no such opinion can be expressed.
 5. The "Board" is the Public Company Accounting Oversight Board established by
section 101 of the bill.
 6. The "Commission" is the U.S. Securities and Exchange Commission.
 7. An "issuer" is a company that issues or proposes to issue securities, if the
securities are registered under section 12 of the Securities Exchange Act of 1934,
or if the company is required to file reports with the SEC under section 15(d) of
the Securities Exchange Act (or will be required to file those reports at the end
of the fiscal year in which a registration statement for the issuer's securities
has become effective under the Securities Act of 1933).
 8. "Non-audit services" are professional services provided to an issuer by an
accounting firm registered with the Board, other than those required to be
provided in connection with an audit or other review of the issuer's financial
statements.
 9. A "person associated with a public accounting firm" is a proprietor, partner,
shareholder, principal, or an accountant or other professional employee of a pub-
lic accounting firm, or any independent contractor or entity that shares in com-
pensation or profits, or that participates on behalf of the firm in an activity,
in connection with preparation or issuance of an audit report.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

10. "Professional standards" include (i) accounting principles established by
the standard-setting body recognized under the bill or prescribed or recognized by
the SEC that are relevant to particular audit reports or accounting firm quality
control systems, and (ii) auditing standards, standards for attestation engage-
ments, quality control policy, ethical and competency standards, and independence
standards that relate to the preparation of audit reports and are established or
adopted by the Board or SEC.

**\*44** 11. A "public accounting firm" includes a proprietorship or entity engaged
in the practice of public accounting or preparing or issuing audit reports. To the
extent the new oversight board designates in its rules, the term can also include
an associated person of an accounting firm.

12. A "registered public accounting firm" is a firm that registers with the new
oversight board, as required by section 102 of the bill.

13. The "rules of the Board" include both the formal bylaws and rules adopted by
the new oversight board (subject to action of the SEC under section 107 of the
bill) and stated policies, practices, and interpretations of the board that the
SEC deems to be rules of the board.

14. The term "security" has the same meaning as in section 3(a) of the Securit-
ies Exchange Act.

15. The term "securities laws" has the meaning given that term in section
3(a)(47) of the Securities Exchange Act, and includes the SEC's rules, regulations
and orders. (Section 2(b), in a conforming amendment, makes the bill a part of the
section 3(a)(47) definition.)

16. A "State" includes any state of the United States, the District of Columbia,
Puerto Rico, the Virgin Islands, and any other U.S. territory or possession.

Section 3. Commission rules and enforcement

Section 3 generally gives the Securities and Exchange Commission (the "Commis-
sion" or the "SEC") authority to promulgate rules consistent with the Act and
provides that a violation of the Act, or of any rule of the Commission or of the
new Public Company Accounting Oversight Board created by title I of the Act, will
be treated for all purposes as a violation of the Securities Exchange Act of 1934
and the rules thereunder; similarly, the new Board will be treated as if it were a
self-regulatory organization under the 1934 Act for purposes of the Commission's
investigative and enforcement authority. It should be emphasized that the new
Board's own authority is limited to the work of accountants in auditing public
companies; the Board has no jurisdiction with respect to the work of accountants
in performing audits of other companies.

Section 3 thus confirms that the Commission will have the authority to enforce
the Act directly. Section 3 also makes clear that nothing in the Act or the rules
of the new Board limits the Commission's own authority over accounting firms and
their personnel, or accounting, auditing, independence, or other standards relat-
ing to auditors' reports.

TITLE I-PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Section 101. Establishment

   Section 101 creates a new Public Company Accounting Oversight Board (the
"Board"). The Board will oversee the auditing of companies that are subject to the
federal securities laws (i.e., companies ("public companies" or "issuers") that
have chosen to sell stock or debt instruments to public investors). Accounting
firms that perform audits of public companies must register with the Board, and
the Board will possess authority, subject to action by the Commission, to (i) set
auditing, quality control, ethics, and independence standards (the latter supple-
menting statutory provisions on that **\*45** subject), with respect to audits of the
financial statements of public companies, (ii) inspect accounting firms' audit op-
erations with respect to public companies, (iii) investigate potential violations
by the firms or their partners or employees of the Act, the Board's rules, related
provisions of the securities laws (and the Commission's rules), and professional
accounting and conduct standards, and (iv) impose sanctions for violations. Again,
the Board's authority in these areas is focused on, and limited to, the audit of
public companies; it has no jurisdiction over accountants performing other audits.
The Board is to submit an annual report of its activities to the Commission, which
in turn is to send a copy to the House Committee on Financial Services and the
Senate Committee on Banking, Housing, and Urban Affairs within 30 days of receipt.
   Legally, the Board will be a private nonprofit corporation subject to the Dis-
trict of Columbia Nonprofit Corporation Act. The Board will not be an agency or
establishment of the United States. It is explicitly given authority to set com-
pensation for its employees at levels comparable to similar positions in the
private sector.
   Membership. Section 101(e) provides that the Board will have five members. The
initial Board will be appointed by the Commission, after consultation with the
Federal Reserve Board and the Department of the Treasury, within 90 days of the
date of enactment; vacancies will be filled by the Commission after similar con-
sultations. Board members will serve full-time, for five-year (staggered) terms,
with a two-term limit. All Board members must have an understanding of the re-
sponsibilities for and the nature of the financial disclosures and accountants'
responsibilities required by the securities laws. Three members of the Board will
have a general background, and two members will have an accountancy background;
the Board's Chairperson may be one of the two Board members with an accountancy
background, but if so, he or she may not have been a practicing accountant for at
least five years prior to appointment to the Board. Internal Board standard of
conduct rules must include a one-year ban on practice before the Board (or before
the Commission, with respect to Board-related matters) for former Board members
and appropriate "cooling off" periods (not to exceed one year) for former Board
staff.
   The initial Board's first task will be to hire staff, propose or adopt its first
sets of rules and generally bring the organization into operational existence, so
that the Commission can make a determination, required under section 101(d) within
270 days of enactment, that the Board possesses the capacity to carry out its re-
sponsibilities and enforce compliance with title I of the Act.


© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-10258-SHS     Document 23-5     Filed 01/07/2008     Page 43 of 71

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Section 102. Registration with the Board

   The Commission's determination that the Board can begin to exercise its author-
ity starts the running of a 180-day period within which each public accounting
firm that prepares or issues audit reports for public companies must register with
the Board. At the end of the 180-day period it will become unlawful for an unre-
gistered accounting firm to audit a public company. (Again, lack of registration
will have no effect on an accounting firm's ability to perform any other sort of
work.) An application for registration must include information about the identity
of the public companies for which an accounting firm currently or during the pre-
vious **\*46** year performs or has performed audit work, certain current financial in-
formation about the accounting firm itself, a statement of the firm's quality con-
trol policies for its accounting and auditing practice, a list of the firm's ac-
countants who participate in public company audits, and information about pending
civil, criminal, or disciplinary actions, and client-auditor disputes, relating to
the firm's audits of public companies. The application must also include a consent
to compliance with any requests for documents or testimony, within the Board's au-
thority, made to the registrant in the course of the Board's operation and an
agreement to obtain and if necessary to enforce similar consents from the firm's
partners and employees who participate in public company audits. Registered ac-
counting firms will be required to report changes in this information to the Board
annually (or more frequently if the Board so requires).
   Information submitted to the Board as part of each application will be made
available to the public, subject to limitations to protect the confidentiality of
proprietary, personal, and other information for which such protection is neces-
sary or required by law. In particular, information "reasonably identified by [the
registrant] as proprietary information" will be withheld from disclosure.
   The Board is authorized by section 102(f) to impose a registration fee and an
annual fee on each registrant, to cover the cost of processing and reviewing ap-
plications and annual reports.

Section 103. Auditing, quality control, and independence standards and rules

   Section 103 requires the Board to establish auditing, quality control, and eth-
ical standards, as required by the Act or the rules of the Commission or necessary
or appropriate in the public interest or for the protection of investors, to be
used by registered accounting firms in the preparation of audit reports for public
companies. The Board is also to adopt rules to implement the provisions on the in-
dependence of public company auditors contained in title II of the Act.
   The Board's rules specifically must require (i) preparation and maintenance for
7 years by public company auditors of audit work papers and related information in
sufficient detail to support each audit's conclusions, (ii) "second partner" re-
view and approval of each public company audit report and its issuance, and (iii)
inclusion in each audit report of a description of the auditor's testing of the
public company's systems for compliance with the requirements of section 13(b)(2)
of the Securities Exchange Act and of the company's controls over its receipts and
expenditures, together with specific notation of any significant defects or mater-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ial noncompliance of which the auditor should know on the basis of such testing.

Section 103 also specifies the subjects that the quality control standards adop-
ted by the Board must address. These are: monitoring of ethics and independence;
internal and external consulting on audit issues; audit supervision; hiring, de-
velopment, and advancement of audit personnel; acceptance and continuance of en-
gagements; and internal inspection.

The Board may adopt as part of its rules (and modify as appropriate for that
purpose, at the time of adoption or thereafter), any portion of a statement of
auditing, quality control, or ethics standards **\*47** that meet the statutory test
prepared (i) by a professional group of accountants designated by a rule of the
Board for that purpose, or (ii) by one or more advisory groups convened by the
Board. (Pre-existing standards of designated professional groups of accountants
that may be adopted during the Board's nine-month transitional period are to be
separately approved by the Commission at the time of the Commission's determina-
tion (pursuant to section 101(d), noted above) that the Board is ready to begin
operation.)

The Board will convene advisory groups of practicing accountants and other ex-
perts, as well as representatives of other interested groups (subject to appropri-
ate conflict of interest rules), to make recommendations concerning, or propose
drafts of, the content of any required standards for public company auditors.

The Board is to cooperate on an ongoing basis with both the designated profes-
sional groups of accountants noted above, and with its own advisory groups, in ex-
amining the need for changes in any standards subject to Board authority. The
Board is to recommend issues for inclusion on the agendas of these groups, and
take other steps to facilitate the standard-setting process, and it is to respond
in a timely fashion to requests for changes in the standards over which the Board
has authority.

Finally, the Board is to include a summary of the results of its standard-set-
ting responsibilities in each of its annual reports. Each summary must include a
discussion of the Board's work with any designated professional group of account-
ants or advisory group, as well as the Board's pending agenda for future standard-
setting projects.

Section 104. Inspections of registered public accounting firms

Section 104 outlines the duty of the staff of the Board to undertake annual in-
spections of registered public accounting firms that prepare audit reports for
more than 100 public companies, and triennial inspections of firms that prepare
audit reports for 100 or fewer public companies, to assess the degree of compli-
ance by those firms with the Act, the rules of the Board, and professional stand-
ards relating to audits of public companies. (The inspection cycles for different-
sized accounting firms may be subsequently changed by the Board.) The Board is to
(i) identify in the course of each inspection any act, practice, or omission by
the firm or its partners or employees revealed by the inspection that may violate
the Act, the Board's or related Commission rules, the firm's own quality control
policies, or professional standards, (ii) report any such finding, if appropriate,
to the Commission and each state accountancy board with jurisdiction over the mat-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ter, and (iii) commence a formal investigation or take any appropriate disciplin-
ary action with respect to the violation.

The scope of each inspection will include both particular audit and review en-
gagements (which may include engagements that are otherwise the subject of ongoing
controversy between the accounting firm under inspection and third parties), se-
lected solely by the Board, as well as a review of each firm's quality control
system and its compliance with professional standards relating to audit reports
for public companies. The term "professional standards" means, for purposes of
title I and the Board's authorization, (i) generally accepted **\*48** accounting prin-
ciples, (ii) auditing standards, standards for attestation engagements and quality
control policies, and ethical and competency standards that the Board adopts, and
(iii) independence standards that the Board adopts to implement title II of the
Act.

The rules of the Board are to provide a procedure for review and comment on a
draft inspection report by the firm inspected; the text of any comment by the firm
on a draft inspection report is to be attached, with appropriate redactions to
protect confidential information, to the final report. That report is to be sent
to the Commission and the appropriate state board of accountancy and made avail-
able to the public (subject, again, to protection of confidential and proprietary
information). Portions of an inspection report which deal with criticisms of or
potential defects in the quality control systems of a firm will not be made public
if the defects are addressed to the satisfaction of the Board within 12 months of
the date of the report. In certain cases interim Commission review of certain in-
spection-related disputes is available.

Section 105. Investigations and disciplinary proceedings

Section 105 outlines the investigative and disciplinary authority of the Board
over firms that audit public companies and partners and employees of these firms.

Investigations. Section 105(a) authorizes the Board to investigate any act or
practice by a registered accounting firm, or its partners or employees, that may
violate the Act, the Board's rules, professional standards, and the portion of the
securities laws and SEC rules that relate to the preparation and issuance of audit
reports and the obligations and liabilities of accountants with respect thereto.
The Board may require testimony or production of documents or information, or in-
spect documents or information, in the possession of any registered public ac-
counting firm or its partners or employees. The Board's investigative activities
and any information gathered in the course of an investigation are to be confiden-
tial and privileged for all purposes (including civil discovery), unless and until
particular information is presented in connection with a public proceeding. The
Board may refer investigations to the Commission, any other federal functional
regulator (in the case of an investigation relating to the audit of an institution
subject to the jurisdiction of such functional regulator), and, at the direction
of the Commission, to the Attorney General, state attorneys general in connection
with any criminal investigation, or appropriate state boards of accountancy, and
may share information derived from investigations with the same parties, but only
if the Board determines that such disclosure is "necessary to accomplish the pur-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

poses of the Act or to protect investors." The Board's investigators are granted
civil immunity for their activities during an investigation to the same extent
that a federal investigator would enjoy such immunity.

Disciplinary proceedings. Section 105(b) authorizes the Board to impose a full
range of sanctions if it finds that a registered firm, or its partners or employ-
ees, have engaged in any act or practice that violates the Act, the Board's rules,
professional standards, or the portion of the securities laws (and SEC rules) re-
lating to audits of public companies. Potential sanctions include revocation or
suspension **49** of the registration of an accounting firm, or of the ability of
particular individuals to remain associated with that firm or become associated
with any other registered accounting firm (effectively barring the subject of the
sanction from participating in audits of public companies), substantial civil
money penalties, required professional education or training, or censure; the
Board's ability to suspend or bar an associated person from the auditing of public
companies, and the Board's ability to impose civil money penalties above a certain
amount, is limited to situations involving intentional, knowing, or reckless con-
duct, or repeated negligent conduct. The Board may also impose sanctions upon a
registered accounting firm for failure reasonably to supervise a partner or em-
ployee (in terms similar to those that apply to broker-dealers under section
15(b)(4) of the Securities Exchange Act of 1934, which permit the firm to defend
by showing that its internal control procedures were reasonable and were operating
fully in the case at issue).

The Board's rules must set out fully the procedural requirements for disciplin-
ary proceedings. Disciplinary sanctions finally imposed must be reported to the
Commission, appropriate state or foreign boards of accountancy, and the public
(once any stay of enforcement pending appeal has been lifted). Any sanction may be
appealed to the Commission under the provisions of section 107(c) (described be-
low).

Fines imposed by the Board are to be used to fund a scholarship program for stu-
dents in undergraduate or graduate programs in accounting.

Section 106. Foreign public accounting firms

Section 106 provides that accounting firms organized under the laws of countries
other than the United States that issue audit reports for public companies subject
to the U.S. securities laws are covered by the Act in the same manner as domestic
accounting firms, subject to the exemptive authority of both the Board and the
Commission. (Registration under the Act will not in itself provide a basis for
subjecting a foreign accounting firm to U.S. jurisdiction other than with respect
to controversies between such a firm and the Board.) The Board is authorized to
determine that other foreign accounting firms play a sufficiently substantial role
in the preparation and furnishing of such reports for particular issuers that
their coverage under the Act is necessary or appropriate, in light of the purposes
of the Act and in the public interest or for the protection of investors.

Section 106 also sets terms for the production in the United States by a foreign
public accounting firm of its audit work papers, for any audit in which the for-
eign accounting firm issues an opinion or otherwise performs material services

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

upon which an accounting firm registered under the Act relies in issuing all or
part of an audit report for a public company.

Section 107. Commission oversight of the Board

  Section 107 makes the Board generally subject to the same degree of control by
the Commission as the National Association of Securities Dealers or the New York
Stock Exchange. Section 107(b) provides that the Board's proposed rules must be
filed with the **\*50** Commission and published by the Commission for public comment.
No Board rule may take effect without Commission approval (except in limited situ-
ations), and the Commission retains the power not only to disapprove, but to ab-
rogate or amend, any rules of the Board. Section 107(c) incorporates the provi-
sions of section 19(d)(2) and (e)(1) of the Securities Exchange Act of 1934 to
give the Commission full authority to review, modify, or cancel any disciplinary
sanction imposed by the Board (including any sanction imposed for failure to com-
ply with a demand for testimony or documents in the course of a Board investiga-
tion), either upon the Commission's own motion or on the motion of an aggrieved
party. (The Commission may, in some cases, also review registration- or inspec-
tion-related disputes.) Finally, the Commission possesses authority to limit the
authority and activities, or to censure, or even to remove members, of the Board
itself, if the Commission finds that the Board, or a particular member, has viol-
ated, is unable to comply with, or has failed to enforce compliance with the Act,
the Board's or the Commission's rules, or the securities laws, has failed to en-
force compliance with professional standards, or, in the case of a particular
Board member, has willfully abused his or her authority.

Section 108. Accounting standards

  Section 108 amends section 19 of the Securities Act of 1933 specifically to al-
low the Commission to recognize as "generally accepted" (for securities law pur-
poses) accounting principles established by a standard-setting body that meets
certain criteria. First, the body must be a private entity and be funded by public
companies in the same manner as the Board (provided in section 109 of the Act),
and it must have adopted procedures, including acting by majority vote, to ensure
prompt consideration of necessary changes to the body of accounting principles.
Second, the Commission must determine that the standard-setting body has the abil-
ity to assist the Commission, because the standard-setting body has proved able to
improve the accuracy and effectiveness of financial reporting and the protection
of investors. Any such standard-setting body must report annually to the Commis-
sion. Finally, section 108 requires the Commission to conduct a study of the adop-
tion by the U.S. financial reporting system of a principles-based accounting sys-
tem.

Section 109. Funding

  Section 109 provides that the Board and the accounting principles standard-set-
ting body recognized under section 108 of title I are to be funded by an "account-
ing support fee." (The Board's budget, but not the budget of the standard-setting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

body, is to be subject to approval by the Commission.) In the case of both the
Board and the standard-setting body, the annual support fee is to be assessed
against each public company. Amounts payable by public companies to either body
will generally be allocated among those companies based on relative average annual
monthly market capitalization for the 12 months prior to the year to which the
support fee relates; both the Board and the standard-setting body are permitted to
differentiate among various classes of public companies, as necessary or appropri-
ate, in allocating fees. Fees are to be collected in such manner as is deemed ap-
propriate in each case.

**\*51** TITLE II-AUDITOR INDEPENDENCE

Section 201. Services outside the auditor scope of practice

   The Act restricts a registered public accounting firm in the non-audit services
it may provide to its audit clients that are public companies in order to preserve
the firm's independence. The Act specifies eight categories of activities that an
auditor may not provide to a public company that is its audit client. These in-
clude: (1) bookkeeping or other services related to the accounting records or fin-
ancial statements of the issuer; (2) financial information systems design and im-
plementation consulting services; (3) appraisal or valuation services, fairness
opinions, or contribution-in-kind reports; (4) actuarial services; (5) internal
audit services; (6) any management or human resources function; (7) broker, deal-
er, investment adviser, or investment banking services; and (8) legal services and
expert services unrelated to the auditing service. In addition, the Public Company
Accounting Oversight Board may determine that any other non-audit service is pro-
hibited. The Board has the authority to grant exemptions on a case-by-case basis
to the extent necessary or appropriate in the public interest and consistent with
the protection of investors, subject to SEC review. A registered public accounting
firm would be permitted to perform for a public company audit client any other
non-audit service, including tax services, that the public company's Audit Commit-
tee pre-approves in accordance with the requirements adopted in Section 202.
   The Act would not affect the services that a registered public accounting firm
provides to non-public companies or to public companies that are not its audit
clients. Thus, a firm could provide any consulting service to any public company
for which it does not provide audit services as well as to any non-public company.

Section 202. Pre-approval requirements

   The Audit Committee of a public company must pre-approve all the services, both
audit and non-audit, provided to that company by a registered public accounting
firm. The public company is required to disclose the Audit Committee's approvals
of non-audit services to shareholders in SEC filings. The pre-approval requirement
is waived if an auditor provides a service that was not recognized to be a non-
audit service at the time of the engagement and if the aggregate amount of all
such non-audit services is 5% or less of total auditor fees and such services are
promptly brought to the attention of the Audit Committee and approved by the Audit

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


Committee prior to the completion of the audit. Approval may be made by one or
more members of the Audit Committee, to whom such authority has been delegated.
The decisions of any delegated member to pre-approve an activity shall be presen-
ted to the full Audit Committee at each of its meetings.

Section 203. Audit partner rotation

   A registered public accounting firm must rotate its lead partner and review
partner on its audits of a public company so that no partner performs an audit on
the same issuer as a lead partner or review partner for more than five consecutive
years.

**\*52** Section 204. Auditor report to Audit Committees

   A registered independent public accounting firm performing an audit for a public
company will timely report to that company's Audit Committee the critical account-
ing policies and practices to be used and all alternative treatments of financial
information within GAAP that have been discussed with management, any accounting
disagreements between the auditor and management and other material written commu-
nications between the auditor and management.

Section 205. Conforming amendments

Section 206. Conflicts of interest

   An accounting firm may not provide audit services for a public company if that
company's chief executive officer, controller, chief financial officer, chief ac-
counting officer, or other individual serving in an equivalent position, was em-
ployed by the accounting firm and worked on the audit of the public company during
the one year before the start of the audit services.

Section 207. Study of mandatory rotation of registered public accounting firms

   The GAO will study the potential effects of requiring the mandatory rotation of
registered public accounting firms and report to Congress within one year.

Section 208. Commission authority

   A registered independent public accounting firm must comply with the restric-
tions in sections 201-204 and 206 in order to perform an audit for a public com-
pany.

Section 209. Considerations by appropriate state regulatory authorities

   It is the intent of this Act that in supervising non-registered accounting
firms, state regulatory authorities should make an independent determination of
the proper standards, and should not presume the standards applied by the Board
under this Act to be applicable to small- and medium-sized non-registered account-
ing firms.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


TITLE III-CORPORATE RESPONSIBILITY

Section 301. Issuer Audit Committees

   The Exchange Act is amended to require the SEC to draft rules directing national
securities exchanges and national securities associations to require listed com-
panies to make Audit Committees responsible for the appointment, compensation, and
oversight of the work of auditors and to require auditors to report directly to
the Audit Committee. The amendments also: bar Audit Committee members from accept-
ing consulting fees or being affiliated persons of the issuer or the issuer's sub-
sidiaries other than in the member's capacity as a member of the board of direct-
ors or any board committee; require Audit Committees to have in place procedures
to receive and address complaints regarding accounting, internal control or audit-
ing issues; require Audit Committees to establish procedures **\*53** for employees'
anonymous submission of concerns regarding accounting or auditing matters; and re-
quire public companies to provide their Audit Committees with authority and fund-
ing to engage independent counsel and other advisers as they determine necessary.

Section 302. Corporate responsibility for financial reports

   CEOs and CFOs must certify, in periodic reports containing financial statements
filed with the Commission pursuant to section 13(a) or 15(d) of the Exchange Act,
the appropriateness of financial statements and disclosures contained therein, and
that those financials and disclosures fairly present the company's operations and
financial condition.

Section 303. Prohibited influence

   It is unlawful for any officer, director, or person acting under their direction
to fraudulently influence, coerce, manipulate, or mislead any accountant engaged
in preparing an audit report, for the purpose of rendering the audit report mis-
leading.

Section 304. Forfeiture of certain bonuses and profits

   In the case of accounting restatements that result from material non-compliance
with SEC financial reporting requirements, CEOs and CFOs must disgorge bonuses and
other incentive-based compensation and profits on stock sales, if the non-
compliance results from misconduct. The required disgorgement applies to the 12
months after the first public issuance or filing of a financial document embodying
such financial reporting requirement. The SEC may exempt any person from this re-
quirement as it deems necessary and appropriate.

Section 305. Officer and director bars and penalties

   The sanction of barring securities law violators from serving as officers or
directors of public companies is strengthened by modifying the standard that gov-
erns judicial imposition of officer and director bars. In addition, courts may im-
pose any equitable relief necessary or appropriate to protect, and mitigate harm

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


to, investors.

Section 306. Insider trades during pension fund blackout periods prohibited

   Directors and executive officers are prohibited from engaging in transactions
involving any equity security of the issuer during a "blackout" period when at
least half of the issuer's individual account plan participants are not permitted
to purchase, sell or otherwise transfer their interest in that equity security. No
blackout period may take effect until at least 30 days after written notice of the
blackout is provided by the plan administrator to the participants or beneficiar-
ies. Exceptions to the 30-day notice are allowed in cases: (1) where a deferral of
the blackout period would violate ERISA fiduciary provisions; or (2) where the in-
ability to provide the notice is due to unforeseeable events or circumstances bey-
ond the reasonable control of the plan administrator.

                    **\*54** TITLE IV-ENHANCED FINANCIAL DISCLOSURES

Section 401. Disclosures in periodic reports

   A public company in periodic reports filed with the SEC will present: (1) dis-
closures of financial information that reflect all material correcting adjustments
that have been identified by the auditor in accordance with GAAP and (2) the ma-
terial off-balance sheet transactions, arrangements, obligations, and other rela-
tionships of the issuer with unconsolidated entities or other persons that may
have a material current or future effect on financial condition, changes in finan-
cial condition, results of operations, liquidity, capital expenditures, capital
resources or significant components of revenues or expenses.
   Issuers that disseminate "pro forma" financial information in their filings with
the SEC, press releases or other public disclosures must present pro forma data in
a manner that does not contain an untrue statement or omit to state a material
fact necessary in order to make the information, in light of the circumstances un-
der which it is presented, not misleading, and that reconciles it with the is-
suer's financial condition under GAAP.

Section 402. Enhanced disclosures of loans

   An issuer in its current reports must disclose within 7 days, or such other time
period determined to be appropriate by the SEC: (A) all loans, except credit card
loans, made by the issuer and its affiliates to any executive officer or director,
specifying amounts paid and balances owed on such obligations and (B) any con-
flicts of interest, as defined by the SEC.

Section 403. Disclosures of transactions involving management

   Section 16(a) of the Exchange Act is amended to require directors, officers and
10% equity holders to report their purchases and sales of securities more
promptly, by the end of the second day following the transaction or such other
time established by the SEC in any case in which the two-day period is not feas-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ible.

Section 404. Management assessment of internal controls

   Annual reports filed with the SEC must be accompanied by a statement by the man-
agement of its responsibility for creating and maintaining adequate internal con-
trols. Management must also present its assessment of the effectiveness of those
controls. In addition, the company's auditor must report on and attest to manage-
ment's assessment of the company's internal controls. Such attestation shall not
be the subject of a separate engagement.

Section 405. Exemption

   Investment companies are exempted from the disclosure requirements of sections
401, 402 and 404.

Section 406. Code of ethics for senior financial officers

   Issuers are required to disclose whether or not they have adopted a code of eth-
ics for senior financial officers, and if not, the reason therefor.

**\*55** Section 407. Audit Committee financial expert

   The SEC is required to adopt rules to require issuers to disclose whether their
Audit Committees include among their members at least one "financial expert." In
defining "financial expert," the SEC shall consider whether a person understands
GAAP and financial statements, has experience preparing or auditing financials,
has experience with internal accounting controls, and understands Audit Committee
functions.

                    TITLE V-ANALYST CONFLICTS OF INTEREST

Section 501. Treatment of securities analysts by registered securities associ-
ations

   The Act requires the Commission, or upon the authorization and direction of the
Commission, a registered securities association or national securities exchange,
within one year to adopt rules designed to address conflicts of interest facing
securities analysts. The rules will (A) foster greater public confidence in secur-
ities research and protect the objectivity and independence of stock analysts who
publish research intended for the public by (i) prohibiting the pre-publication
clearance of such research or recommendations by investment banking or other staff
not directly responsible for investment research, (ii) limiting the supervision
and compensatory evaluation of such research personnel to officials who are not
engaged in investment banking activities, and (iii) protecting securities analysts
from retaliation or threats of retaliation by investment banking staff because of
negative or otherwise unfavorable research reports that might adversely affect in-
vestment banking relations with the issuer described in the report, provided that
the rules shall not limit the authority of a broker or dealer to discipline a se-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                    Page 53

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

curities analyst for causes other than such report in accordance with the firm's
policies and procedures, (B) define periods during which broker-dealers who parti-
cipate in a public offering of securities as underwriters or dealers shall not
publish research or recommendations about the securities of the issuer, (C) estab-
lish structural and institutional safeguards within broker-dealers to assure that
securities analysts preparing research reports are separated by appropriate in-
formational partitions from the review, pressure, or oversight of those whose in-
volvement in investment banking activities might potentially bias their judgment
or supervision, and (D) address such other issues as the SEC or the SROs deem ap-
propriate.

The Act also requires the Commission, or upon the direction of the Commission, a
registered securities association or national securities exchange, to adopt rules
requiring disclosures about conflicts of interest in reports and public appear-
ances. These disclosures include (A) the extent to which the analyst holds secur-
ities in the issuer, (B) whether compensation has been received from the issuer,
subject to such exemptions as the Commission may determine appropriate and neces-
sary to prevent disclosure of material non-public information regarding specific
potential future investment banking transactions as is appropriate in the public
interest and consistent with investor protection, (C) whether the issuer is or has
recently been a client of the analyst's firm, and if so, the types of services
provided, (D) whether the analyst received compensation **56** based on an affili-
ate's investment banking revenues, and (E) such other disclosures as the SEC or
the SROs deem appropriate. The regulator would have the authority to amend its
rules.

### TITLE VI-COMMISSION RESOURCES AND AUTHORITY

### Section 601. Authorization of appropriations

There is authorized an appropriation of $776,000,000 for the SEC for fiscal year
2003, of which: $102,700,000 would fund the pay parity of salary and benefits for
SEC employees, as authorized in the Investor and Capital Markets Fee Relief Act
(P.L. 107-123); $108,400,000 would fund information technology, security enhance-
ments, and recovery and mitigation activities in light of the terrorist attacks of
September 11, 2001; and $98,000,000 would fund at least 200 more professionals to
oversee auditors and auditing services, and additional staff to improve SEC in-
vestigative and disciplinary efforts and strengthen the SEC's oversight and regu-
lation of market participants and of issuer disclosure, securities markets and in-
vestment companies.

### Section 602. Appearance and practice before the SEC

The SEC is authorized to censure or deny, temporarily or permanently, the priv-
ilege of appearing or practicing before it to any person found by the SEC after
notice and opportunity for hearing: (i) not to possess the requisite qualifica-
tions to represent others, (ii) to be lacking in character or integrity or to have
engaged in unethical or improper professional conduct, or (iii) to have willfully

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

violated, or willfully aided and abetted the violation of any provision of the
federal securities laws or the rules and regulations thereunder. This codifies
Section 102(e) of the SEC's Rules of Practice.

Section 603. Federal court authority to impose penny stock bars

   Federal courts are authorized to conditionally or unconditionally and temporar-
ily or permanently prohibit a person from participating in a penny stock offering.

Section 604. Qualifications of associated persons of brokers and dealers

   The SEC is authorized to bar from the securities industry persons who have been
suspended or barred by a state securities, banking or insurance regulator because
of fraudulent, manipulative or deceptive conduct.

                         TITLE VII-STUDIES AND REPORTS

Section 701. GAO study and report regarding consolidation of public accounting
firms

   The Comptroller General, in consultation with the SEC, similar regulatory agen-
cies of the other G-7 nations, and the Department of Justice, is to conduct a
study identifying the factors that have led to the consolidation of public ac-
counting firms since 1989, the impact of such consolidation, and solutions to any
problems caused by such consolidation. The study shall also examine the problems
faced by businesses as a result of limited competition among public accounting
firms, and consider whether federal or state regulations impede competition among
public accounting firms. A report is to **\*57** be submitted to the Senate Banking
Committee and the House Financial Services Committee within one year of enactment.

Section 702. Commission study and report regarding credit rating agencies

   The SEC is to conduct a study of the role of credit rating agencies in the oper-
ation of the securities market, including an examination of the role of credit
rating agencies in the evaluation of issuers, the importance of that role to in-
vestors, any impediments to the rating agencies' accurate appraisal of issuers,
any barriers to entry into the business of acting as a credit rating agency, meas-
ures to improve the dissemination of information about issuers when credit rating
agencies announce credit ratings, and any conflicts of interest in the operation
of credit rating agencies. A report is to be submitted to the President, the Sen-
ate Banking Committee, and the House Financial Services Committee within 180 days
of enactment.

                         CHANGES IN EXISTING LAW

   On June 18, 2002, the Committee unanimously approved a motion by Senator Sar-
banes to waive the Cordon rule. Thus, in the opinion of the Committee, it is ne-
cessary to dispense with the requirement of section 12 of Rule XXVI of the Stand-
ing Rules of the Senate in order to expedite the business of the Senate.

                © 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


## REGULATORY IMPACT STATEMENT

   In accordance with paragraph 11(b), rule XXVI, of the Standing Rules of the Sen-
ate, the Committee makes the following statement concerning the regulatory impact
of the bill.

   The bill make structural changes in various aspects of the federal securities
laws. Titles I through IV and portions of title VI affect the auditing of public
companies and financial disclosures by those companies and their managers. Title V
affects conflicts of interest by employees of broker-dealers who issue research
reports dealing with particular companies or industries.

   There are, according to the SEC, approximately 16,500 public companies subject
to the federal securities laws. [FN98] Fewer than 15 percent of the nation's ac-
counting firms audit any public companies, and only 20 firms have more than 30
audit clients. [FN99] There are perhaps 75-100 registered broker-dealers that is-
sue research reports of the type dealt with in title V, and perhaps as many as
5000 analysts who prepare those research reports.

   The bill establishes a comprehensive framework to modernize and reform the over-
sight of public company auditing, improve quality and transparency in financial
reporting by those companies, and strengthen the independence of auditors. It pro-
motes competition among service providers, enhances accurate investor decision-mak-
ing **58** throughout the capital markets, and seeks to correct shortcomings that
have threatened the reputation of those markets for integrity.

   The legislation should have little additional impact upon the privacy of partic-
ular individuals. Information and documents held by the Public Company Accounting
Oversight Board created by the bill are generally confidential and privileged un-
til made public in connection with a particular public enforcement proceeding.
Corporate managers and others affected by the bill are already subject to extens-
ive reporting requirements under the federal securities laws.

   Specific rules issued by the SEC under various provisions of the bill will con-
tain their own regulatory and paperwork estimates, as required by applicable law.
Otherwise, it is difficult to measure, at this time, the extent to which the bill
would impose additional costs beyond those described in the CBO estimate, below.
In addition, the bill's net regulatory impact upon the economy can be positive,
especially as its terms operate to reduce crises in corporate management and value
of the sort the economy is now witnessing. Finally, the immediate regulatory im-
pact of the bill must be weighed against the continuing serious adverse economic
impact on investors, the markets, and the national economy of the failure of ex-
isting regulatory arrangements and the decline in investor confidence, here and
abroad, that this failure has generated. For all of these reasons, the Committee
has determined that more extensive compliance with rule XXVI(11)(b) than that con-
tained above is impracticable.


## COST OF LEGISLATION

   Section 11(b) of rule XXVI of the Standing Rules of the Senate, and Section 403
of the Congressional Budget Impoundment and Control Act, require that each commit-
tee report on a bill contain a statement estimating the cost of the proposed le-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


gislation. The Congressional Budget Office has provided the following cost estim-
ate and estimate of costs of private-sector mandates.

    U.S. Congress,

    Congressional Budget Office,

    Washington, DC, June 27, 2002.

Hon. Paul S. Sarbanes,
Chairman, Committee on Banking, Housing, and Urban Affairs,
U.S. Senate, Washington, DC.
    Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed
cost estimate for the Public Company Accounting Reform and Investor Protection Act
of 2002.
    If you wish further details on this estimate, we will be pleased to provide
them. The CBO staff contacts are Ken Johnson (for federal costs), Greg Waring (for
the state and local impact), and Paige Piper/Bach (for the private-sector impact).

Sincerely,
    Robert A. Sunshine

    (For Dan L. Crippen, Director).
    Enclosure.

                    **\*59** CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

Public Company Accounting Reform and Investor Protection Act of 2002

    Summary: The bill would establish two new organizations-the Public Company Ac-
counting Oversight Board (Oversight Board) to regulate the accounting industry and
the Standard-Setting Body to write national standards for accounting practices.
The activities of these organizations would be overseen by the Securities and Ex-
change Commission (SEC). In addition, the bill would authorize the appropriation
of $776 million in 2003 for the SEC's activities. Under the bill, both the SEC and
the Oversight Board could assess civil penalties for violations of the bill's pro-
visions. Any civil penalties collected by the Oversight Board would be spent on a
scholarship program for accounting students. The bill also would require the Gen-
eral Accounting Office (GAO) to complete two studies of the accounting industry
within one year of enactment.
    Based on information from the SEC, CBO estimates that implementing this bill
would cost about $787 million over the 2003-2007 period, assuming the appropri-
ation of the necessary amounts. Under current law, the SEC's discretionary costs
are offset by fees the agency collects from securities markets. Enactment of the
bill would not change the amount of fees expected to be collected in the future.
Assuming the continued collection of the regulatory fees assessed by the SEC, the
commission would collect $1.3 billion in fees in 2003, and its net outlays would
be --$621 million in that year. The two GAO studies also would cost an estimated

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


$1 million in 2003, subject to the availability of appropriated funds. CBO estim-
ates that the bill would have effects on revenues and direct spending, but that
the net effect of those changes would be negligible each year. Because the bill
would affect revenues and direct spending, pay-as-you-go procedures would apply.

  The bill contains an intergovernmental mandate as defined in the Unfunded Man-
dates Reform Act (UMRA), but CBO estimates that complying with that mandate would
result in no costs to state, local, or tribal governments. Therefore, the
threshold established by UMRA ($58 million in 2002, adjusted annually for infla-
tion) would not be exceeded.

  The bill would impose several private-sector mandates, as defined by UMRA, on
certain accounting firms, companies that issue registered securities, officers and
directors of those companies, investment banking firms, and securities analysts.
CBO cannot determine whether the direct cost of those mandates would exceed the
annual threshold set by UMRA for private-sector mandates ($115 million in 2002,
adjusted annually for inflation). The mandate costs are difficult to estimate be-
cause (1) we do not have sufficient information to estimate the cost of prohibit-
ing insider trading during blackout periods when investment activity is restric-
ted; (2) the cost to comply with several of the mandates would depend on rules
soon to be prescribed by the SEC under current authority; and (3) the cost to com-
ply with several of the mandates would depend on rules that would be prescribed by
the SEC under the bill.

  Estimated cost to the Federal Government: The estimated budgetary impact of the
bill is shown in the following table. The costs of this legislation would fall
within budget functions 370 (commerce **\*60** and housing credit-for the SEC) and 800
(general government-for GAO).


TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE


Basis of estimate

  For this estimate, CBO assumes that the bill will be enacted by the end of fisc-
al year 2002. Assuming appropriation of the necessary funds, CBO estimates that
implementing the bill would cost the SEC about $787 million and GAO about $1 mil-
lion during the 2003-2007 period. We estimate that the bill also would affect both
revenues and direct spending, but that the net impact of those effects would be
negligible for each year.

  The SEC is typically funded through fees the agency collects for registrations,
transactions, and mergers of securities. Under current law, the fee rates are de-
termined periodically by the SEC, and they are collected only to the extent
provided in advance in appropriations acts. These fees are classified in the
budget as offsets to the SEC's discretionary spending.


Spending subject to appropriation

  The bill would authorize the appropriation of $776 million for all SEC activit-
ies in 2003. Of this amount, the bill would earmark $103 million for higher salar-
ies for SEC employees, $108 million for security and information technology en-
hancements needed by the agency after the September 11th attacks, and $98 million

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523 (Leg.Hist.)
**(Cite as: S. REP. 107-205)**

for additional staff to monitor audit services. Based on the agency's historical spending patterns, CBO estimates that implementing this provision would result in gross outlays of about $592 million in 2003 and $768 million over the 2003-2004 period, assuming the appropriation of the necessary amounts. Adding these amounts to CBO's projections for fee collections in 2003, we estimate that the SEC's net spending would be --$621 million in that year.

The bill also would require the SEC to review any sanctions or rules proposed by the Oversight Board. CBO estimates that the cost of these activities would be roughly comparable to the SEC's **\*61** oversight of national securities exchanges and associations. Based on information from the SEC about the cost of such oversight, CBO estimates that the SEC would require about 40 staff members, at a cost of about $5 million a year, to review the rules and sanctions proposed by the new Oversight Board. Any amounts the SEC would spend to oversee accounting practices under the bill would be subject to the availability of appropriated funds.

Under the bill, GAO would complete two reports to the Congress on the accounting industry within one year of enactment. Based on information from GAO, CBO estimates that conducting these two studies would cost the agency about $1 million in 2003, subject to the availability of appropriated funds.

Revenues and direct spending

CBO estimates that implementing this bill also would affect direct spending and revenues. The effects would result from the bill's provisions creating an Oversight Board and a Standard-Setting Body to oversee the accounting industry and from provisions relating to civil penalties.

Costs of Creating the Oversight Board and Standard-Setting Body. The bill would require that annual financial reports filed by public companies under the securities laws must be audited by an accountant who is deemed qualified to do so by a new organization called the Public Company Accounting Oversight Board. CBO expects this provision would give the Oversight Board substantial authority to regulate and control entry into the accounting industry, thus exercising the sovereign power of the federal government. The fact that the board's rules, sanctions, funding sources, and annual budget would be approved by the SEC indicate a significant level of federal control over the board's operations and funding. For these reasons, CBO would consider the board's spending and the fees it would collect under the bill from public companies and accounting firms as part of the federal budget (even though the bill states it would not be part of the government).

The bill also would require the SEC to designate an organization called the Standard-Setting Body to write national standards for accounting practices. Under current law, all annual financial statements filed by public companies must comply with such standards. The bill also would mandate that the Standard-Setting body assess fees on public companies using a formula that would be approved by the SEC, thereby giving the federal government control over the Standard-Setting Body's funding. Therefore CBO also would consider this body's collections and spending a part of the federal budget (even though the bill states it would be organized as a private entity).

CBO expects that operating the Oversight Board, when fully implemented, would

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

cost at least as much as similar activities that are now performed by the Public
Oversight Board (POB) and the Independence Standards Board, and through peer re-
views administered by the American Institute of Certified Public Accountants
(AICPA). Before they recently disbanded, the POB and the Independence Standards
Board spent about $8 million a year. The peer reviews administered by AICPA are
conducted by other accounting firms. Based on information from AICPA, CBO estim-
ates that these reviews could cost the Oversight Board at least $50 million **\*62** a
year. Similarly, CBO expects that the annual costs of the Standard-Setting Board
would approach the $20 million spent each year by the Federal Accounting Standards
Board (FASB), which performs standard-setting duties today.

   Under the bill, the Oversight Board and the Standard-Setting Body would assess
fees on the public to cover their costs. CBO expects that the net effect of the
two organizations' collections and spending under this bill would not be signific-
ant in any year. Whether such collections would be categorized in the budget as
revenues or offsetting receipts is uncertain because we do not know how the organ-
izations would assess those fees.

   Civil Penalties.The bill also would authorize the SEC and the Oversight Board to
enforce the bill's provisions with civil penalties. Such penalties are recorded in
the budget as governmental receipts (revenues). Based on information from the SEC,
CBO estimates that these provisions would increase revenues by less than $500,000
a year.

   Under the bill, any civil penalties collected by the Oversight Board would be
spent on scholarships for accounting students in undergraduate or graduate pro-
grams. Because the amounts spent would equal the penalties collected by the ac-
counting board, CBO estimates that the increase in direct spending also would be
less than $500,000 per year.

   Pay-as-you-go considerations: The Balanced Budget and Emergency Deficit Control
Act sets up pay-as-you-go procedures for legislation affecting direct spending or
receipts. CBO estimates that the net pay-as-you-go effects of this bill would be
insignificant for each year.

   Estimated impact on state, local, and tribal governments: Because it would pree-
mpt state authority to license or regulate the Public Company Accounting Oversight
Board as a nonprofit corporation, the bill contains an intergovernmental mandate
as defined in UMRA. CBO estimates that this preemption would not affect state
budgets because, while it would limit the application of state law towards the
board, it would not impose a duty on states that would result in additional spend-
ing. Therefore, the threshold established by UMRA ($58 million, in 2002, adjusted
annually for inflation) would not be exceeded. The remaining provisions of the
bill contain no intergovernmental mandates and would impose no costs on state,
local, or tribal governments.

Estimated impact on the private sector

   The bill would impose private-sector mandates, as defined by UMRA, on certain
accounting firms, companies that issue registered securities, officers and direct-
ors of those companies, investment banking firms, and securities analysts. CBO
cannot determine whether the direct cost of those mandates would exceed the annual

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

threshold set by UMRA fro private-sector mandates ($115 million in 2002, adjusted
annually for inflation). The mandate costs are difficult to estimate because (1)
we do not have sufficient information to estimate the cost of prohibiting insider
trading during blackout periods when investment activity is restricted; (2) the
cost to comply with several of the mandates would depend on rules soon to be pre-
scribed by the SEC under current authority; and (3) the **\*63** cost to comply with
several of the mandates would depend on rules that would be prescribed by the SEC
under the bill.

Regulation of accounting firms

  Under the bill, a registered public accounting firm would be:
    Subject to a system of review by the Public Company Accounting Oversight Board
to be established under the bill;
    Prohibited from offering both audit and certain non-audit consulting services
(designing or implementing financial information systems or providing internal
audit services); and
    Required to retain all audit work papers for at least seven years.
  According to the American Institute of Certified Public Accountants (AICPA) and
other industry representatives, the accounting industry currently:
    Sponsors a transitional private entity that reviews independent accountants:
    Has voluntarily stopped offering both audit and such non-audit consulting ser-
vices; and
    Retains financial statement working papers and records for seven years.
  Therefore, CBO estimates that the direct cost to comply with those new mandates
would be small.
  The bill would require an accounting firm to obtain a second review of audit re-
ports from another auditor within the firm, and test and express an opinion on
certain internal controls of public companies. The cost to obtain a second review
and provide an opinion on compliance by a company would depend on rules to be pre-
scribed by the SEC. Since the regulations have not been established, CBO cannot
estimate the cost to comply with those mandates.

Registration and accounting support fees

  The bill would require that the new Oversight Board and a designated Standard-
Setting Body be independently funded by public companies. Based on information
from the SEC, CBO estimates the annual cost of operating the oversight board and
the standard-setting body would be approximately $80 million. The bill would re-
quire those organizations to levy fees on registered public accounting firms and
an annual accounting support fee on issuers of securities. Currently, the account-
ing industry is self-regulated and voluntarily provides the funding for the regu-
latory organization, including peer reviews. According to the SEC and the in-
dustry, the cost of oversight and review required by the bill are similar to the
costs now voluntarily incurred by the industry. Therefore the incremental cost to
the private sector would be small.

Auditor independence

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                                 Page 61

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


   Section 203 of the bill would prohibit the lead and review partners of an ac-
counting firm from providing audit services for the same company for more than
five consecutive years. Based on information from the AICPA, CBO estimates that
the direct cost to rotate lead and review partners would be minimal.
   Section 206 would prohibit an accounting firm from providing audit services for
a public company if that company's chief executive **\*64** officer, financial officer,
controller, or other equivalent position was employed by the accounting firm dur-
ing the year before the start of the audit services. Based on information from the
AICPA, CBO anticipates that some firms would lose business that other accounting
firms would gain. Therefore, CBO estimates that total direct cost to the account-
ing industry would be negligible.

Corporate responsibility

   The bill contains provisions that would require greater corporate responsibility
for financial reports. The cost of complying with those requirements would depend
on rules that the SEC has agreed to propose, but not yet promulgated. Therefore,
CBO cannot estimate the direct costs of complying with the following mandates:
   Section 301 would require the audit committee of a corporate board to be re-
sponsible for the appointment, compensation, and oversight of the work of their
auditors. This section also would prohibit national securities exchanges and asso-
ciations from listing companies that do not comply with certain audit committee
standards.
   Section 302 would require chief executive officers and chief financial officers
of public companies to certify the appropriateness of their company's periodic re-
ports and to ascertain that the financial reports fairly reflect the operations
and conditions of their companies.

Periodic restrictions on insider trading

   Section 306 would prohibit certain owners and officers of a company from selling
equity securities issued by that company during periods (called "blackout" peri-
ods) when participants in the retirement plan are restricted in their ability to
direct investments. Such periods may occur for administrative reasons-for example,
when a plan changes recordkeepers. This restriction would increase the financial
exposure of affected owners and officers and, thus, could impose a cost on them.
CBO does not have sufficient information to estimate the amount of that cost.

Enhanced financial information disclosure

   Section 403 would require officers and directors of companies that issue secur-
ities and certain owners of such securities to disclose to the SEC any insider
trading by a certain time. According to the SEC, insider trading disclosure is
currently required to be reported to the SEC by the tenth day following the month
in which the trade occurred. Thus, CBO estimates that the cost of providing such
information on an expedited basis would be small.
   The bill also contains provisions that require increased disclosure of financial
information. The cost of complying with those requirements would depend on rules

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

that the SEC has agreed to propose, but not yet promulgated. Therefore, SEC cannot
estimate the direct costs of complying with the following mandates:

   Under Title IV, the SEC would prescribe rules that would require companies that
issue securities to report loans to insiders within a certain time period, to dis-
close material off balance sheet transactions and conflicts, and present pro forma
data in a manner that is not misleading in periodic financial reports to the SEC.

   **\*65** Section 404 would require a company and the company's auditor to attest to
the company's internal control procedures in their annual reports. Public compan-
ies also would be required to disclose whether they have adopted a code of ethics
for senior financial officers, and whether their audit committee has among its
members a "financial expert."

Analyst conflicts of interest

   Section 501 would require the SEC or a registered securities association or ex-
change to adopt rules to prohibit certain conflicts within investment banking
firms that could compromise securities analysts' independence and to require se-
curity analysts to disclose other potential conflicts. The cost of prohibiting
certain conflicts and disclosing additional information would depend on rules to
be prescribed by the SEC or the directed authority. CBO does not have sufficient
information to estimate the cost to comply with those mandates.

   Previous CBO Estimate: On April 26, 2002, CBO transmitted a cost estimate for
H.R. 3763, the Corporate and Auditing Accountability, Responsibility, and Trans-
parency Act of 2002, as passed by the House of Representatives on April 24, 2002.
H.R. 3763 would require the SEC to oversee a new board that would regulate the ac-
counting industry and to accelerate its review of annual reports filed by public
companies. CBO estimated that implementing H.R. 3763 would cost about $150 million
over the 2003-2007 period, assuming the appropriation of the necessary amounts.
Because of provisions that would create new civil penalties and a new accounting
board that CBO considered part of the federal budget, CBO estimated that H.R. 3763
also would cause revenues and direct spending to rise to insignificant net amounts
for each year.

   For H.R. 3763, CBO identified similar private-sector mandates on accountants,
companies that issue registered securities, officers and directors of those com-
panies, and certain owners of the securities. CBO could not determine whether the
total direct cost of those mandates would exceed the annual threshold established
by UMRA for private-sector mandates as we did not have sufficient information to
estimate the cost of prohibiting insider trading during blackout periods when in-
vestment activity is restricted.

   Estimate prepared by: Federal costs: Ken Johnson; impact on state, local and
tribal governments: Greg Waring; impact on the private sector: Paige Piper/Bach.

   Estimate approved by: Peter H. Fontaine, Deputy Assistant Director for Budget
Analysis.

                        **\*66** ADDITIONAL VIEWS OF SENATOR GRAMM

   President Bush's Ten Point program for regulatory reform in corporate accounting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

and governance is an excellent plan, and he and his administration are to be com-
mended for wasting no time in implementing it. The actions already being taken by
the Securities and Exchange Commission, together with their published regulatory
proposals, as well as the actions taken by our nation's stock markets, are firm,
clear, and directed to the real problems. They represent substantial reform. It is
also undeniable that changes are occurring in every board room, on every corporate
audit committee, and with every accounting firm in America. But a legislative re-
sponse is also called for.

First of all though, it would be hard to overestimate the importance of main-
taining our system of private setting of accounting standards through the Finan-
cial Accounting Standards Board (FASB). Neither Congress nor any other agency of
the government should be in the business of setting accounting standards. A bad
accounting standard set by an independent board is better than a good standard set
by Congress. But we do need to establish a stable, reliable funding mechanism for
FASB.

With regard to legislation, the reported bill is better today than the bill as
first proposed, yet the fundamental problems of the original bill remain. We
should pass a bill that sets up an independent ethics supervisory board that will
oversee and enforce the highest standards of ethics in public accounting. This
board should be given power to determine what are conflicts of interest and to
make determinations on questions of auditor independence. It should also be inde-
pendently funded by a source that is committed to the purpose of funding that
activity, and the funding source should be reliable.

Yet, even though some flexibility has been added, the structure of the bill is
still troubling. If we are going to create this independent panel, we should cre-
ate one in which we can place our confidence, allowing the panel, for example, to
set the standards as to what represents a conflict of interest. While it is tempt-
ing to vote on these things and to set out in government writ for all time what we
mean and what we want, if we are trying to make this board powerful, why would we
want to prejudge what the panel is going to decide? There is a fundamental differ-
ence between having the board make decisions or having Congress make them.

When Congress prejudges the board's activities, we eliminate the flexibility
that the board will need to apply statutory principles to the variety of circum-
stances that appear in the real world. The one-size-fits-all approach of the bill
cripples the ability of the board to adjust to differences in situations among
companies-particularly to distinguish between large and small companies-as well as
to stay up to date with changes that occur over time.

**\*67** This will be particularly hard on smaller companies. While the legislation
allows for exceptions to its ban on auditors providing companies with additional
services, these exceptions can only be obtained on a case-by-case basis. It is the
smaller companies who routinely obtain a number of services from their auditor and
who can least afford to pay for a second or third auditing firm to provide these
additional services. These smaller business will be most likely to need the exemp-
tions. But the smaller the company, the less likely it will be able to afford the
legal services to get its needed exemptions from the new board. This is not a
small problem, as the bill would impose its new regulatory requirements on 17,000

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                    Page 44
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

companies-the vast majority of which are small businesses-all across the country.
    It may be easy to envision requiring that General Motors have six different ac-
counting firms to comply with the conflict of interest rules. But it stretches
reason and good judgment to legislate those same standards for Joe Green and Son
Motor Repair of Texarkana. We should trust the board that we create and let them
look at the feasibility for large and small companies, ask them to look at the be-
nefits to shareholders, the integrity of the financial system and long term growth
prospects. It is easy to envision that they might end up with standards that would
be differentiated based on the size of accounting firms and the size of the busi-
nesses that are affected. We would preserve flexibility in doing this. One-
size-fits-all will hurt a lot of shareholders and the businesses in which they
have invested. And heaping unnecessary costs on struggling small enterprises, it
will hurt the economy.
    The point is, when you start setting out in law what auditing standards are,
what the conflict of interest standard is, and the many other specific mandates in
the bill, you eliminate flexibility, you eliminate the ability of the board to
learn what works and what does not work, and you eliminate the ability of the
board to differentiate between General Motors and Joe Green and Son, Incorporated.
In the process of setting up a strong, independent board we have largely done our
work. We ought not to be doing the board's work after that.
    In addition, before this legislation becomes law, the concerns of constitutional
experts with regard to the appointment, regulatory powers, and taxing authority of
this new supervisory board will need to be resolved.

        Phil Gramm.

                **\*68** ADDITIONAL VIEWS OF SENATOR ENZI

    The collapse in the faith of corporate financial statements is alarming. Corpor-
ate executive abuses have shattered the savings and dreams of countless Americans.
Broad and strong changes need to be implemented to restore that confidence and en-
sure these abuses do not take place in the future.
    A wave of new regulations and legislative proposals have been introduced to pro-
tect America's investors against corporate abuses. The securities' self-regulatory
organizations (SROs), the Securities and Exchange Commission (SEC), the White
House, and Congress are all working on different approaches with the same goal-to
ensure executives are providing accurate and reliable information to the public.
    However, any approach must also be sensitive to the fact that auditors are a
critical element in assuring the quality of a financial statement. Legislation
that does not provide adequate liability protections for auditing firms will de-
crease the already minimal number of companies which can audit and evaluate com-
plex and fast-growing companies. Without a competitive auditing industry, con-
sumers may, at the end of the day, experience less reliable financial statements.
    I believe this legislation, as reported by the Senate Banking Committee, will
provide a disincentive for small accounting firms to continue to audit publicly
traded companies. These small accounting firms may only audit a relatively few
public companies, and my fear is that this legislation would increase their liab-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

ility exponentially, thus the firms would decide to cease offering services to
public companies. With current litigation downsizing an already limited number of
accounting firms, we cannot allow additional regulations to drive more firms from
offering auditing services to public companies.

The legislation also places a negative presumption on any approval of non-
prohibited consulting services. Legislation should not mandate to audit committees
that all consulting services are inherently conflicted. Audit committees should be
left to make their own determination as to what services provided by their audit-
ing companies is in the best interest of their shareholders.

I also have concerns that the setting of auditing standards will be taken out of
the hands of accountants. Auditing standards are complicated and detailed and the
setting of them requires the knowledge and expertise of individuals who understand
and work in the field of accounting. I am hesitant to allow a Board, of which the
majority must be non-accountants, to establish the standards under which account-
ants operate.

**\*69** I continue to support reform of the accounting industry and will continue to
work toward that goal with this legislation. I, however, will work to change as-
pects of the bill which I believe will impose severe unintended and unnecessary
consequences on the accounting industry and their clients.

Mike Enzi.

FN1 John Shad, the SEC's Chairman from 1981-87, is deceased.

FN2 Testimony of John H. Biggs, Chairman, President and CEO, Teachers' Insurance
and Annuity Association-College Retirement Equities Fund (TIAA-CREF), and former
member of the Public Oversight Board, before the Committee on February 27, 2002.

FN3 Testimony of Shaun O'Malley, Chairman, 2000 Public Oversight Board Panel on
Audit Effectiveness, and former Chairman, Price Waterhouse LLP, before the Commit-
tee on March 6, 2002.

FN4 Testimony of Paul Volcker, Chairman of the Trustees of the International Ac-
counting Standards Committee, and former Chairman of the Board of Governors of the
Federal Reserve System, before the Committee on February 14, 2002.

FN5 The Public Oversight Board was created in 1977 as part of self-regulatory
efforts by the accounting industry. In January 2002, the P.O.B. voted unanimously
to disband, in "recognition of the obstacles to achieving this goal [i.e., effect-
ive self-regulation] which have been encountered in recent years, and given the
proposal of the SEC in consultation with the AICPA and the SEC Practice Section
Executive Committee, without input from the Public Oversight Board, to reorganize
the self-regulatory structure. * * *" Resolution of the Public Oversight Board,
January 20, 2002. Available at http:// www.publicoversightboard.org/about.htm.

FN6 Testimony of Charles A. Bowsher, Chairman, Public Oversight Board, and
former Comptroller General of the United States, before the Committee on March 29,
2002; testimony of Aulana L. Peters, Member, Public Oversight Board and former

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

Commissioner, Securities and Exchange Commission (1984-88), before the Committee
on March 19, 2002; Biggs Testimony, February 27, 2002.

FN7 Schedule A(25) of the Securities Act of 1933, 15 U.S.C. S 77(aa)(25)
(emphasis added); see also section 13(a)(2) of the Securities Exchange Act of
1934, 15 U.S.C. S 78m(a)(2), section 14 of the Public Utility Holding Company Act
of 1935, at U.S.C. S 79n, and section 30(g) of the Investment Company Act of 1940,
15 U.S.C. S 80a-29(g).

FN8 Graham, Dodd, and Cottle, Security Analysis, 108 (4th ed., 1962).

FN9 Testimony of Lee Seidler, former partner, Bear Stearns & Co. and Deputy
Chair of the 1978 Commission on Auditors' Responsibilities, before the Committee
on March 6, 2002.

FN10 Senator Enzi suggested that the bill require, not merely permit, that two
Board members have an accountancy background.

FN11 Testimony of Harold M. Williams, former SEC Chairman (1977-81), before the
Committee on February 12, 2002; Biggs Testimony, February 27, 2002; testimony of
Joel Seligman, Dean and Ethan A.H. Shepley University Professor, Washington Uni-
versity School of Law, before the Committee on March 5, 2002; testimony of Bevis
Longstreth, Member, 2000 Public Oversight Board Panel on Audit Effectiveness, and
former Commissioner, Securities and Exchange Commission (1981-84), before the Com-
mittee on March 6, 2002; cf. testimony of Robert Glauber, Chairman and Chief Exec-
utive Officer, National Association of Securities Dealers, Inc., and former Under
Secretary for Finance, Department of Treasury, under President Bush (1989-1992),
before the Committee on March 5, 2002.

FN12 The Board itself will be a corporation created under the D.C. Nonprofit
Corporation Act. It will be neither an agency nor establishment of the federal
government, and its members and employees are not to be deemed to be federal of-
ficers or employees by reason of their Board service.

FN13 Testimony of Arthur Levitt, former SEC Chairman (1993-2000), before the
Committee on February 12, 2002; Bowsher Testimony, March 19, 2002; testimony of L.
William Seidman, former Chairman, Federal Deposit Insurance Corporation and Resol-
ution Trust Corporation, and former partner, Seidman & Seidman, before the Commit-
tee on March 19, 2002.

FN14 See, e.g., Ruder Testimony, February 12, 2002; Seligman Testimony, March 5,
2002; Seidler Testimony, March 6, 2002.

FN15 The bill creates a right to interim SEC review of certain inspection-re-
lated disputes.

FN16 Levitt Testimony, February 12, 2002.

FN17 Glauber Testimony, March 5, 2002. John Biggs said simply: "Accounting firms

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

must know that they cannot refuse to open their books or prevent their staff from
cooperating with this new agency." Biggs Testimony, February 27, 2002.

FN18 The Board may request, but not require, the testimony of, or production of
documents, in the possession of any other person (for example, an audit firm's
client). Its rules may provide for procedures to seek issuance of a subpoena from
the SEC to any person.

FN19 Fines imposed by the Board are to be used to fund a scholarship program for
students in undergraduate or graduate programs in accounting.

FN20 Accounting Series Release No. 150, 3 SEC Dock. 275 (1973).

FN21 Testimony of Michael Sutton, former SEC Chief Accountant (1995-98), before
the Committee on February 26, 2002.

FN22 Testimony of Richard Breeden, former SEC Chairman (1989-93), before the
Committee on February 12, 2002.

FN23 Letter from James E. Burton, Chief Executive Officer, California Public Em-
ployees' Retirement System (CalPERS), to Chairman Paul S. Sarbanes, June 26, 2002.

FN24 Letter from John H. Biggs, Chairman, President and CEO, Teachers' Insurance
and Annuity Association-College Retirement Equities Fund (TIAA-CREF), to Chairman
Paul S. Sarbanes, June 28, 2002.

FN25 Testimony of John C. Whitehead, former Co-Chairman, Goldman Sachs & Co.,
and former Deputy Secretary of State, before the Committee on March 19, 2002.

FN26 Testimony of Walter P. Schuetze, former SEC Chief Accountant (1992-95), be-
fore the Committee on February 26, 2002.

FN27 Williams Testimony, February 12, 2002.

FN28 Bowsher Testimony, March 19, 2002; Levitt Testimony, February 12, 2002;
Volcker Testimony, February 14, 2002.

FN29 Statement of David Walker, Comptroller General of the United States, June
18, 2002.

FN30 "Analysis of the Failure of Superior Bank, FSB, Hinsdale, Illinois," Hear-
ing before the Senate Committee on Banking, Housing, and Urban Affairs, February
7, 2002.

FN31 Sutton Testimony, February 26, 2002.

FN32 Longstreth Testimony, March 6, 2002.

FN33 Levitt Testimony, on February 12, 2002.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                        Page 68
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

FN34 Williams Testimony, February 12, 2002.

FN35 Whitehead Testimony, March 19, 2002.

FN36 Testimony of Lynn Turner, former SEC Chief Accountant (1998-2001), before
the Committee on February 26, 2002.

FN37 Testimony of Roderick M. Hills, former SEC Chairman (1975-77), before the
Committee on February 12, 2002.

FN38 O'Malley Testimony, March 6, 2002.

FN39 The "lead" partner is the partner who is in charge of the audit engagement.
The "review" partner refers to the outside partner brought in to review the work
done by the lead partner and the audit team.

FN40 Bowsher Testimony, March 19, 2002.

FN41 Turner Testimony, February 26, 2002.

FN42 Testimony of James E. Copeland, Jr., Chief Executive Officer, Deloitte &
Touche LLP, before the Committee on March 14, 2002.

FN43 See, e.g., Seligman Testimony, March 5, 2002.

FN44 Testimony of Sarah Teslik, Executive Director, Council of Institutional In-
vestors, before the Committee on March 20, 2002.

FN45 Testimony of Robert E. Litan, Director, Economic Studies Program, The
Brookings Institution, before the Committee on March 14, 2002; testimony of Damon
Silvers, Associate General Counsel, AFL-CIO, before the Committee on March 20,
2002; Bowsher Testimony, March 19, 2002.

FN46 Testimony of Ira Millstein, Senior Partner, Weil, Gotshal & Manges LLP, be-
fore the Committee on February 27, 2002; Whitehead Testimony, March 19, 2002;
Biggs Testimony, February 27, 2002.

FN47 Levitt Testimony, February 12, 2002.

FN48 Hills Testimony, February 12, 2002; Seligman Testimony, March 5, 2002.

FN49 Testimony of Howard M. Metzenbaum, Chairman, Consumer Federation of Amer-
ica, and former U.S. Senator, before the Committee on March 20, 2002.

FN50 Testimony of David Walker, Comptroller General of the United States, before
the Committee on March 5, 2002.

FN51 Breeden Testimony, on February 12, 2002.

FN52 Teslik Testimony, March 20, 2002.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205
S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

FN53 O'Malley Testimony, March 6, 2002; Teslik Testimony, March 20, 2002.

FN54 Breeden Testimony, on February 12, 2002.

FN55 Breeden Testimony, February 12, 2002.

FN56 Testimony of Thomas A. Bowman, President and Chief Executive Officer, Association for Investment Management and Research, before the Committee on March 20, 2002.

FN57 Volcker Testimony, February 14, 2002.

FN58 Seligman Testimony, March 5, 2002.

FN59 For example:
   Two of Enron's top officials who were also board members-Kenneth Lay and Jeffery Skilling-received personal loans from Enron. Mr. Lay received more than $70 million in cash during one 12-month period and repaid the loan with his own Enron stock. Wall Street Journal (May 3, 2002).
   WorldCom's board extended its former chief executive, Bernard Ebbers, a personal loan of $366.5 million. Richard Waters, Pressure Forces Ebbers to Leave WorldCom, Financial Times (May 1, 2002).
   Adelphia Communications made $3.1 billion in off-balance sheet loans to its founder, John Rigas, reportedly without the knowledge of its shareholders or board. Richard Waters, Rigas Agrees to Give Up Adelphia, Financial Times (May 24, 2002).
   In April, Qwest revealed in its proxy statement that it lent $4 million to President and COO Afshin Mohebbi. It was reported that a portion of the loan will be used to pay the premium on his life insurance policy. Jim Seymour, Nacchio Dip: Qwest CEO Delays His Pay Raise, TheStreet.com (April 9, 2002).
   Global Crossing Ltd. eliminated or substantially reduced the terms of $18 million worth of personal loans the company made to two of its top executives in the months before the telecommunications company filed for bankruptcy protection, regulatory filings show. Elizabeth Douglass, Global Eased Loan Terms Compensation: The firm forgave or reduced advances to executives in the months before its Chapter 11 filing, L.A. Times (February 7, 2002).
   AES Corp., a power producer, granted $1.5 million personal loans to both its chief financial officer and an executive vice president in October to prevent them from being forced to immediately sell company shares due to margin calls. AES Makes Loans To Two Executives To Cover Margin Calls, Wall Street Journal (March 26, 2002).

FN60 Breeden Testimony, February 12, 2002.

FN61 Millstein Testimony, February 27, 2002.

FN62 Bowsher Testimony, March 19, 2002.

FN63 Bowsher Testimony, March 19, 2002.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205                                                        Page 70

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**

FN64 Bowman Testimony, March 20, 2002.

FN65 Bowman Testimony, March 20, 2002.

FN66 Bowman Testimony, March 20, 2002.

FN67 Breeden Testimony, February 12, 2002.

FN68 Letter from Eliot Spitzer, Attorney General of the State of New York, to
Chairman Paul S. Sarbanes, June 5, 2002.

FN69 Spitzer Letter, June 5, 2002.

FN70 Testimony of John C. Coffee, Jr., Adolf A. Berle Professor of Law, Columbia
University Law School, before the Committee on March 5, 2002 (internal citations
omitted).

FN71 Seligman Testimony, March 5, 2002.

FN72 Coffee Testimony, March 5, 2002 (internal citations omitted).

FN73 Bowman Testimony, March 20, 2002.

FN74 Testimony of Michael Mayo, Managing Director, Prudential Securities, Inc.,
before the Committee on March 19, 2002.

FN75 Turner Testimony, February 26, 2002.

FN76 Mayo Testimony, March 19, 2002.

FN77 Coffee Testimony, March 5, 2002.

FN78 Coffee Testimony, March 5, 2002 (internal citations omitted).

FN79 Spitzer Letter, June 5, 2002.

FN80 Coffee Testimony, March 5, 2002.

FN81 Coffee Testimony, March 5, 2002.

FN82 Seligman Testimony, March 5, 2002.

FN83 Bowman Testimony, March 20, 2002.

FN84 Bowman Testimony, March 20, 2002.

FN85 Bowman Testimony, March 20, 2002.

FN86 Bowman Testimony, March 20, 2002.

FN87 Mayo Testimony, March 19, 2002.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)
**(Cite as: S. REP. 107-205)**


FN88 Levitt Testimony, on February 12, 2002.

FN89 Spitzer Letter, June 5, 2002.

FN90 Whitehead Testimony, March 19, 2002.

FN91 Walker Testimony, March 5, 2002.

FN92 Hills Testimony, February 12, 2002; Williams Testimony, February 12, 2002;
Breeden Testimony, February 12, 2002; Levitt Testimony, February 12, 2002.

FN93 Breeden Testimony, February 12, 2002.

FN94 Coffee Testimony, March 5, 2002.

FN95 Coffee Testimony, March 5, 2002.

FN96 Turner Testimony, February 26, 2002.

FN97 Copeland Testimony, March 14, 2002.

FN98 SEC budget testimony for FY 2003 gives the number as over 17,000, Testimony
Concerning Appropriations for Fiscal 2003 by Harvey L. Pitt, Chairman, U.S. Secur-
ities & Exchange Commission, before the Subcommittee on Commerce, Justice, State,
and the Judiciary, Committee on Appropriations, United States House of Represent-
atives, April 17, 2002, while SEC Release 33- 8109 gives the number as 16,242, SEC
Release 33-8109 (Proposed Rule: Framework for Enhancing the Quality of Financial
Information Through Improvement of Oversight of the Auditing Process), ht-
tp://www.sec.gov/rules/proposed/33- 8109.htm at 71.

FN99 See Proposed SEC Release 33-8109 at footnote 111, page 111.

S. REP. 107-205, S. Rep. No. 205, 107TH Cong., 2ND Sess. 2002, 2002 WL 1443523
(Leg.Hist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

U.S. DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

JAN 29 2003

FILED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>In re Tyco International, Ltd.</u>
<u>Multidistrict Litigation (MDL 1335)</u>

MDL DOCKET NO. 02-1335-3
ALL CASES


<u>PRACTICE AND PROCEDURE ORDER NO. 5</u>


The New York County District Attorney has intervened in this multidistrict litigation proceeding and seeks a stay of all discovery until he completes a parallel grand jury investigation and prosecutions of three of the defendants in this case. Several of the defendants also seek to stay discovery until I rule on their anticipated motions to dismiss. They argue that a stay is required in the Securities Actions by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 (b)(3)(B) (1997) ("stay provision"), and that prudence warrants a similar stay in the ERISA and Derivative Actions. I determine that the District Attorney's concerns can better be addressed by

targeted requests for protective orders, that document discovery should proceed in the ERISA and Derivative Actions, and that documents produced in the ERISA and Derivative Actions should be shared with counsel in the Securities Actions.

I.

A.   **The Civil Cases**

Plaintiffs in various jurisdictions have filed more than 30 actions against Tyco and its directors and officers.  These cases were consolidated by the Judicial Panel on Multidistrict Litigation and assigned to this court for case management.  The consolidated cases are grouped into one of the following three categories, depending upon the theory of liability asserted by each suit:  (1) Securities Actions; (2) ERISA Actions; and (3) Derivative Actions.

The Securities Actions plaintiffs allege that the defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, see, e.g., 15 U.S.C. §§ 78j, and Rule 10b-5 promulgated thereunder, by making material misrepresentations and failing to disclose material information regarding Tyco's accounting

-2-

practices and financial condition.  They further allege that certain Tyco executives violated §20A of the Exchange Act, see 15 U.S.C. § 78t-1, by selling large amounts of Tyco common stock while in possession of material, non-public information.

The ERISA Action plaintiffs, who were employed by Tyco and participated in its retirement plan by investing in Tyco stock, allege that the defendants violated provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et. seq. (1999 & Supp. 2002).  Specifically, they contend that the defendants breached their fiduciary duties, mismanaged Tyco's retirement plan, made material misrepresentations and failed to disclose material information regarding Tyco's accounting practices and financial condition.  See 29 U.S.C. § 1104.

Lastly, the Derivative Action plaintiffs contend that Tyco's directors and officers breached their fiduciary duties by, among other things, failing to properly monitor Tyco's accounting practices and oversee its financial well-being.  The Derivative Action suits also include allegations that the directors and executives committed corporate waste and grossly mismanaged the corporation.

-3-

B.    **The Criminal Cases**

The New York County District Attorney has obtained an indictment against Dennis Kozlowski, Tyco's former Chief Executive Officer, and Mark Swartz, Tyco's former Chief Financial Officer.  Both men are charged with one count of Enterprise Corruption under New York Penal Law Section 460.20(1)(a), one count of Conspiracy in the Fourth Degree, under New York Penal Law Section 105.10(1), and one count of Violating New York General Business Law Section 352-C(5).  The indictment also charges Kozlowski and Swartz with numerous counts of Larceny in the First Degree under New York Penal Law Section 155.42 and Falsifying Business Records in the First Degree under New York Penal Law Section 175.10.  The District Attorney has also obtained an indictment against Mark Belnick, Tyco's former general counsel, charging him with six counts of Falsifying Business Records.  The District Attorney further represents that he is conducting a grand jury investigation that could lead to additional charges against the three defendants and others.

It is undisputed that the pending charges and the grand jury investigation arise from the same events that are at issue in this proceeding.

-4-

II.

A.    **The District Attorney's Request for a Stay**

The District Attorney argues that if I allow discovery in this proceeding, it "will likely lead to the premature disclosure of sensitive information that could subvert the criminal prosecutions." Aff. of Mark Frasier Schell at ¶ 16. More particularly, he alleges that: (1) evidence of value in the criminal cases will become lost or corrupted; (2) witnesses in criminal cases will use discovery information to commit perjury; (3) witnesses in the criminal cases will be overburdened by having to respond to discovery in this proceeding; (4) my rulings might be inconsistent with rulings made by the judge in the criminal cases; and (5) issues will arise concerning the defendants' Fifth Amendment rights. While I am sensitive to these concerns, I am not persuaded that they warrant a blanket prohibition on discovery.

First, I am not proposing to allow the parties to take depositions or engage in other testimonial forms of discovery. Thus, there is no danger that witnesses will be discouraged from cooperating in the criminal cases because of demands placed on

-5-

them in responding to deposition requests. Nor is it likely that discovery will affect the defendants' Fifth Amendment Rights.[1] Second, the District Attorney's unsupported assertion that evidence of value in the criminal cases will become lost or corrupted if I allow document discovery to proceed is not persuasive. If anything, document discovery will tend to preserve evidence which might otherwise be overlooked or destroyed. Third, I foresee little danger of inconsistent rulings in the state and federal cases. Other than on discovery issues, the only significant rulings that I will likely make in this case before the criminal cases are resolved will concern defendants' anticipated motions to dismiss and plaintiffs' anticipated motions for class certification. These rulings are unlikely to have any bearing on the criminal cases. Moreover, to the extent that I may be asked to rule on discovery disputes, I will pay substantial deference to any related rulings by the state court. Thus, the risk of inconsistent rulings is minimal.

I acknowledge the District Attorney's concern that witnesses in the criminal cases may exploit information obtained through

---

[1] It is significant in this regard that both Kozlowski and Belnick oppose the District Attorney's request for a stay.

discovery in this case to commit perjury.  This concern, however,
must be balanced against the significant interest that the
parties in this proceeding have in obtaining an expeditious
resolution of the pending claims.  Given these competing
interests, document discovery should proceed.  The District
Attorney should be notified of any discovery requests and given
an opportunity to seek targeted protective orders pursuant to
Fed. R. Civ. P. 26(c) to address any particularized concern that
giving the parties access to certain documents will permit
witnesses in the criminal cases to commit perjury.

B.  **Defendants' Request for a Stay**

       All of the defendants except Kozlowski and Belnick seek to
stay discovery until I resolve their anticipated motions to
dismiss.  Their argument can be summarized as follows:  (1) the
Securities Actions assert claims that are subject to the stay
provision; (2) the ERISA and Derivative Actions arise from the
same course of conduct as the Securities Actions; and (3)
allowing discovery in the ERISA and Derivative Actions will
undermine any stay in the Securities Actions because discovery
produced in the former actions inevitably will benefit the

-7-

plaintiffs in the Securities Actions.  While I accept defendants'
contention that the PSLRA ordinarily requires a stay of discovery
in securities actions, I do not agree that a similar stay is
warranted in the ERISA and Derivative Actions.

Congress enacted the stay provision to deter plaintiffs from
filing frivolous securities claims in the hope that either the
high cost of responding to discovery will force corporate
defendants to settle or that discovery will reveal information
that can be used to save an otherwise deficient claim from
dismissal.  See In Re WorldCom, Inc. Securities Lit., 2002 WL
31628566*4 (S.D.N.Y. 2002) (summarizing stay provision's
legislative history).  While the stay provision only applies to
federal securities claims, see 15 U.S.C. § 78u-4(b)(3)(B), its
purpose clearly would be undermined if litigants could circumvent
the stay by using litigation tactics.  To partially address this
concern, Congress amended the PSLRA to authorize a federal court
to stay discovery in parallel state court actions, see 15 U.S.C.
§ 78u-4(b)(3)(D) (Supp. 2002).  Further, at least one circuit
court has held that discovery in a case subject to the stay
provision should also be stayed with respect to supplemental

-6-

state law claims, see SG Cowen Sec. v. U.S. Dist. Ct. for N.D. of Ca., 189 F.3d 909, 913 n.1 (9th Cir. 1999).

I would not hesitate to stay discovery in the ERISA and Derivative Actions if I were to determine that the plaintiffs filed them in an attempt to circumvent the stay provision. The evidence, however, does not support such a conclusion. The ERISA and Derivative Actions were filed as separate lawsuits by different counsel on behalf of different plaintiffs. The claims asserted in those actions are not frivolous and defendants do not claim that plaintiffs' counsel are working together to thwart the stay provision. Absent evidence of collusion, I will not stay discovery in the ERISA and Derivative Actions merely because they have been consolidated with the Securities Actions for pretrial purposes.

I am also unpersuaded by defendants' contention that a stay is warranted because the plaintiffs in the Securities Actions will derive an indirect benefit from the fact that I am allowing limited discovery in the ERISA and Derivative Actions. I recognize that if plaintiffs in the ERISA and Derivative Actions uncover new evidence of wrongdoing by the defendants, they are

-9-

likely to amend their complaints and thereby provide the plaintiffs in the Securities Actions with information that may be useful in drafting their own amended complaint. I fail to see, however, how such a result will encourage plaintiffs in future cases to file frivolous securities claims. In any event, any interest that the defendants have in delaying discovery does not override the legitimate interest that the plaintiffs in the ERISA and Derivative Actions have in obtaining an expeditious resolution of their claims.

A more difficult question is presented by plaintiffs' request in the Securities Actions for access to documents produced in the ERISA and Derivative Actions. The stay provision permits "particularized discovery" in an action subject to the stay to avoid "undue prejudice." 15 U.S.C. § 78u-4(b)(3)(B). Other courts have invoked this exception to give plaintiffs in securities cases access to information that has been made available to investigative agencies and plaintiffs in other actions. See WorldCom, 2002 WL 31628566 at *4-5; In Re Enron Corp. Sec. Derivative and ERISA Litig., 2002 WL 31845114 *1-2 (S.D. Tex. 2002). These courts reason that such discovery is

-10-

"particularized" because it is limited to the discovery documents that have already been produced to others and it prevents "undue prejudice" by placing all potential claimants on an equal footing with respect to discovery. See id. This approach makes sense in a case like this where (1) the Securities Action plaintiffs would be at a serious disadvantage if they are denied access to documents that are produced to the other plaintiffs and government investigators; (2) the defendants will not incur any additional costs if the Securities Actions plaintiffs are given access to the documents; (3) keeping all parties on an equal footing with respect to discovery serves important case management interests in this complex litigation; and (4) none of the claims at issue are frivolous.

**CONCLUSION**

For the reasons set forth in this Practice and Procedure Order, I grant plaintiffs' requests in the ERISA and Derivative Actions to engage in document discovery. Any documents produced in the ERISA and Derivative Actions shall also be made available to the plaintiffs in the Securities Actions. The District

-11-

Attorney shall be served with copies of any discovery requests.

SO ORDERED.

Paul Barbadoro
Chief Judge

January 30, 2003

cc:  Counsel of Record

-12-